Fc1dvid1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   VIDIVIXI, LLC and FRANCIS T.
    BRADLEY,
4
                    Plaintiffs,              New York, N.Y.
5
              v.                             15 Civ. 7364(JGK)
6
    MARK ANTHONY GRATTAN and MARK
7   GRATTAN DESIGN & BUILD,

8                   Defendants.

9   ------------------------------x

10                                           December 1, 2015
                                             9:13 a.m.
11
    Before:
12
                         HON. JOHN G. KOELTL,
13
                                             District Judge
14
                             APPEARANCES
15
    GUZOV OFSINK LLC
16       Attorneys for Plaintiffs
    BY:  MATTHEW ADAM PEK
17
    RAO LAW GROUP
18       Attorneys for Defendants
    BY:  SIDDARTHA RAO
19       BRIAN BOHM

20

21

22

23

24

25

Fc1dvid1

1          (Mr. Pek not present)

2          THE CLERK:  Vidivixi versus Grattan.

3          Counsel, please state who you are for the record.

4          MR. RAO:  Good morning, your Honor.  This is Sidartha

5    Rao.  Next to me is my colleague Brian Bohm and next to Brian

6    is Mark Grattan.  We're here representing Mark Grattan and Mark

7    Grattan Design & Build defendants.

8          THE COURT:  OK.  Good morning.

9          (Pause)

10          (Time noted at 9:27 a.m., Mr. Pek present)

11          MR. PEK:  My apologies, your Honor.

12          THE COURT:  Could we get appearances from the

13    plaintiff?

14          THE CLERK:  May I have the appearances for the

15    plaintiff?

16          MR. PEK:  Matthew A. Pek, P-e-k, counsel for

17    plaintiffs Vidivixi LLC and Francis Timothy Bradley.

18          Good morning, your Honor.

19          THE COURT:  Good morning.  The hearing was scheduled

20    for 9 o'clock and it's now 28 after 9.

21          MR. PEK:  I realize that, your Honor.  And I would for

22    what it's worth and I can't make up that lost time, we're happy

23    to waive whatever time has been lost from our case in chief's

24    time.

25          THE COURT:  What is the explanation?

MR. PEK:  The explanation is I made a mistake and confused the time of the original hearing which I was not present for, which was 9:30, for 9 a.m., and I tried to coordinate with two of my witnesses who had come from New Jersey and to let them know --

THE COURT:  What?

MR. PEK:  I have been trying to coordinate and as soon as I had realized it was 9 a.m., at the last minute I contacted the two witnesses coming from New Jersey to let them know to -- that essentially we would be late.  And it was an oversight on my part, your Honor.  I don't have any excuse or meaningful justification, and I did my best by contacting the courtroom and chambers but, nevertheless, I was late and for that I apologize.

THE COURT:  All right.  I always tell lawyers not to apologize because apologies don't do any good.  Apologies don't make briefs that are late timely.  They don't make appearances timely.  What I do ask lawyers is to assure me that it won't happen again.  It won't happen again, will it?

MR. PEK:  It will not happen again, your Honor.  I can give you that assurance.

THE COURT:  All right.  We're here for a preliminary injunction hearing.  I'll listen to openings that either party would like me to listen to.  Plaintiff.

MR. PEK:  Good morning, your Honor.  May it please the

Fc1dvid1                         Opening - Mr. Pek

1   Court:

2           Today we are here on an evidentiary hearing in

3   connection with plaintiffs' motion which was filed by order to

4   show cause by which and through we commenced this action

5   seeking immediate injunctive relief, as the Court is aware.

6   What plaintiffs intend to prove and what I, as counsel, will

7   intend to prove through live witness testimony and through

8   offering a handful, not a very voluminous number of premarked

9   exhibits, is simply that a preliminary injunction under the

10  circumstances of this case in particular and particularly in

11  light of documents that plaintiffs have obtained by way of

12  several non-party subpoenas that plaintiffs have served -- as

13  the Court is also likely aware, as they were the subject of two

14  motions to compel -- that a preliminary injunction and

15  plaintiffs respectfully submit that ultimately a permanent

16  injunction is absolutely warranted based on the facts which we

17  intend to show are not in dispute and cannot be refuted and

18  simply do not comport with the defendants' opposition as filed

19  in connection with our original motion.

20          The important thing for -- strike that.  It is most

21  important for myself, as plaintiffs' counsel, and for my

22  client, Mr. Francis Timothy Bradley, who does go by Tim

23  Bradley, the name by which I will be addressing him, that we

24  focus today not as much as what has been the focus of the most

25  recent proceedings, which have been somewhat of a full-scale

Fc1dvid1                         Opening - Mr. Pek

1    discovery effort on a very short-term expedited basis, and to

2    focus instead on that very motion by which we commenced this

3    action and the specific language in our order to show cause

4    seeking preliminary injunctive relief.

5              Above all, what plaintiffs intend to show and

6    demonstrate at this evidentiary hearing is that a preliminary

7    injunction enjoining the defendant and any and all parties from

8    any use of the Vidivixi mark, any colorable imitations thereof

9    or any confusingly similar mark in any variant in connection

10   with the sale or offer for sale of any furniture or furniture

11   products or fabrication services is absolutely warranted given

12   most of all the irrefutable I would respectfully submit and

13   compelling instances of irreparable harm that my client --

14   clients, rather, have suffered prior to our filing section and

15   including up and through this hearing itself.

16             Absent the relief requested, my clients will continue

17   to suffer irreparable harm, and seeing as how the mark is I

18   would respectfully submit not disputed to be owned by any other

19   entity than the de facto partnership between the parties, that

20   the mark itself be properly preserved, the status quo properly

21   preserved unless and until the defendants can show that a

22   preliminary injunction is not warranted.  We, of course, bear

23   the burden of proof, and we respectfully submit that the

24   evidence that we will put forward will satisfy the criteria for

25   a preliminary injunction to be granted.

Fc1dvid1                          Opening – Mr. Rao

1          That is all.

2          THE COURT:  All right.  Defendants.

3          MR. RAO:  Thank you, your Honor.  May it please the

4    Court:

5          As plaintiff mentioned, plaintiff bears the burden of

6    proof in order to obtain a preliminary injunction.  So the

7    Court is well aware there are four factors at issue here.

8          Focusing for the time being on the second factor,

9    because I think that's the easiest to understand on these

10   facts, the irreparable harm issue.  At the heart of this case

11   is an allegation of sales of furniture allegedly made without

12   plaintiff's knowledge and allegedly causing harm to plaintiff.

13   Defendants respectfully submit that to the extent the issue is

14   sales of furniture, that is pure money damage.  Plaintiffs will

15   be unable to show irreparable harm.

16         As to the trademark issues upon which this case was

17   commenced, plaintiffs initially commenced this case claiming

18   that Vidivixi, LLC was an owner of the trademark and that

19   defendant Mark Grattan was a mere independent contractor of

20   Mr. Bradley.  The evidence has shown otherwise.  Plaintiff has

21   since filed an amended complaint, and I just heard plaintiff's

22   counsel say it is undisputed that the mark, if it's owned, is

23   owned by the de facto partnership.  That de facto partnership

24   is not a plaintiff in this action.  In fact, there has been no

25   showing and there will be no showing that either of the

Fc1dvid1                     Opening - Mr. Rao

1    plaintiffs have an exclusive ownership interest in the mark.

2              Trademark law, as this Court is well aware, requires

3    competition of some sort of use in commerce.  It would be

4    somewhat bizarre -- and I await plaintiff's presentation of

5    proof -- to demonstrate that Mr. Grattan, who is a business

6    partner of Mr. Bradley under the Vidivixi partnership, in some

7    way infringed Mr. Bradley's rights in the mark by identifying

8    Vidivixi furniture as Vidivixi furniture.

9              Excuse me, your Honor.

10             As to plaintiffs' other claims, we've provided

11   briefing outlining our legal arguments.  I won't belabor the

12   Court on those points.  But briefly, the complaint and the

13   affidavit of Mr. Bradley are internally inconsistent in that

14   they on the one hand allege a partnership and on the other hand

15   allege an independent contractor relationship.  This is a fatal

16   problem in the case.

17             As this Court is aware, based on the procedure and the

18   posture that we're in today, this case really is failure to

19   negotiate a partnership agreement.  This is not a trademark

20   case.  It's been styled as a trademark case, but the

21   unfortunate truth of the matter is that my client tried to

22   enter into a partnership agreement with Mr. Bradley in order to

23   share the profits of those very sales of which plaintiffs now

24   complain.  That attempt was rejected, and rather than engage in

25   negotiation plaintiffs have pursued a litigious and, we

1    respectfully submit, unreasonable approach to simply finding a

2    resolution to the partnership dispute.

3              Briefly as to the other factors, the equities here

4    clearly favor my clients, Mark Grattan and Mark Grattan Design

5    & Build.  As the evidence -- documentary evidence and witness

6    testimony will show, Mark Grattan was effectively running the

7    business of Vidivixi, whether it be fabricating the furniture,

8    marketing the pieces, networking with others in the design

9    industry, handling press inquiries or in any way managing the

10   operational aspects of the business.

11             The fact that Mark Grattan also feels his sales

12   increase is merely consistent with the status quo as it had

13   existed for approximately two years.  There is nothing

14   extraordinary about that.  The only thing extraordinary in this

15   case is plaintiffs' request that Mr. Grattan stop marketing,

16   promoting and attempting to sell Vidivixi furniture, which in

17   fact he's been doing for approximately two years.  Clearly, an

18   injunction would harm Mr. Grattan as a furniture seller and as

19   a person who has put two years of work into Vidivixi, whereas

20   denying the injunction does not harm plaintiffs since

21   Mr. Grattan had offered and continues to offer to negotiate

22   some sort of profit sharing agreement by which plaintiffs can

23   be repaid the capital that they allege to have invested.

24             Finally, plaintiffs have shown no public interest for

25   granting the injunction in this case.  The Court is aware that

Fc1dvid1

1    plaintiffs registered an LLC and I believe a week or

2    approximately two weeks before commencing this case.  That LLC

3    did not exist during the time period when the furniture was

4    created, the logos were designed, the website was designed, or

5    any of the work was done relating to Vidivixi.  There has been

6    no showing and, to my knowledge, there is no evidence that at

7    any time Mr. Bradley or Mr. Grattan assigned any rights to the

8    LLC.  So the LLC is simply a legal filing, at best, clearly

9    postdates relevant events, and it clearly lacks any ownership

10   interest absent any assignment in any of the intellectual

11   property or tangible property of the business Vidivixi.

12          And, moreover, plaintiff's trademark filing, as we've

13   already pointed out to the Court, is neither issued nor is it

14   likely to issue since it was filed on behalf of a nonexistent

15   entity, Francis T. Bradley, LLC as an intend-to-use mark.  At

16   best, plaintiff may allege some sort of common law trademark

17   rights, but as I've pointed out and as plaintiffs' counsel has

18   already pointed out, those would be owned by the de facto

19   partnership between Mr. Grattan and Mr. Bradley.  So there is

20   no public interest in granting the injunction in this case.  If

21   anything, as the evidence shows, Mr. Grattan is the creative

22   force behind the design of the furniture, the website, and the

23   logos.  Public interest would favor not granting an injunction

24   to protect the rights of the creator in their creative works.

25          Thank you, your Honor.

Fc1dvid1                          Bradley – direct

1              THE COURT:  All right.  The plaintiffs can call their

2      first witness.

3              MR. PEK:  The plaintiffs call plaintiff Tim Bradley to

4      the witness stand as the plaintiffs' first witness.

5       FRANCIS TIMOTHY BRADLEY,

6           the plaintiff herein,

7           having been duly sworn, testified as follows:

8              THE CLERK:  You may be seated.

9              Please state your full name, spell your last name --

10     or please state your full name for the record.

11             THE WITNESS:  Francis Timothy Bradley.

12             THE CLERK:  Thank you.

13             THE COURT:  All right.  Mr. Pek, you may examine.

14     DIRECT EXAMINATION

15     BY MR. PEK:

16     Q.  Good morning, Mr. Bradley.

17     A.  Good morning.

18     Q.  If I may call you Tim for --

19             THE COURT:  No.

20             MR. PEK:  Understood.

21             THE COURT:  No.  We use last names.

22             MR. PEK:  Understood, your Honor.  Thank you.

23     BY MR. PEK:

24     Q.  Mr. Bradley, would you inform the Court about the genesis

25     of Vidivixi insofar as it concerns yourself and the defendant

Fc1dvid1                          Bradley - direct

1   Mark Grattan.

2   A.  From the beginning or from --

3   Q.  Yes, from the beginning.

4   A.  So Vidivixi was an idea that was thought up during another

5   project with an artist by the name of Mat Nichols.  It revolved

6   around sharing information between artists and designers and

7   exercising that information to come to a solution that would be

8   greater than being able to work alone and achieve those same

9   results.  So it was the start of a practice of multiple

10  theories being applied to different forms of object making.

11  Q.  Mr. Bradley, are you aware of the allegations set forth by

12  the defendants in this action as set forth in their answer to

13  plaintiffs' amended complaint?

14  A.  Yes.

15  Q.  Do you remember approximately the date, time and year, to

16  the best of your recollection, when the -- rather, strike that,

17  when yourself and Mr. Grattan decided to collaborate your

18  efforts and to engage in business under the Vidivixi name?

19  A.  Yes.

20  Q.  And when was that, approximately?

21  A.  Well, I guess the summer of 2013 I was giving Mark some

22  cash to be able to use -- have access to some of the machines

23  in the wood shop to finish a project that was shaped canvases

24  that I fabricate for an artist and I needed two machines that

25  he had in the wood shop.  So I paid him some money so I could

Fc1dvid1                         Bradley - direct

```
1     have access.  And at the time I signed like a, you know, an
2     insurance waiver for Walter so I could use stuff in the shop.
3             And at that time the artist also commissioned a piece
4     of furniture for his new house, so I asked Mark if he would
5     like to collaborate on that.  So we started doing that.
6             And roughly around the same time another artist was
7     having a show in Brussels and offered or asked if I would be
8     interested in partaking in the show and if I could contribute a
9     piece of furniture with an abstraction.  Basically before --
10    you know, in 2013, I made a sculpture of a chair that was in a
11    show at the Brant Foundation in Connecticut, and within
12    discussion around that piece it was sort of made clear that I
13    wanted to start exploring what Vidivixi would be, you know.
14    Q.  Just for the purposes of maintaining a clear record, you
15    referenced just now an individual by the name of Walter.  Would
16    you just --
17    A.  Walter Goodman.  He runs and manages the Sunset Park
18    Woodworker wood shop space.
19    Q.  And is that wood shop space owned or operated, rather, by
20    Mr. Goodman?
21    A.  Yes.  Yeah.
22    Q.  And is it your understanding that the wood shop -- or,
23    rather, how Mr. Goodman runs it is to rent out space to
24    woodworkers?
25    A.  Correct, yeah.
```

Fc1dvid1                          Bradley – direct

1                 MR. RAO:  Your Honor, I apologize but I believe

2       plaintiffs' witnesses are in the courtroom and would object to

3       their being in the courtroom and present while Mr. Bradley

4       testifies.

5                 THE COURT:  Yes.  If there are witnesses who are going

6       to testify, they should go to the witness room.  Each side can

7       have its party present but nonparty witnesses should wait in

8       the witness room.  It is in the hallway.  And if it should be

9       closed, I will have it opened.  Thank you.

10                (Witnesses not present)

11                MR. PEK:  I apologize for that, your Honor.

12      BY MR. PEK:

13      Q.  Mr. Bradley, how would you describe the Vidivixi

14      enterprise?

15      A.  Well, it's supposed to stand for a new way of applying

16      shared knowledge towards design and the development of design

17      language, contemporary design language.

18      Q.  And who would you identify as the contributors to, or,

19      rather, to and of the Vidivixi name and what it produces?

20      A.  Well, I mean, there have been a number of people that

21      contribute in a number of different ways.  You know, there is

22      the dialogue that the end result resolves around, the dialogue.

23      If it wasn't for the dialogue between the artist and designers,

24      we wouldn't be able to reach sort of a third entity of result,

25      like that's -- it kind of revolves around the idea that if

Fc1dvid1                         Bradley - direct

you're working with two or more minds, then you can kind of

create, you know, if you are working with two people, then you

can create a third, you know, umm, identity through the work.

And I guess it comes down to that aspect of, you know,

contribution, and then there's people that step in and help the

best they can in every way and in what way they have to offer.

So there is a lot of, you know, me doing favors so you can do

me a favor type of thing going on.

        But you have fabricators.  We have designers that we

collaborate with, and we have, you know, people like Tony that

are there a hundred percent of the time in every area filling

the void so we don't collapse and that we can actually succeed.

That passion towards the cause that Vidivixi is fighting for is

extremely necessary and valuable; it is one of the most

valuable assets that make this possible.

Q.  Can you, in your own words and as briefly I think as you

are able, summarize what you regard as being your contributions

to the business of Vidivixi?

A.  Yes.  I mean, Vidivixi is a vision that I had before I

started Vidivixi, and Vidivixi is a project that I have been

putting every aspect of my life towards to accomplish it.

Raising money, building and designing the products, research

and development, relevance -- research and relevance, you know,

the what and why, you know, what is it that we're making and

why is it relevant to even being made and, I mean, everything

Fc1dvid1                          Bradley - direct

1   else in between, managing the outsource fabrication, making

2   sure everyone is paid, you know.

3   Q.  Did you contribute any money to the Vidivixi business?

4   A.  Yes.

5   Q.  And just so we can narrow the timeframe here, about,

6   looking backwards from this date, how old or how long, rather,

7   has Vidivixi been engaged in business?  And by that I mean

8   seeking to make money and earn a profit.

9   A.  I think like the end of 2013 into 2014 is when we started

10  sort of partaking in, you know, the design scene.

11  Q.  Do you have an approximate figure, or, rather, do you have

12  in your head or in your bank statements or anywhere else, do

13  you know how much you've actually contributed in terms of

14  capital contributions, how much money you have invested?

15          MR. RAO:  Objection.  It is a compound question.

16          THE COURT:  Overruled.

17  A.  Roughly around like $79,933 or something.

18  Q.  And Vidivixi, as you've explained it, seems to be -- strike

19  that.

20          What was it that began Vidivixi in 2013?

21  A.  A conversation between two artists, Mat Nichols and myself,

22  while we were designing a store on the Lower East Side called

23  Community 54.  We talked about working together and also

24  working for other artists and apprenticing and just sort of the

25  journey through developing yourself as an artist into a career

Fc1dvid1                    Bradley - direct

1    which every artist wants to be.

2            We both -- we spoke a lot about the academic structure

3    and, you know, the art world and then also the sales, the

4    scene, and how if you are involved in both sides of the art

5    world, behind the scenes and in the forefront, you are revealed

6    to a lot and you realize that a lot is missed.  So we wanted to

7    figure out a way to communicate for the end consumer to

8    understand that there is a lot more about making something than

9    just making it because you think it's cool or it looks nice or,

10   you know, it is a cool idea.  Just we're trying to really

11   explore what happened in mid-century modernism and architecture

12   and design and why the '80s wasn't able to really do much for

13   it and why the '90s nothing happened and where do we stand now

14   in art and design.

15           And the only place that we do stand is that if you can

16   make a sale, you're an artist, and that's not really true

17   anywhere else other than the art world, the market scene.  And

18   so it's sort of like a discussion among our peers about sharing

19   dialogue, sharing information, and actually executing maybe a

20   theory that would be applied to making a body work in sculpture

21   that an artist that I, you know, rub shoulders with or maybe

22   apprentice for but his theories are in my head and how can I

23   exercise those theories without stepping on toes but actually

24   further that -- further that in a different direction so it's

25   still an object but it's a different functioning object now but

Fc1dvid1                     Bradley - direct

1   the same rules are applied and now there is a different outcome

2   but it's more progressive and it's a new outcome.

3   Q.   Who would you identify as the faces or the leaders or the

4   managers or members that comprise or embody Vidivixi?  Whose

5   business have you understood it to be?

6   A.   Well, I wanted it to be a partnership or a collaborative

7   the way I had originally -- it was supposed to work when I was

8   discussing it with Mat Nichols.  Unfortunately, he moved out of

9   the state.  He had an injury and moved back to the West Coast.

10  But there was always room to work together again in the future.

11  I needed to get this up off the ground somewhat sustainable

12  before I can really -- you know, I was taking the risks.  They

13  were -- I was feeling the risks, too.  So it started to

14  discourage me about involving anyone else, although we did.

15         But there is myself.  There is Mark, who I, you know,

16  invited in to collaborate with.  There's Tony, Anthony Bunda

17  and Mat LaBarbiera, the photographer.  There is other friends

18  that helped with photography, Dom Smith.  I mean, Nate Lowman

19  was someone who commissioned some of the pieces to be

20  developed, and we couldn't have done that without him.  He also

21  is someone that supports my work a great deal.  So without that

22  support I wouldn't have been able to raise money and contribute

23  it to Vidivixi.  Aaron Aujla is another artist, Nate Lowman,

24  Q.   Mr. Bradley, thank you for that background.  I would like

25  to turn, shift gears, and hear a little bit about your history

Fc1dvid1                          Bradley - direct

with Mark Grattan, how you came to meet, when that was, and how

it was that he became a part of the Vidivixi business or

enterprise.

A.  Well, I was doing a project and I needed some space.  I met

Mark at Pratt Institute when we were studying.  So I've known

him since then.  We became friends at Pratt and I graduated in

2005.  Since 2005, we've, you know, seen each other the same

places sometimes and keep in touch.

        When I needed access to the wood shop, you know, I

knew Mark needed work so I paid him to let me use the space.

And then with that, you know, I invited him in to doing

collaborative work together.  We were working on the piece for

Nate, the Jumping Jack Credenza, and then a small bookshelf

that sort of had an abstraction attitude.  It just had a rod

going through the center sort of causing some dysfunction, and

that was sent to Brussels for a show that Aaron Aujla had,

which was an apartment that was fully furnished with slightly

abstracted objects but were semifunctional and it was rented on

Airbnb, as I showed you in the book.

Q.  Is it safe to say you forged a friendship with Mr. Grattan

while you were enrolled at Pratt with Mr. Grattan?

A.  Yes.  We were goods friends.

Q.  And --

        THE COURT:  What was your area of concentration when

you were at Pratt?

Fc1dvid1                         Bradley - direct

1          THE WITNESS:  Sculpture and art history.

2          THE COURT:  And after you got out of Pratt, what did

3     you do in terms of your work in the art world?  Were you an

4     active designer, sculptor, woodworker?  Just tell me about what

5     you did.

6          THE WITNESS:  I worked for a woman by the name of

7     Michelle Maccarone.  She has a gallery on Greenwich and a

8     gallery in L.A. now.  Yeah, I worked for her for about four

9     years and it was my apprenticeship.  I decided to work with her

10    instead of going to grad school because she was going to give

11    me an opportunity to work side-by-side with the best artists in

12    the world that I could get connected to any sort of --

13         THE COURT:  What was it that you did in your

14    apprenticeship?

15         THE WITNESS:  I would project manage the shows.  I

16    would rebuild the gallery.  I would do anything from mop the

17    floor, you know, to fix the toilet to do actual conceptual

18    development to help further the well-being of the artists that

19    I was working with, like their show and their work.  So a lot

20    of custom fabrication on the spot.  Anything from concrete,

21    steel, wood, stone, interior, you know, building structure

22    walls, perfect for steam walls, lighting, a little bit of

23    electrical, anything that I could basically do without having

24    like, you know, getting caught without a license.  Basically

25    general contracting for her gallery, and then apprenticing with

Fc1dvid1                          Bradley - direct

1   the artists that I really wanted to know their work better.  So

2   Corey McCorkle is an architect and a sculptor that I

3   apprenticed for.

4              THE COURT:  So architecture and sculpture?

5              THE WITNESS:  Yeah.  I don't have a degree in

6   architecture but I love architecture and I love structure.

7              THE COURT:  OK.  Thank you.

8   BY MR. PEK:

9   Q.  Mr. Bradley, you mentioned you attended Pratt and met

10  Mr. Grattan at Pratt Institute.  Do you and Mr. Grattan have

11  different or overlapping areas of expertise or a primary common

12  trade, as you just explained to the Judge?  Are you aware that

13  in connection with this action Mr. Grattan has submitted a

14  declaration describing you as a sculptor, for example?

15  A.  Right.  That's fine.  I think a sculptor is a good word for

16  someone who is well rounded in a -- you know, has a

17  well-rounded and diverse portfolio of skill sets.

18  Q.  What is your understanding Mr. Grattan's skill sets?

19  A.  I understand that he is a woodworker.

20  Q.  And it's safe to say that you respect him as a woodworker?

21  A.  I would not have invited him to collaborate if I didn't

22  respect him.

23  Q.  So the first -- what was the first tangible manifestation

24  or creation, physical product that bore the Vidivixi name?

25  A.  I wouldn't --

Fc1dvid1                          Bradley - direct

1    Q.   Who built that or who contributed to that?

2    A.   I would say it would be the Dog in Beech, because it is in

3    beechwood; it went to Brussels.  It was made clear when Aaron

4    invited me to submit a piece, I decided to say I would like to

5    submit a piece under Vidivixi rather than Francis Bradley.  And

6    he was like, ah, OK, fine.  And, umm, even though the piece

7    that was submitted was like a recontextualized like version of

8    a small scrap wood bookshelf in my apartment that he always

9    wanted, you know, and so I sort of remade it with a little bit

10   of a, you know, kind of a joke.  And we made it in beech, but

11   it's the exactly portions and everything of the shelf, the

12   small shelf in my apartment.

13   Q.   Did you enter into a partnership with Mr. Grattan?

14   A.   Did I enter into a partnership?  I invited him into a

15   collaboration.

16   Q.   And did that collaboration produce any artwork, any

17   sculptures, furniture?

18   A.   Yes.

19   Q.   If you could -- if you would, I'd like to know about how

20   the collaboration between yourself and your skill set and the

21   defendant Mark Grattan and his skill set worked.

22   A.   Well, we would meet at either my apartment or my

23   girlfriend's apartment depending on, you know, what was easier

24   for the day, and we would meet and talk.  And I would bring my

25   findings and we would discuss what we thought about certain

Fc1dvid1                          Bradley - direct

1   design solutions.  And then a lot of it was, you know, me

2   casing around talking about what I want to do, and Mark would

3   be sitting on the laptop and sketch up a little bit roughly

4   what we want to do on Google SketchUp.  And then we would order

5   supplies and start, you know, roughing -- like rough sketching

6   the piece out because a lot of things would change.  Our

7   drawings were really just like gesture drawings and the final

8   piece was the result, so everything would need to be taken back

9   and drawings would be made accordingly.  But -- sorry, go

10  ahead.

11  Q.  Did you see an opportunity when, if I understood your

12  testimony earlier, you -- or strike that.

13          Following your graduation from Pratt, do you recall

14  the next time or the first time, rather, that you had a

15  conversation with Mr. Grattan, if you did, about Vidivixi?

16  A.  No.  I mean, I don't think I would have brought that up

17  until we -- I asked him to be a part of it, really.

18  Q.  And is it fair to say -- well, did you and Mr. Grattan

19  enter into a written agreement of any sort, a partnership

20  agreement, for example?

21  A.  No.

22  Q.  Any writing at all establishing what the business

23  arrangement was, or was there a business arrangement or

24  understanding?

25  A.  Well, there was an understanding that, you know, do you

1    want to do this with me?  This is something I'm going to do.  I

2    don't think he was in the best place at the time.  It would

3    have been something that was good for him.  So the offer was on

4    the table.

5              Things kind of got tricky because there wasn't really

6    an equal partner there from the start, but, umm -- but I wanted

7    it to potentially turn into something positive because, you

8    know, this is something that I've wanted to do for a really

9    long time.  Whether it had a name or not, like I knew it was

10   going to someday be something that I did.

11             And Mat Nichols and I were making furniture for Studio

12   Sofield -- for a designer named Christine Kearny who worked for

13   Studio Sofield at the time.  They had a big contract in

14   Shanghai doing the Harry Winston store that was to open in

15   Shanghai.  So when she came to Community 54, the store that Mat

16   and I were designing, in the middle of the build out, she just

17   walked past, you know, peeked in, and said, wait a second, you

18   guys, could you make some stuff for me.  So we talked to her

19   and eventually we got the trickle down of the, you know,

20   overload of the amount of work that she needed to get to

21   Shanghai.  So we made a bunch of, you know, tables and --

22   Q.  "We" being?

23   A.  Mat Nichols and I.  That's how my relationship with

24   Christine started.  And that's how I realized like furniture is

25   kind of not very difficult, let's -- maybe we can do this.

Fc1dvid1                          Bradley - direct

1   It's fun, you know, and --

2   Q.  Was Mark Grattan the first person with whom you worked to

3   actually begin a business venture under the name Vidivixi?

4   A.  Yeah.  He was -- yeah, ideally it would have been Mat but

5   circumstances didn't --

6   Q.  So you and Mark worked -- excuse me.  You and Mr. Grattan

7   worked as a team; is it fair to say that?

8   A.  Yes, yeah.

9   Q.  Have you ever, to the best of your recollection, or since

10  2013 held yourself out -- yourself and Mr. Grattan as partners

11  to vendors, clients, or the industry, anybody?

12  A.  Yes.

13  Q.  And did you all -- did the two of you work together to

14  create furniture?

15  A.  Yes.

16  Q.  Just to be clear, do you have a sense of how many actual

17  pieces of physical furniture the two of you ultimately worked

18  together to create, fabricate and produce for show or sale or

19  any commercial purpose?

20  A.  About 14 -- 13/14.

21          THE COURT:  Mr. Bradley, when did you begin to hold

22  yourself out with Mark Grattan as partners?  When did you begin

23  to -- let's start there.

24          THE WITNESS:  When did I decide that he was going to

25  be my partner or when did I want to --

Fc1dvid1                      Bradley - direct

1             THE COURT:  Well, you were asked did you and Mark

2     Grattan hold yourself out as partners to the world and you said

3     yes.  And when did that start?

4             THE WITNESS:  I think it started after the first expo

5     that we took place in in Factory Floor, which was in November.

6     It was in Industry City.  The woman that was organizing it was

7     walking through all of the wood shops and, you know, making

8     spaces in Industry City and inviting people to partake so she

9     could fill up the trade show.  And I believe that we were

10    working on a credenza that was commissioned by me when she

11    walked into the booth and invited us.

12            THE COURT:  About when was that?

13            THE WITNESS:  That was in November, I believe.

14            THE COURT:  Of?

15            THE WITNESS:  2013.

16            THE COURT:  OK.  Thank you.

17    BY MR. PEK:

18    Q.  Were you and Mr. Grattan the primary forces behind Vidivixi

19    when it began and as we know it today in its two-year history,

20    more or less?

21    A.  I mean, I wish, yeah, but there are other forces that

22    actually made it more possible that kept it from failing when

23    it was going to.

24    Q.  Did you regard Mr. Grattan as your partner?

25    A.  Of course.  I defended him as my partner, as well, when

Fc1dvid1                          Bradley – direct

1     things weren't going well.

2     Q.  Was there a time that things were going well?

3     A.  There was a time where things could potentially turn into

4     something good if we did the right thing but they never really

5     got there.

6     Q.  You just testified you did manage to create 14 pieces of

7     furniture.  Did the industry, whether the furniture industry or

8     the art world, to the best of your recollection as you remember

9     it, seem to take an interest in what you and Mr. Grattan had

10    been doing?

11    A.  Yes.

12    Q.  Would you go so far as to say you were successful at the

13    outset or have received any critical acclaim?

14    A.  Yeah.  We got some attention.  We won the top pick at the

15    Factory Floor.  It is when organizers or sponsors of the event

16    circle the fair and decide who they like the best.  And so we

17    got that at Factory Floor, and we also achieved another one at

18    the AD Home Design Expo.

19             MR. RAO:  Your Honor, these are our party witnesses

20    and we are going to send them to the witness room, too.

21             THE COURT:  Perhaps we should open up another room,

22    too.  The witnesses can wait out in the hallway, if you would,

23    please.  Thank you.

24             Mr. Bradley, keep your voice up.  Thank you.

25             Go ahead.

Fc1dvid1                          Bradley - direct

1    BY MR. PEK:

2    Q.  Mr. Bradley, you mentioned you contributed a good deal of

3    money, a substantial deal of your personal finances, your

4    money, into Vidivixi.  Could you describe or characterize what

5    it was that Mr. Grattan contributed?  Was it something similar

6    or was it something different?

7    A.  Well, I mean, he was supposed to contribute his half of

8    expenses but he wasn't capable of meeting those demands so I

9    filled the void.

10   Q.  Were you comfortable with that arrangement?

11   A.  Never.  Of course not.  I mean, I'm trying to do something

12   with someone, work together as partners, and it's -- I'm left

13   with the hardest part.  And it's funding and figuring out how

14   to keep something alive, and it takes up a lot of time and it

15   takes a lot of effort.

16   Q.  Is that -- I don't want to cut you off but you mentioned

17   the funding part.  Are you aware that in connection with this

18   action Mr. Grattan and other since-dismissed defendants are

19   contractual parties with whom Vidivixi had entered into an

20   agreement, Jean Lin and Jean Lin, LLC, known as "Good Colony"?

21            Did Mr. Grattan perform work that was of value to

22   Vidivixi?

23   A.  Yes.  We all worked really hard on the furniture.

24   Q.  "We all" being yourself and Mr. Grattan or --

25   A.  Myself, Mr. Grattan, Tony Bunda, Kevin Walsh helped with

Fc1dvid1                    Bradley - direct

1   the 2014 work, you know.  The outsourced fabrication, the

2   fabricators, they worked hard for us because they believed in

3   us and helped us the best possible way they could contribute.

4   Q.  I'm sorry, I didn't complete my question earlier.

5          What I meant to ask was are you aware that Mr. Grattan

6   and/or Ms. Lin, Ms. Jean Lin, had described you in connection

7   with this action as, quote-unquote, the money guy or the money

8   man?

9   A.  Yeah, I'm aware of that.

10  Q.  Is money all you contributed to Vidivixi?

11  A.  No.  Far from that.

12  Q.  Did you expend any hard -- or did you do any manual labor

13  or fabrication, heavy lifting?  Can you just give me an idea

14  what it was that you contributed apart from the money?

15  A.  OK.  Well, we would fabricate everything together that we

16  were going to fabricate.  Anything that wasn't outsourced, we

17  would be working in the wood shop late at night.  We would get

18  there around anywhere from 8:30 to 9:30 so the wood shop would

19  be empty.  There would be no lines to wait on to use a machine.

20  There is no interference.  We had the place to ourselves.  And

21  we would work until sunrise sometimes.  But usually around, you

22  know, 8:30, 9, sometimes 10 'til, you know, 4/5 in the morning.

23  Q.  Was there a particular formula or procedure by which each

24  of these 14 pieces were made or that was in place?  I imagine

25  it begins with the design.  I may be wrong.  Can you just --

Fc1dvid1                        Bradley - direct

A.  Well, we would decide that we were going to partake in

something and it would give us an opportunity to showcase more

and we also were eager to further develop pieces.  So most of

our fabricating would be done in sort of rushed batches of, you

know, a one-month period of time working late every night for,

you know, for four weeks or so until we finished, you know.

And then we'd have the expo or whatever we were partaking in

and then document the work and put it on the site and just --

Q.  Was there a website, is that what you mean to say?

A.  Yes.

Q.  What was the domain name of that website?

A.  Vidivixi.com.

Q.  And do you have a specific recollection as to when you

and/or Mr. Grattan or Vidivixi collectively, how was it that

Vidivixi acquired this domain name?

A.  I bought it and my cousin Kyle was working with us to get

the site up as fast as possible.  I think he quickly gave us

just like a one-page type like coming soon, and it had the

image of the bookshelf in Brussels, you know, the image from

the show, and then we took it further from there.  Kyle handled

that in the beginning with Mark.  Mark was overseeing that with

Kyle.

Q.  Did Mark do -- or is it safe to say that Mark did a

substantial or a considerable amount of work on the website, as

you recall?

Fc1dvid1                          Bradley - direct

1   A.  I mean, yeah.  I think we all worked hard on the website.

2   Mostly Kyle.  But it was a lot of just like talking and kind of

3   sitting and waiting for the web designer guy to do his job,

4   make sure that it's aesthetically up to par and functioning

5   correctly, but just in communication and, you know, a few hours

6   at my apartment or here and there, you know, or in my studio

7   working with Kyle.  And then eventually Kyle was too busy and I

8   think we hired another guy that Mark knew.  And he helped

9   change a few things to get the site working like a little

10  better, and we gave him the wardrobe closet as compensation for

11  his time and effort so we paid him with that.

12  Q.  You mentioned that you bought the domain name.  Do you

13  recall from whom you purchased the rights to this domain name?

14  A.  GoDaddy.

15  Q.  GoDaddy.  And when you say you bought it, do you mean to

16  say that you personally paid for it out of your personal

17  pocket, not some other joint Vidivixi bank account or anything

18  like that?

19  A.  My personal, yeah, debit card or credit card.

20  Q.  Are you aware of -- strike that.

21          Is there a registrant, to the best of your knowledge,

22  listed on GoDaddy for Vidivixi.com?

23  A.  I mean, I figured the registrant was Vidivixi or -- but I

24  believe it's Mark Grattan.

25  Q.  Is it safe to say that to the extent that Mark Grattan in

Fc1dvid1                           Bradley - direct

1    fact was the registrant, if that was the case, that was

2    something that you authorized or permitted him to do, if not

3    maybe --

4    A.   I don't remember, it was so long ago.  You know, it's a

5    possibility.

6    Q.   And since purchasing this domain name, who has paid for the

7    maintenance of the domain name, and was there a Web host or an

8    email server that came with that?

9    A.   Yes.  Yeah.

10   Q.   Who paid for that?

11   A.   I did.

12   Q.   Is that website still active today?

13   A.   Yes.

14   Q.   Was there any interruption since you first hosted an actual

15   site on the URL domain name?

16   A.   Well, since -- yes.  I mean, the site was taken down

17   shortly after Mark and I had our dispute.  It was taken down

18   and re-- you know, put back up through another hosting.  And,

19   also, the emails were taken down and relaunched through another

20   host.  So as of now I have no access to any information coming

21   into the website because I am blocked by him.

22   Q.   You mentioned a dispute between yourself and Mr. Grattan.

23   Are you referring to the dispute that effectively has brought

24   us here today?

25   A.   Yes.  Yes.

1   Q.  And can you describe in your own words how it was that you

2   and Mr. Grattan found yourself in disagreement or at odds with

3   one another, or what the dispute was about, in short?

4   A.  Yeah.  I think the dispute was about the future of

5   Vidivixi, the short future of Vidivixi.  Decisions to be made,

6   you know, within the present few months.

7   Q.  Just so that we have the chronology right here, when would

8   you say this dispute --

9   A.  It started after the AD show in 2015, in March.

10  Q.  AD?

11  A.  Architectural Digest Expo.

12         So we were in serious financial crisis, and I had just

13  sacrificed every penny to my name to see it through the trade

14  show.  And, also, like some of the bills weren't going to start

15  coming in, you know, like the union fees and things that have

16  the credit card on them weren't going to start charging until

17  that following week so I had only a few days to prepare an

18  extra few thousand dollars or, you know, in union fees.  So we

19  needed to have a discussion about the state of Vidivixi.  And I

20  believe like around the beginning of the summer, end of spring,

21  we had the discussion that we need to draw back, regroup and

22  save money because I don't have any anymore and we have a lease

23  with Jean that I need to pay every month and he was supposed to

24  meet me halfway on the $800-a-month fee.  But I couldn't get

25  that $400 contribution to that and I never did once -- not even

Fc1dvid1                          Bradley - direct

1    offered.  So it was getting to the point I realized I was being

2    left alone with this.  And when we had the discussion about

3    drawing back, it didn't interest him whatsoever, but nor did

4    the acknowledgment of the fact that if we do not draw back,

5    there is no money, there is nothing, like we can't function

6    correctly, and where do we go from there.

7    Q.  As a business, you --

8    A.  As a business.  We have no revenue stream.  We have zero

9    equity.

10   Q.  I would like to ask you about the revenue stream.  You

11   talked a little bit about the amount you personally invested.

12           And before we move on to money coming in, if there was

13   any, would you say that you -- or is it fair to say in your

14   estimation, based on your experience, that you in fact financed

15   or contributed the lion's share, the majority, the entirety of

16   the actual capital investment, the actual money?  Or, put

17   differently, if I may, did Mr. Grattan invest any money?

18   A.  No.  And, yes, I did invest 99.9 percent of all the money.

19   Even money on the side to help him with his personal financial

20   struggles so he could get up to speed and start to contribute.

21   Sometimes if someone lends you a few thousand dollars just to

22   get up on your feet and you continue to work, you can make --

23   you really figure your situation out, and I was hoping that

24   that would happen and he would get up to speed and be able to

25   contribute in a 50/50 partnership, you know.

Fc1dvid1                              Bradley - direct

1   Q.  So thank you for that.

2            Now, turning to sales.  Are you familiar with

3   Vidivixi's sales numbers?  Were there sales?  Was there a

4   revenue stream?

5   A.  No.  It wasn't communicated to me.  As far as I know, there

6   were some talks and discussions and some interest but nothing

7   was ever coming through.

8   Q.  Did you ever receive any money from any sales -- were you

9   ever approached by a potential buyer or client, somebody

10  interested in purchasing your furniture or commissioning you

11  for some fabrication job?

12  A.  Yeah, of course.  But, I mean, like -- but that's like a

13  separate -- I mean, I do fabrication for people all the time.

14  It has nothing do with Vidivixi.

15           Through Vidivixi, as like any sort of sales or

16  projects or any sort of outcome, no, not that turned into

17  money.

18  Q.  But you described earlier that you all had -- yourself and

19  Mr. Grattan had worked to create, if I understand correctly,

20  furniture for trade shows, or expos, as you put it, such as the

21  Architectural Digest I think you said, and was the purpose of

22  showing your and Mr. Grattan's furniture or the Vidivixi

23  furniture, what was the goal, the end goal there, of showcasing

24  these pieces?

25  A.  It was to create a relevance in the scene and start

Fc1dvid1                    Bradley - direct

1    creating a dialogue with people so we could actually figure out

2    a good business plan and what's the right way to go.  You know,

3    we were sort of -- the idea was this was a very high-end luxury

4    brand, but clearly we weren't, you know, offering anything that

5    was incredibly high end yet other than the conceptual design,

6    you know.

7    Q.  You didn't have a catalog or anything like that?

8    A.  No.  Nothing was finished yet.  We were still trying -- you

9    know, we were scraping by.  So to make a catalog it takes up a

10   lot of time and effort and bringing people together.

11        So if I'm focused primarily on getting myself out of

12   financial trouble, like taking any job I can get to pay the

13   bills so I don't lose my studio and my apartment and we don't

14   lose the wood shop and Vidivixi just doesn't die, you know,

15   like I need to do these things and sort of -- I just need to

16   delegate what is necessary at the time or else I can fall off

17   track very easily, and then that's very devastating for me

18   because one hiccup can -- I have a lot of overhead so, you

19   know.

20   Q.  Well, I'd like to actually ask you a few brief questions

21   about that, but getting to the point of, I think, this hearing,

22   Mr. Bradley, if I can back up, do you recall when you and I

23   first met?

24   A.  Yes.

25   Q.  And could you just inform the Court very briefly how it is

Fc1dvid1                    Bradley - direct

1   we met?

2   A.   I did some research on the computer, IP attorneys, and you

3   seemed to be the most loyal and hardworking.  So I called you

4   with ten other people I called and you called me back first.

5   You were the first person to call me back, and we spoke for

6   two-and-a-half hours while you were pulled over on the side the

7   of the LIE.

8   Q.   And here we are.

9           Did you then represent -- excuse me.  Did you then

10  retain me as your counsel in connection with this Vidivixi

11  matter?

12  A.   Yes.

13           MR. RAO:  Objection.  Relevance.

14           THE COURT:  Sustained.

15  BY MR. PEK:

16  Q.   By the time -- at the time this action was commenced, had

17  you ever seen a -- strike that.

18           By the time -- at the time you were looking for

19  attorneys, or for counsel, rather, did you at that point ever

20  see or create a Vidivixi invoice or purchase form or any kind

21  of documentation geared towards generating revenue, proposal?

22  A.   A consignment agreement, you know, when we would be with --

23  yeah, just like consignment agreements and stuff like that.

24  Nothing regarding actual final sales.

25  Q.   Was there a dispute at some point --

Fc1dvid1                          Bradley - direct

1                  THE COURT:  Can I stop you for a moment?

2            So we're talking now about September of 2015, right?

3                  THE WITNESS:  Yes.

4                  THE COURT:  OK.  Now, up until September of 2015, was

5      Vidivixi a corporation?  Did it file any sort of corporation

6      papers or authorization to do business under the name Vidivixi?

7                  THE WITNESS:  Yes.  I filed in, I think,

8      August 27th or 28th of this year.

9                  THE COURT:  August of 2015?

10                 THE WITNESS:  Yes.

11                 THE COURT:  As what?

12                 THE WITNESS:  Why?

13                 THE COURT:  No.  As what?

14                 THE WITNESS:  As Vidivixi, LLC.

15                 THE COURT:  Prior to Vidivixi, LLC, had Vidivixi filed

16     any authorization to do business or anything like that under

17     the name Vidivixi?

18                 THE WITNESS:  No.  I purchased the trademark March of

19     2015.

20                 THE COURT:  I'm sorry.

21                 THE WITNESS:  I had purchased the trademark in March

22     of 2015, but there was no d/b/a or anything like that.

23                 THE COURT:  OK.  Were there any -- you referred to

24     paying $800 a month for a lease.

25                 THE WITNESS:  Right.  That was the Good Colony, the

Fc1dvid1                          Bradley - direct

1   showroom where we were presenting our work.  It is a co-op so

2   you paid $800 a month and you have your five pieces you are

3   allowed to showcase, and, yeah, there is a group of other

4   designers.

5          THE COURT:  And that lease was in the name of who?

6          THE WITNESS:  Vidivixi and Mark Grattan, Francis

7   Bradley.

8          THE COURT:  So the three of you?

9          THE WITNESS:  Yes.

10         THE COURT:  OK.

11         THE WITNESS:  I believe.  I mean, it could have just

12  been Vidivixi.  I have to look.  I would assume that both of

13  our names would be on it, too.

14         THE COURT:  Any other leases that you had for

15  Vidivixi?

16         THE WITNESS:  Yes.  I have my studio space in

17  Greenpoint, which is at --

18         THE COURT:  Where?

19         THE WITNESS:  In Greenpoint.  It is 551 Stewart

20  Avenue.  That's sort of our -- Vidivixi's headquarters.

21         THE COURT:  And the lease on that studio is in your

22  name?

23         THE WITNESS:  Yes.

24         THE COURT:  Did Vidivixi have any employees?

25         THE WITNESS:  Not like employees on paper but people

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

Fc1dvid1                          Bradley - direct

1     that consistently helped that I paid, yes.

2               THE COURT:  OK.  To help with --

3               THE WITNESS:  Fabrication.

4               THE COURT:  -- fabricating the furniture?

5               THE WITNESS:  Photography.

6               THE COURT:  OK.  Those people you would pay

7     personally?

8               THE WITNESS:  Yes.

9               THE COURT:  Did Vidivixi have any bank accounts?

10              THE WITNESS:  None other than my personal two bank

11    accounts, yes.

12              THE COURT:  And your personal account was in your name

13    rather than --

14              THE WITNESS:  Yes.

15              THE COURT:  OK.  Thank you.

16              MR. PEK:  Go ahead.

17    BY MR. PEK:

18    Q.  If I can turn back to the dispute, as you described it, and

19    which is still ongoing and which is why we are here, as I think

20    you, yourself and the Court are aware.

21              Did this dispute come to some sort of a climax?  Was

22    there a tipping point that you can identify where, for example,

23    you all decided you were done working with each other?

24              MR. RAO:  Objection.  Leading.

25              THE COURT:  Sustained.  Rephrase.

Fc1dvid1                           Bradley - direct

1           Did there come a time when you and Mr. Grattan had a

2    dispute?

3           THE WITNESS:  Yes.

4           THE COURT:  What was the nature of the dispute?

5           THE WITNESS:  Well, there are two disputes.  The first

6    dispute was in my apartment discussing the future of Vidivixi.

7    And when I explained that we have no money and we need to draw

8    back, I suggested that he do whatever is in his power to fix

9    his financial situation and either get a job or do something

10   extra that you can -- that can help you, you know, build up a

11   savings to where we can actually function.  And he mentioned

12   that he didn't want to get a job and that Vidivixi was his job

13   and his passion.  And, you know, we had to have the sort of --

14   this argument that Vidivixi is not your job, it's far away from

15   being my job, as well.  My job is to provide for myself and to

16   provide for the projects that I get myself into, my personal

17   ventures, that those are my problems and I need to -- if they

18   turn into problems, they're mine.  So I need to take care of

19   them.  So in order to go any further we need to save money and

20   stop being as social and start being more inside and working

21   all the time so we can actually do this right.

22           With that being said, over the next few weeks there

23   was distance between us, and I just was sort of hoping for the

24   best that he was getting himself together.  And it is a lot of

25   lack of communication over the summer.  Eventually, it led to

Fc1dvid1                              Bradley - direct

1    him I think accidentally revealing that he had made a sale of

2    nine chairs and he overordered the lumber from an out-of-state

3    lumberyard that had a minimum order of like 2300 -- you had to

4    order a certain amount of wood for them to deliver to New York.

5             At the time Mark wasn't really able to order lumber

6    from a number of lumberyards in the Tri-State area, especially

7    in the New York Metro Area, due to lack of payments, bounced

8    checks and stuff like that.  So largely that's what started

9    contributing -- me contributing to paying every penny.  It was

10   because of he can't use his credit card.  He can't be a part of

11   it.  He can't let Rosenzweig know that we're sending it to, you

12   know, Mark Grattan at, you know, his address; we have to put

13   Vidivixi.  And it's just certain things we were dodging, you

14   know, dodging his debt.

15            And so eventually he I think accidentally revealed

16   that he had made a sale of nine chairs.  And when I called him

17   out on it, he made it clear that he felt that those nine chairs

18   were his designs even though that they were nine chairs that we

19   collaborated on for the Vidivixi line.  He felt strongly that

20   they were his designs and that he didn't have to contribute any

21   of the profits to Vidivixi or myself.

22            Then I explained to him that we are seriously in the

23   hole and there are no profits.  You know, when you're trying to

24   do something and you're negative, you know, upwards of $80,000,

25   there is no -- there is no profits.  You know, like things need

Fc1dvid1                          Bradley - direct

1     to go -- the money needs to go where it needs to be -- it needs

2     to be put in the right places and areas that need to be

3     reimbursed and those areas that could, you know, sort of give

4     us the ability to actually see some longevity if we do the

5     right thing with income.

6             So I was upset about it and I said take the money, get

7     the chairs done, get them delivered on time.  This one's on

8     you.  I expect you to be up to speed after this.  $9,000.

9             So after that smoke kind of cleared, Mark was a little

10    dodgy, hard to get ahold of.  And there was a meeting in the

11    wood shop about the building being purchased by a new company

12    and that things were going to change so rent was going to

13    increase and we had to figure something out.  So Mark made it

14    clear that he didn't want to be working in a wood shop anymore

15    and didn't want to renew the lease.  It made sense to me that

16    we should be looking for another wood shop anyway because we

17    can't afford that or just save up for the machines that I

18    desperately need and then just moving them into my space in

19    Greenpoint.

20            So I guess at some point while the wood shop space --

21    we no longer have a space in the wood shop that we rent, I

22    believe Mark was storing some of our stuff in a friend's bay.

23    During this time, Walter, the owner of the wood shop, called me

24    and said, Do you have the rent?  I can't get in touch with

25    Mark.  And I said, you know, I'm in the same boat as you.  I

Fc1dvid1                          Bradley – direct

1   haven't really been able to get ahold of Mark.  What's the

2   problem?  And Walter said, Mark hasn't paid rent in a month and

3   a half or two months or something like that.  I'm very upset

4   about it because he's bragging to Richard about how much money

5   he's making and I know you guys are making money.  So pay me.

6           So I had to tell Walter that I'm sorry, that this is

7   the first time that I'm hearing of this.  So that was sort of

8   the concrete like, you know, now I know what's going on and I

9   have to figure out how to stop it.

10          From there on it was just sort of, you know, trying to

11  communicate.  It wasn't going well.  And then finally I had

12  some objects that belonged to Nate, the artist that I used to

13  make his pieces in the wood shop.  So I made it clear to Mark

14  that I need the jigs for the stretchers, the painting

15  stretchers.  They're very valuable; I can't lose them.  So he

16  agreed to meet me at the shop to let me grab some of my

17  belongings.  And he was in Dobbie's bay borrowing space and I

18  collected my belongings, one of them being my laptop computer,

19  which caused quite a stir for him because of the information

20  that he left on it, I guess.

21          MR. PEK:  If I may, your Honor, I would like to ask

22  about that specific aspect of the dispute.

23          THE COURT:  Go ahead.

24  BY MR. PEK:

25  Q.  Did some part of this dispute take place in the wood shop?

Fc1dvid1                    Bradley - direct

1   A.  Yes.  Yeah.

2   Q.  And did some part of the dispute concern a computer or a

3   laptop?

4   A.  Yes.

5   Q.  And are you familiar with the specific laptop I'm referring

6   to or I'm asking you about?

7   A.  Yes.

8   Q.  Did you share a laptop with Mr. Grattan?

9   A.  Well, the laptop that he had was the Vidivixi laptop.

10  That's where all the information for Vidivixi was on.  His

11  personal computer, something happened to it so where it broke

12  or it crashed or whatever.  He needed a laptop so he could

13  function and do work.

14         So I said -- I gave him permission to use my laptop.

15  At some point he crashed my laptop, the Vidivixi laptop.  So I

16  brought it to the Apple Store and I'm having a hard drive put

17  in and then I handed it back to Mark.  After that point he took

18  the opportunity to completely make my laptop his laptop, you

19  know.

20  Q.  When you say your laptop, did you purchase this laptop?

21  A.  Yes.

22  Q.  Do you remember what brand of computer this laptop was?

23  A.  It's like a MacBook.

24  Q.  And insofar as your dispute, was there a dispute -- did

25  your dispute with Mr. Grattan, as you've explained to the

Fc1dvid1                          Bradley - direct

1    Court, transpire or carry into the actual wood shop itself?

2    A.  Can you repeat that?  I'm sorry.

3    Q.  Sure.  I asked before and you had mentioned that there was

4    a dispute in the wood shop, is that right?

5    A.  Yes.

6    Q.  And was there a time where the dispute centered on the

7    laptop or the ownership or the possession of the laptop?

8    A.  Yes.  I think everything was under control.  I was just --

9    everything was -- I walked in, said hello to Mark.  There were

10   two Vidivixi pieces being touched up in the space.  I asked why

11   are these here.  And he's like because I'm cleaning them up.

12   And I said, Well, no one -- you didn't even tell me you're

13   removing them out of the showroom, you know.  There's no

14   communication.  And, well, I'm here to get my tools.  So I

15   started rounding up my tools.  I saw my computer bag.  I took

16   it.  And once he realized that I had my computer under my arm,

17   that's when he sort of got a little aggressive and wanted his

18   computer back.

19   Q.  Where was this taking place again?

20   A.  In the wood shop, yeah.  So, you know, there were other

21   people around.  I'm not trying to cause a big scene.  I just

22   said, Don't do this.  This is my property.  You know that this

23   is my property.  And I walked in my car, locked it in my car,

24   walked back upstairs, grabbed the remainder of my belongings

25   and hit the road.

Fc1dvid1                          Bradley - direct

1    Q.  Before you entered the wood shop on that day, had you had

2    any prior communication with Mr. Grattan regarding your

3    intentions to retrieve the laptop?

4    A.  He knew that I was coming to retrieve my belongings.

5    Q.  How did he know that?

6    A.  He -- I sent him a text message requesting.  He confirmed.

7    And he gave me a timeframe that he would be there so I could

8    show up.

9    Q.  Do you recall submitting an affidavit in connection with

10   this action?

11   A.  Yes.

12   Q.  Do you recall that -- do you recall certain exhibits -- or,

13   excuse me, do you recall attaching certain exhibits, with my

14   assistance, to your affidavit?

15   A.  Yes.

16   Q.  Do you have in your possession a proof of purchase of this

17   laptop.

18   A.  Right now?  No.  But I have the receipt, yes.

19   Q.  OK.  That's all I'm asking you.

20           How is it that you found out about the nine chairs?

21   You told Judge Koeltl minutes ago about Mr. Grattan selling

22   chairs or making money.

23   A.  I think he called me in a sort of like a, oh, I messed up,

24   I ordered too much wood but I'm trying to make it.  Like, is

25   this a bad thing or could we do something positive about this

1    wood order?  And then while asking what the wood was for, he

2    slipped and told me that it was for the nine chairs.  And then,

3    you know, I said, well, what's up with that?  And then he

4    said -- he made it clear that he felt that this was his now.

5    And so I said to take it off the website if that's the way you

6    feel.  This isn't happening again, you know, and...

7    Q.  OK.  And did you ever steal anything from Mr. Grattan?

8            THE COURT:  What did you mean by saying "I said to

9    take it off the website?"

10           THE WITNESS:  Oh, like if you feel so strongly that

11   this is not a collaboration, that this is solely your design,

12   then it shouldn't -- has no business being on this website and

13   being a part of Vidivixi, and so take it -- you can have it

14   back just if that's what you want to do.

15           THE COURT:  These nine chairs were the same pattern?

16   They were identical chairs, essentially?

17           THE WITNESS:  Right.  Yes.

18           THE COURT:  OK.

19   BY MR. PEK:

20   Q.  And, Mr. Bradley, if I understand you correctly,

21   Mr. Grattan told you at some point that he had -- well, did you

22   build these nine chairs?  Did you take any part in the manual

23   labor of fabricating these nine chairs?

24   A.  No.  I told him I wasn't going to, and I also made it clear

25   that it's up to you to get these shipped to Connecticut or

Fc1dvid1                          Bradley - direct

1    whatever.  And there were problems in the end.  Tony almost had

2    to --

3    Q.  Well, before I get to the end, are you aware of a business

4    enterprise that Mr. Grattan conducts on the side for his own

5    personal living?

6    A.  Yes.

7    Q.  And do you know what it's called?

8    A.  Mark Grattan Design & Build.

9    Q.  Do you know or did you have any understanding as to whether

10   those nine chairs were sold under that name or any name or the

11   Vidivixi name?

12   A.  I am not aware of that.  I don't know.  I'm assuming it was

13   a Vidivixi sale because the inquiry of the sale I believe came

14   at the AD show in 2015 but I'm...

15   Q.  Have you ever stolen anything from Mark Grattan?

16   A.  No.

17              THE COURT:  Please keep your voice up.

18              THE WITNESS:  No.

19              MR. PEK:  Your Honor, I'd like to approach the witness

20   with what has been premarked as Plaintiff's Exhibit 1.  I am

21   handing one to counsel.

22              (Pause)

23              Would the Court like a copy as well?

24              THE COURT:  Yes.  Do you have a copy for the witness?

25              MR. PEK:  Yes, I do.

```
 1          THE COURT:  Could you also speed it up?  You have been
 2   going for about an hour and a half.
 3          MR. PEK:  Yes.
 4          (Discussion off the record)
 5          (Recess)
 6          THE COURT:  Please be seated.
 7          Mr. Bradley is on the stand.  Mr. Fletcher.
 8          THE CLERK:  Mr. Bradley, you are reminded you are
 9   still under oath.
10          THE WITNESS:  Yes.
11          THE COURT:  You may proceed.
12   BY MR. PEK:
13   Q.  Mr. Bradley, I would like to just move a little bit quicker
14   and pick up where we left off.
15          You mentioned earlier that you retrieved the laptop?
16   A.  Correct.
17   Q.  What happened next?
18   A.  I got back to my destination and I opened the laptop and I
19   was exposed to a number of alarming things.
20   Q.  So you opened the laptop and what were the alarming things?
21   A.  I saw invoices.  I saw correspondence --
22   Q.  All I am asking about is the invoices.  Invoices from a
23   vendor that you all worked with?  Invoices that you had seen or
24   not seen before?
25   A.  That I have not seen before, no mention of or, you know.
```

Fc1dvid1                         Bradley - direct

1   Q.  And did those invoices have any entity listed as to who is

2   billing or being billed?

3   A.  Yes.  The payments were to be made directly to Mark

4   Grattan, and the address -- Vidivixi's address was often

5   changed to Mark Grattan's personal home address or back to the

6   Greenpoint address.  It seemed like every invoice had its own

7   individual identity on what is actually the truth of the

8   matter.

9   Q.  Did these invoices have the Vidivixi mark or the word

10  "Vidivixi" anywhere?

11  A.  Yes.  Yes.

12  Q.  Can you estimate how many, roughly, of these invoices you

13  found on the computer?

14  A.  An alarming amount, like over like I think around 20, I

15  think, if I remember correctly.

16  Q.  I have handed you what has been premarked as Plaintiffs'

17  Exhibit 1 just moments ago.  Do you recognize that document?

18  A.  Yes.

19  Q.  Have you seen it before?

20  A.  Yeah.  I heard about it first and then, yeah, I saw it

21  after...

22  Q.  How did you hear about it?

23  A.  Through word of mouth.

24  Q.  And what did you hear before we take a look at the

25  document?

Fc1dvid1                    Bradley - direct

1   A.  I heard that -- you know, someone gave me a heads up that

2   there was an email being sent out that they received an email,

3   and it was sort of advising people in the industry that I'm not

4   to be trusted, I'm dangerous and on a rampage and stole stuff

5   from Walter's wood shop.

6   Q.  Do you recall on your behalf my serving some subpoenas in

7   this case?

8   A.  Yes.

9   Q.  And do you recall receiving a copy of the document before

10  you?

11  A.  Yes.

12  Q.  And do you recall who it was that sent it?

13  A.  Walter Goodman sent it -- or Mark Grattan sent it to a

14  number of people but it was Walter Goodman who sent it to us,

15  yeah.

16  Q.  Would you mind reading that email, and just if you could

17  start by saying who is the sender and who is the recipient?

18  A.  Well, the sender is -- well, here it is from Walter's

19  iCloud and to us.

20  Q.  To me?

21  A.  Yes.

22  Q.  And is Mr. Grattan's name anywhere on that invoice -- not

23  invoice?

24  A.  On this email.

25  Q.  Yes.

Fc1dvid1                          Bradley - direct

```
 1    A.  No.
 2              It says -- do you want me to read you the email?
 3    Q.  Before you do, do you recall the subpoena that I served on
 4    Mr. Goodman?
 5    A.  Yes.
 6    Q.  And is it your understanding that he produced this?
 7    A.  Yes.
 8              THE COURT:  Hold on.  Hold on.
 9              Is there an objection to the document?
10              MR. RAO:  Your Honor, I was just conferring with my
11    client.  I believe he sent a similar email but this is
12    obviously not an accurate copy.  I believe that they are the
13    same but I don't have the original in front of me so --
14              MR. PEK:  Your Honor, if I may --
15              MR. RAO:  I suppose there is a technical authenticity
16    objection, but I don't want to be technical here and hold up a
17    hearing that's already, you know, you've instructed us to speed
18    it up.  So what I can tell you is my client says he sent an
19    email that to the best of his recollection looks like this one
20    but I don't know more than that.
21              THE COURT:  OK.  There is no objection.
22              Plaintiff's Exhibit 1 received in evidence.
23              (Plaintiffs' Exhibit 1 received in evidence)
24              THE COURT:  OK.
25    BY MR. PEK:
```

Fc1dvid1                          Bradley - direct

1    Q.  Would you mind just reading that.

2    A.   Good morning, guys.  My former business partner Francis Tim

3    Bradley is on a rampage.  We had a significant falling out and

4    he is unfortunately having difficulty accepting my decisions I

5    have made regarding our relationship.  He came into the shop

6    yesterday, took a bunch of items, and left.  A few of those

7    items include my computer and external hard drive.  He is

8    currently a threat to me and to items being stored in the wood

9    shop.  Police have been informed --

10            THE COURT:  In the shop?

11   A.   In the shop.  Police have been informed.  If he attempts to

12   enter the premises, please deny his access.  He is not welcome.

13   Sorry for the scare.  Everything is most likely fine.  XXX.

14   Q.  Mr. Bradley, did you ever get contacted by the police?

15   A.  No.

16   Q.  And -- well, let's move on from that.

17            Have you ever made any money from Vidivixi -- from the

18   business of Vidivixi?

19   A.  No, never made any money from it, no.

20   Q.  Received.  Speaking in gross terms, not profit, just was

21   any revenue earned, to your knowledge?

22   A.  No.  No.

23            THE COURT:  I'm sorry.  So you never received any

24   money from any products sold by Vidivixi?

25            THE WITNESS:  No.  We never sold a piece, really, as

Fc1dvid1                      Bradley - direct

1    far as I know.  There were commissioned pieces but they're, you

2    know, paid for to be developed and then, you know, handed to

3    the person afterwards.  But you break even on those, really.

4              THE COURT:  I'm not following you.  Did you actually

5    sell any pieces?

6              THE WITNESS:  No, not finished product pieces, no.

7              THE COURT:  OK.

8    BY MR. PEK:

9    Q.  So I'll just wrap up here.

10             To the best of your knowledge, Vidivixi never made any

11   sales -- has never made any sales, is that -- strike that.

12             Did Mark Grattan ever tell you about any potential

13   sales, any leads?

14   A.  Yes.  Yeah.

15   Q.  And did he ever tell you that any of those leads were

16   consummated and a transaction completed or --

17   A.  No, not other than slipping up with the nine chairs.

18   Q.  Was it your understanding with Mr. Grattan that in the

19   event there was an interest in Vidivixi that could lead to a

20   revenue stream, that it was to be shared among you two?

21   A.  Yes.

22   Q.  Did you ever hear -- field any inquiries or solicitations

23   or offers to purchase any of the Vidivixi items?

24   A.  Coming in through me?

25   Q.  Yes, from third parties.

Fc1dvid1                          Bradley - direct

1    A.  Yes.

2    Q.  Did you apprise Mark Grattan when that happened?

3    A.  Of course.

4    Q.  And was it your testimony today that Mark Grattan routinely

5    apprised you of the same?

6    A.  No.  I mean, I think he was selective on what he told me

7    that came his way, you know -- very selective.

8    Q.  Do you remember receiving -- did you ever receive a

9    partnership proposal of some nature from Mr. Grattan?

10   A.  Yes.

11   Q.  When around was that?

12   A.  That was towards the end of October -- I mean, August.

13   Q.  At that time when you received that, how did you receive

14   it?  Was it a letter, an email, or --

15   A.  I received that as an email, yeah.

16   Q.  At the time that you received that email, were you aware of

17   any invoices, sales or --

18   A.  No.

19   Q.  -- potential sales?

20   A.  No, umm.

21           THE COURT:  I'm sorry?

22   A.  No.

23   Q.  And you've never seen -- witnessed, realized a dollar?

24           MR. RAO:  Asked and answered.  Objection.

25           MR. PEK:  I rest with this witness, your Honor.  Thank

Fc1dvid1                          Bradley - cross

1    you, Mr. Bradley.

2              THE COURT:  All right.  OK.  Cross.

3              (To the witness) No.  No.  Have a seat.

4              All right.  Mr. Rao, you may examine.

5    CROSS-EXAMINATION

6    BY MR. RAO:

7    Q.  Good afternoon, Mr. Bradley.  My name is Siddartha Rao.

8    You know I represent Mark Grattan.  I'll try to be brief.

9              Mr. Bradley, can you state again for the record your

10   profession?

11   A.  I'm an artist.

12   Q.  Have you ever designed furniture?

13   A.  Yes.

14   Q.  Which pieces of furniture?

15   A.  I designed the pieces of furniture regarding Vidivixi, and

16   I designed custom pieces of furniture in the past --

17   Q.  What were those pieces of furniture from the past?

18   A.  -- for my clients.

19             Well, there were three display tables for Harry

20   Winston, for Studio Sofield, and then I've made other custom

21   sort of installations in, you know, retail stores, private

22   homes.

23   Q.  Do you have any licenses to operate machinery related to

24   woodworking or fabrication?

25   A.  None that are needed.

Fc1dvid1                          Bradley - cross

1   Q.   Did you have collaborators in the manufacture of the

2   display tables that you just mentioned?

3   A.   Which tables?

4   Q.   The display tables.

5   A.   For?

6   Q.   For Harry Winston.

7   A.   For Harry Winston, those are just straight up -- you know,

8   you're fabricating a design that's already set in stone.

9   There's no -- it's just custom fabrication according to what

10  they ask.

11  Q.   I see.  So to be --

12  A.   They show us a table and they say can you make 20 of these

13  tables, and we say yeah.  Can you get them done by Tuesday?  I

14  say, I'll give you 'til Thursday.

15  Q.   So to be clear, the designs are premade and then you

16  fabricate based on --

17  A.   For that particular client, yes.

18  Q.   I understand.  You mentioned the Vidivixi furniture.

19  A.   Right.

20  Q.   Can you identify those pieces of furniture?

21  A.   Every -- you want me to go off and list every piece of

22  furniture?

23  Q.   Sure.

24  A.   OK.  There is there is the ISO Side Table.  There is the

25  Dakku Sleep Frame.  There is the Bugsy's Bar.  There is the

Fc1dvid1                          Bradley - cross

Dining Table, the Vantage Chairs, Puff Panel Sofa, Puff Panel

Chairs.  There is the Three Piece Suit.  There is the Fall 14

Bookshelf, the Double Fold Desk.  There is also two small

dressers that have yet to have been decided on the final name

but -- and, let's see.  Could you read the list so far of what

I have said so I don't repeat?

Q.  Sure.  I have an ISO Side Table, Summer Bed, Dakku Sleep

Frame, Bugsy's Bar, Dining Table, Vantage Chairs, Puff Sofa,

Puff Chairs, Three Piece Suit, a bookshelf from fall of 2013.

A.  And the Tom's Bed, Candy Bed.  And there are some lights

that were collaborated with Nate Lowman and Aaron Aujla.

Q.  And is it your testimony that you worked on building these

pieces of furniture, setting aside the lights?

A.  I worked on the lights as well.  I work on everything that

I do.

Q.  What did you do -- let's focus on the ISO Side Table.  What

did you do to help design the ISO Side Table?

A.  Well, I came up with the exact concept of the ISO Side

Table, that it should sit on a triangle and should be hovering

off of a cleave and it should be a one-drawer box with a glass

top.  I helped fabricate the box and then we outsourced the

steelwork.

Q.  What tools did you use to fabricate?

A.  Excuse me.

Q.  What tools did you use to fabricate the Side Table?

Fc1dvid1                         Bradley – cross

1    A.   The Side Table?

2    Q.   Mm-hmm.

3    A.   Basic tools.  We start milling wood, which you walk over,

4    you rough cut the wood down to the general size that you are

5    going to be using for the piece.  Then you take it to the

6    joiner and you get one side flush.  Then you take it to the

7    plainer.  Then you take it to the table saw.  There is a

8    process in milling wood, and then once you get it to the size

9    and accuracy that you like it, you assemble it.

10   Q.   Did you noble it?

11   A.   Yes.

12   Q.   Do you know the approximate dimensions of the Side Table?

13   A.   About 8 inches deep -- 8 inches high, about 14 inches deep

14   and about 18 inches wide off the top of my head.  I don't have

15   the data in front of me, but generally speaking that is roughly

16   the proportions.

17   Q.   Do you know what materials have been used on the Side

18   Table?

19   A.   Yes.

20   Q.   Which materials were used?

21   A.   Steel.  There is leather.  There is amber glass and there

22   is ash and walnut.  The ash is lacquered and the general finish

23   is black.

24   Q.   Where was this piece manufactured or fabricated?

25   A.   Partially it was fabricated in the wood shop on Sunset

Fc1dvid1                    Bradley – cross

1  Park.

2  Q.  And the rest of it?

3  A.  Was outsourced steelwork.

4  Q.  The Summer Bed, was that also fabricated in the wood shop?

5  A.  Yes.

6  Q.  What about the Dakku?

7  A.  That is the same thing, the Dakku Summer Bed.

8  Q.  Right.  Just to keep this brief, the furniture, the

9  remaining pieces that you mentioned, were those fabricated in

10  the wood shop as well?

11  A.  Briefly, just small parts of them.

12  Q.  Which pieces would have been fabricated outside the wood

13  shop?

14  A.  Everything other than any piece that is solely made out of

15  wood.  Most of our pieces are –– the least amount of material

16  is wood and some of them a lot of it is steel, glass and stone.

17  So anything that doesn't involve solely wood obviously would be

18  outsourced.

19  Q.  Are the Vidivixi pieces –– so if we were to go through

20  these materials, what is wood typically used for in the

21  Vidivixi pieces?  Like a frame or is it an accent or ––

22  A.  Whatever you want to –– I mean, it is usually a functional

23  part or a decorative part.  I mean, what is furniture –– what

24  is wood used for is kind of a broad question.  It can be a

25  table surface.  It can be a right angle to stop something from

Fc1dvid1                         Bradley – cross

1   sliding.  It can be any sort of object that you want to make

2   out of wood.

3           What's your question?  I don't really understand the

4   question.

5   Q.  I am just trying to understand what portion of the work was

6   done in the wood shop.  Let me rephrase that question, then.

7           Let's take an example.  The Summer Bed.  How much of

8   that would you say was fabricated in the wood shop?

9   A.  90 percent of it.

10  Q.  OK.  And what about the sweet frame?

11  A.  The what?

12  Q.  I have on my list ISO Side Table, Summer Bed, sweet frame.

13  A.  Sleep frame.

14  Q.  Oh, Sleep Frame, yeah.

15  A.  Sleep Frame is the Summer Bed.  The Dakku Sleep Frame is

16  the Summer Bed.

17  Q.  Oh, they are all the same?

18  A.  Yeah.

19  Q.  So that would be, you said, 90 percent was made in the wood

20  shop?

21  A.  It's 90 percent wood.

22  Q.  Yes.  What about Bugsy's Bar?

23  A.  Bugsy's Bar was made in the wood shop.

24  Q.  OK.  And, roughly, what percentage of that would you say

25  was made in the wood shop?

Fc1dvid1                    Bradley - cross

1    A.  I think 90 percent of it.  It is just wood and glass and

2    leather.

3    Q.  What about the dining table?

4    A.  The dining table -- the glass dining table was Mark's

5    contribution to Vidivixi so...

6    Q.  When you say Mark's contribution, what do you mean by that?

7    A.  He was eager to contribute something to the line.  So I let

8    him say, all right, yes, you can show the dining table in the

9    line, like we'll add it to the line.  It was in the Factory

10   Floor show.

11   Q.  Was the dining table made before the Vidivixi

12   collaboration?

13   A.  Yes.

14   Q.  Got it.  And the Vantage Chairs, were they primarily

15   manufactured in the wood shop as well?

16   A.  Yeah.  They're wood and glass.

17   Q.  Got it.  What's your rough estimate of how much work would

18   have been done in the wood shop?

19   A.  I would say 40 percent of all the work would be done in the

20   wood shop.

21   Q.  What about with the Puff Sofa?

22   A.  That's outsourced to the upholsters.

23   Q.  And the Puff Chairs, is that similar?

24   A.  Same.

25   Q.  And the Three Piece Suit?

Fc1dvid1                     Bradley - cross

1   A.  That's the steel fabricator, and then the rest of it is

2   glass.  It has a small walnut box in the middle and then it

3   sits on stone, so 99 percent of that is outsourced fabrication.

4   Q.  And the Fall 2013 Bookshelf?

5   A.  100 percent outsourced fabrication except there is a -- it

6   is a modular piece so you can add a drawer box or a series of

7   draw boxes but --

8   Q.  Got it.  What about the Double Fold?

9   A.  The Double Fold was -- it is a 50/50.  Half of it was made

10  at a steel fabricator in Philadelphia and the other half was

11  just assembled in the wood shop.

12  Q.  And then the dressers?

13  A.  The dressers we made in the wood shop.

14  Q.  Got it.  And you mentioned a canopy bed as well.  Was that

15  primarily made in the wood shop?

16  A.  Yeah.  Well, there was also some upholstery done and stuff

17  like that, but, yeah, anything wood on it was done in the wood

18  shop.

19  Q.  How did you find the -- is "vendor" the right word to

20  outsource these outsourced pieces to?

21  A.  I have like a Rolodex full of different fabricators and

22  vendors and specialty people.  Some of them were local in the

23  Sunset Industry City scene.  So we would stay close.  We used

24  Al Atoli, who has his upholstery company and it's in the

25  adjacent building to the wood shop.  So we would walk across,

Fc1dvid1                        Bradley - cross

1   take an elevator and go upstairs.

2   Q.  And that was for the steel fabricating?

3   A.  That's for upholstery.  We also used a guy name Jesus in

4   Bushwick for upholstery.

5   Q.  And for the steel you mentioned a Pennsylvania --

6   A.  Yeah.  There is a fabricator in Pennsylvania that Farrah

7   Sit recommended us to.  It didn't work out very well.  It was

8   not what we were looking for in accuracy.

9           There is also Juan, who is a friend of Mark, that

10  helps us sometimes, and there's one or two other welders that

11  help us as well.

12  Q.  When you say "Juan," do you mean Juan Alfaro?

13  A.  Yes.

14  Q.  The Vidivixi pieces that we just went through, prior to

15  fabrication, is it correct to say that somebody would have to

16  create a technical drawing or design for them?

17  A.  I mean, the technical drawings that we would create are

18  very sort of basic.  They're not very detailed.  They're not

19  factory quality.  They're gestures towards -- you know, that's

20  why being present and being involved while things are being

21  made is incredibly important.

22  Q.  What do you mean by not comparable to factory quality?

23  A.  Well, if we were to sell a licensed -- if a company came in

24  and they wanted to license our sofa and we handed them a Google

25  SketchUp drawing, they just sort of would get a little -- they

Fc1dvid1                    Bradley - cross

1   would laugh at us.  So they're for us.  They're guidelines for

2   us to go in, and then we go according to plan and we tweak.  We

3   make whatever decisions we want to make on the fly.  When a

4   piece is being built three-dimensionally in front of us, you

5   can understand the proportions and understand the way things

6   are working out much better than just seeing some technical

7   drawing.  In the end, that piece that's made needs to be

8   submitted and technical drawings need to be done according to

9   that final product if it's going to go further.

10  Q.  I understand.  So you're saying that a lot of design

11  decisions are made while fabricating the piece?

12  A.  On the fly.  Like when we're making things, we come up with

13  our concepts and we're -- you know, you would hit problems, you

14  know.  So that's why we work together, very closely together.

15  Q.  And those types of decisions would be made in the wood shop

16  or in the case of an outsourced vendor wherever the vendor is,

17  is that correct?

18  A.  Right.  We're pretty prepared before we go to a vendor.  I

19  don't have any money to waste on -- you know, if a vendor

20  doesn't do something up to par, I still have to pay him for his

21  time.

22  Q.  How much of the final product would you say changes between

23  the initial sketching and the final fabrication?

24  A.  Umm, not so much.  We sort of -- we know roughly like what

25  we're going to do.  So it's just about -- it's a matter of like

Fc1dvid1                    Bradley - cross

1    just little touches.

2    Q.  Do you use any other design programs besides Google

3    SketchUp?

4    A.  No, not really.  I just started to explore a little bit in

5    like 3D printing but that's just for the future.  It is far

6    away for us.

7    Q.  With respect to any of these pieces, are there any in

8    particular where the final product had a lot of variance from

9    the initial sketches?

10   A.  No, not necessarily.  I think everything we kind of keep --

11   I mean, the sketches are sort of irrelevant because we're --

12   we, you know, I know what I'm doing and I know what isn't

13   working and what's, you know, maybe some things work in a

14   drawing but they just don't make sense in the physical

15   three-dimensional world.  Like aesthetics are very important in

16   what we do.  All my theory revolves around the aesthetics of

17   these pieces.  So that's what's being exercised the most here

18   is this dialogue with contemporary, you know, object making and

19   aesthetic understandings so...

20   Q.  You mentioned the names of several people in connection

21   with Vidivixi, and purely to refresh your recollection I am

22   just going to state some of them:  Mat Nichols, Dom Smith,

23   Aaron Aujla?

24   A.  Aujla.

25   Q.  Aujla, and Nate Lowman.

Fc1dvid1                        Bradley - cross

1   A.   Right.

2   Q.   Starting with Dom Smith, what was his role in Vidivixi?

3   A.   Dom Smith was a friend of Mark.  He asked that -- well,

4   there was a period of time where Mark had lent my studio space

5   out to a fashion designer to do a production shoot.

6   Q.   Who was that fashion designer?

7   A.   That was Rio and he has Gypsy Sport.  It wasn't really

8   asked -- he didn't really ask my permission.  He kind of threw

9   me in a situation.  I was kind of cornered, so I agreed.  And

10  there was supposed to be some sort of bartering of anything,

11  what can you offer that we need that I can lend you my space.

12  And they did a very, very, very large-scale, multiple green

13  screen video production that took the entire day in my studio.

14  If I was to lease my studio out to someone on that scale, I

15  would have seen at least $5,000 for that day in rental.  It was

16  a huge production.  It did nothing for us.  I didn't get a

17  baseball hat to wear.

18       Dom was another attempt of working with Mark's

19  friends.  He is a photographer.  There were some situations to

20  where the photographer we were using wasn't really -- wasn't

21  really getting along with Mark so I didn't -- he was a personal

22  friend of mine and a personal, like, colleague of mine in a lot

23  of ways, so I didn't want to subject him to -- you know, I

24  would pay him but he would refuse the payment and so we went

25  with Dom.  Dom had the agreement that if he'll shoot some of

Fc1dvid1                    Bradley - cross

1   our photography, then I will lend him my studio for his own

2   production shoots.  And that took place twice, and then it

3   started to turn out that Dom still wanted to be paid as well as

4   use my studio space, and that's just not working out for us.

5   So -- but, you know, he sent me a text message the other day

6   saying sorry about what happened between Mark and I and he

7   would really love to keep working together.  So I'll keep using

8   Dom in the future.  I think he is a good photographer.

9   Q.  To be clear, Dom's role was as a photographer as far as --

10  A.  Dom is a photographer.  He has taken a few photos.  I think

11  there is only like one or two photos on the site that Dom took

12  but more recent stuff Dom shot.

13  Q.  What about Aaron -- I can't even pronounce the last name?

14  A.  Aaron Aujla.

15  Q.  Aujla, yes.

16  A.  Aaron Aujla is an artist.  He's also someone that

17  understands what I'm doing with Vidivixi.  We have collaborated

18  on a series of lighting together for the Vidivixi line.  They

19  were showcased at the AD show in 2015.

20  Q.  Did Aaron Aujla have a role in designing or fabricating the

21  furniture pieces?

22  A.  No.  This is another -- this is sort of like another

23  direction.  Furniture -- Vidivixi isn't just furniture.  It's

24  going to be more accessories.  It's going to be a design house

25  in a lot of ways, taking projects, what it originally set out

Fc1dvid1                         Bradley - cross

1    to do.  It was never supposed to just be a furniture -- solely

2    furniture line.  That doesn't make a lot of sense.

3    Q.  And when you say "going to be," do you mean that it is

4    currently --

5    A.  Well, we're currently exploring lighting, preparing to

6    launch 12 items hopefully by fall 2016 and we're also embarking

7    on sound.  It is just a high-end sound quality bluetooth,

8    working with a sound engineer in New Jersey on developing these

9    pieces.  I would like to sort of parallel that with sound

10   studio interior design so it can be one sort of package.  So

11   that's what I'm focusing on right now as well other things.

12   Q.  So Aaron Aujla was involved in the lighting aspect of this?

13   A.  As well as Nate Lowman, so it is the three of us

14   collaborating on the lighting for Vidivixi, the same way Mark

15   and I were collaborating on furniture for Vidivixi.

16   Q.  And is Mark involved in the lighting or sound aspects?

17   A.  Nope.

18   Q.  Have you spoken to Mark about the lighting or sound

19   aspects?

20   A.  Yes.  He said he didn't really want to do it.  So I invited

21   him to partake in that but he opted out.

22          MR. RAO:  I would like to show the witness what has

23   been premarked as Defendant's Exhibit A.  It is the affidavit

24   that was previously filed.

25          (Pause)

Fc1dvid1                        Bradley - cross

1                I apologize.  I am getting my copy as well.

2    Q.  Mr. Bradley, do you recognize this document?

3    A.  Yes.

4    Q.  Can you describe this document?

5    A.  It's my affidavit.

6    Q.  I would like to turn your attention to paragraph 5 of this

7    document.  Could you read the text of paragraph 5, please, for

8    the record?

9                THE COURT:  Well, are you offering Defendant's Exhibit

10   A?

11               MR. RAO:  Yes, your Honor.  I move it into evidence.

12               THE COURT:  No objection.  Defendant's Exhibit A

13   received in evidence.

14               (Defendants' Exhibit A received in evidence)

15   A.  Paragraph 5.  "In short, due to my recent discovery (made

16   less than two weeks ago) upon retrieving my laptop back from my

17   former freelance independent contractor/woodworker, Mark

18   Grattan, that he has not only been stealing from me and

19   Vidivixi -- a company I put every cent I've had (not to mention

20   three-plus years of blood, sweat and tears, just for

21   starters) -- but engaging in unfair and deceptive business

22   practices behind my back, diverting corporate opportunities

23   away from Vidivixi and into his own pocket (despite his zero

24   capital/financial contribution -- compared with my 100 percent

25   investment in same)."

Fc1dvid1                    Bradley - cross

1    Q.   Is it accurate to refer to Mark as a former freelance

2    independent contractor of Vidivixi?

3    A.   I think, yes, it's fair in a lot of ways because I paid him

4    on a number of different, you know, occasions for his time and

5    for his efforts.  And it was very clear to him that if he

6    wanted to -- if this partnership was to work out and become a

7    formal partnership, then there couldn't be this sort of

8    imbalance.  And so, yes, I worded it in the best way that I

9    felt Mark, you know, represents himself in the industry.

10   Q.   When did you pay him?

11   A.   Throughout 2014 and 2015 multiple cash payments.  I'm sure

12   I wrote a few checks in there.  I paid his debts.  I paid him

13   for his time.  I lent him money.  I bought his cat food.  I

14   have given him taxi rides home from the wood shop late at

15   night, and every which way you could possibly imagine I stepped

16   in to support Mark to where he could maintain and keep his head

17   above water.

18   Q.   OK.  I would like to turn your attention to paragraph 6.

19   Could you read paragraph 6 for the record as well?

20   A.   Mm-hmm.  Worst of all, in an unconscionable strident and

21   reckless manner, has been tarnishing the good will associated

22   with the good Vidivixi name and trademark, and like the LLC, I

23   am sole owner by misappropriating the Vidivixi name in a well

24   documented scheme to unfairly compete with his own business

25   partner (not to mention the business itself, which has already

Fc1dvid1                    Bradley - cross

1   suffered permanent and irreparable harm in the most impossible

2   to measure).  All of this -- all for his own personal profit

3   and gain, while I on the other hand have poured my life's work,

4   sweat and all of my savings into Vidivixi, but have yet to

5   realize a single dime in revenue.

6   Q.  Do you say in this paragraph that you refer to Mark Grattan

7   as your business partner or, I suppose more precisely, you as

8   his business partner?

9   A.  Yes.

10  Q.  What did you mean by referring to Mr. Grattan as your

11  business partner?

12  A.  I mean the same thing I've said over and over.  I invited

13  him into a collaboration and we were seeking out to be formal

14  partners.  We were trying to do this right, but there was only

15  one of us trying to do it right.  That's why we're here.

16  Q.  Is it your testimony today that Mr. Grattan was an

17  independent contractor or is it your testimony that Mr. Grattan

18  was a business partner?

19  A.  I think we amended my complaint and made that clear that he

20  was the potential business partner.

21          MR. RAO:  I move to strike as nonresponsive.

22  Q.  Could you please answer --

23          THE COURT:  No.  Overruled.

24          Next question.

25  Q.  I would like to turn your attention to -- just give me a

Fc1dvid1                    Bradley - cross

1   second -- paragraph 20 of the affidavit.  Do you see the, so we

2   don't have to read the whole paragraph into the record, the

3   final part of that paragraph on page 6 of the affidavit at the

4   top of the page?

5   A.  Yes.  Do you want me to read --

6   Q.  Yes.  Do you see where it states after the comma, "with the

7   potential to one day become part of a design collaborative if

8   and when I could afford to transform Vidivixi into a business"?

9   A.  Yes.

10  Q.  What did you mean by "one day become part of a design

11  collaborative"?

12  A.  That this isn't ever going to be possible if it doesn't --

13  if we don't strive to do and make this business function

14  correctly.  So one day this could be a functioning business

15  that revolves around a design collaborative.  Exactly what I

16  wrote.

17  Q.  All right.  Just give me one second here.

18          You mentioned earlier in your testimony a website for

19  Vidivixi.

20  A.  Right.

21  Q.  Vidivixi.com.  Are you familiar with the content on that

22  website?

23  A.  Yes.

24  Q.  I would like to show defendant what's been premarked as --

25  sorry, plaintiff what's been premarked as Defendants' Exhibits

Fc1dvid1                          Bradley - cross

1    R and S.

2              Do you have the exhibits?

3    A.  No.

4              (Pause)

5    Q.  I apologize.

6              Looking at Exhibit R, do you recognize that document?

7    A.  Yes.

8    Q.  Could you describe that document?

9    A.  That is the about.

10   Q.  The about for?

11   A.  For the Vidivixi.  It's the link on the about page for

12   Vidivixi on the website.

13   Q.  Could you read the description of the about?

14   A.  Sure.

15             THE COURT:  Hold on.  You are offering Defendants

16   Exhibits R and S?

17             MR. RAO:  I'm sorry, your Honor.  Yes.  I'm offering

18   Defendant's Exhibits R and S to move into evidence.

19             THE COURT:  No objection?

20             MR. PEK:  No objection.

21             THE COURT:  Defendant's Exhibits R and S received in

22   evidence.

23             (Defendants' Exhibits R and S received in evidence)

24             THE WITNESS:  Shall I read it?

25             MR. RAO:  Yes, please.

Fc1dvid1                        Bradley - cross

1              THE COURT:  Yes.

2              THE WITNESS:  A furniture designer merges with a

3    contemporary artist and sculptor forming Vidivixi, a design

4    collaborative that responds to the debates and conversations

5    among their peers and mentors.  Artists and designer alike,

6    through three-dimensional object making, together they create

7    an energetic collective thinking process, uncompromised

8    quality, and truly innovative.

9    BY MR. RAO:

10   Q.  Who is the furniture designer referred to in this about

11   section?

12   A.  Well, we're referring to ourselves as what we do.  So Mark,

13   yeah.

14   Q.  And then the contemporary artist and sculptor?

15   A.  Myself.

16   Q.  And then the section that says Vidivixi, a design

17   collaborative, is a design collaborative a description for

18   Vidivixi?

19   A.  Yeah.  It is a broad description but yes.

20   Q.  I would like to turn your attention to what's been

21   premarked as Defendant's Exhibit S.

22              Do you recognize this document?

23   A.  Yep.

24   Q.  Could you describe this document?

25   A.  It is the contacts link page.

76

Fc1dvid1                          Bradley - cross

1   Q.  And do you see where it states "Principals"?

2   A.  Yes.

3   Q.  Who are the names listed on this?

4   A.  Mark Grattan and Francis Bradley.

5   Q.  Is it accurate to state that Vidivixi was a design

6   collaborative of which you and Mark Grattan were principals?

7   A.  Yeah.  We were business partners, yeah.

8   Q.  In your affidavit you reference several times an LLC.

9   Could you state for the record what LLC you are referring to?

10  A.  The limited liability company.

11  Q.  What's the name of that limited liability company?

12  A.  Vidivixi.

13  Q.  And when was that formed?

14  A.  In late August.

15  Q.  Do you recall attaching as an exhibit to your affidavit a

16  company operating agreement for that company -- for that LLC?

17  A.  I don't remember but maybe.

18         MR. RAO:  OK.  I would like to show the witness what's

19  been premarked as Defendant's Exhibit C and offer the same into

20  evidence, your Honor.

21         (Pause)

22         THE COURT:  OK.  No objection.  Defendants' Exhibit C

23  received in evidence.

24         (Defendants' Exhibit C received in evidence)

25         THE COURT:  My copy has no pages 1 and 2.  It begins

Fc1dvid1                          Bradley - cross

1    at page 3 with a cover page.

2              (Pause)

3              MR. RAO:  Your Honor, my copy also begins at page 3.

4    Let me try and figure out why that is.  Just give me a moment.

5              (Pause)

6              THE COURT:  OK.  The document in the file contains a

7    page 2, so.

8              MR. RAO:  Apologies, your Honor.

9              THE COURT:  OK.

10   BY MR. RAO:

11   Q.  Mr. Bradley, looking at this document today, does this

12   refresh your recollection at all as to what this document is?

13             I think you just said you didn't recall attaching it.

14             MR. RAO:  Sorry, your Honor.

15   A.  Yes.  This is the basic breakdown of a limited liability

16   corporation agreement.

17   Q.  And that's for Vidivixi LLC, is that correct?

18             (Pause)

19             Did you sign this operating agreement?

20   A.  I don't remember.

21   Q.  Let me ask a slightly different question.  Do you recall

22   ever signing an operating agreement of any kind for Vidivixi,

23   LLC?

24             MR. PEK:  Objection, your Honor.  Relevance.

25             THE COURT:  Overruled.

Fc1dvid1                        Bradley - cross

1    A.  Possibly, but I don't remember.

2    Q.  And do you recall submitting this particular document as an

3    exhibit to your affidavit?

4    A.  No.  That's why I said I don't recall the first time you

5    asked.

6    Q.  But it wouldn't surprise you or you wouldn't find it

7    strange to know that you had in fact submitted this document as

8    part --

9              THE COURT:  Speculation.  Sustained.

10             MR. RAO:  Withdrawn.

11   Q.  Turning to the first page of this --

12             THE COURT:  It doesn't have to be withdrawn.  I

13   sustained the objection so next question.

14             MR. RAO:  Sorry, your Honor.

15   Q.  On the first page of this document, do you see where it

16   states, "Form single member, member-managed LLC agreement"?

17   A.  Yes.

18   Q.  If I could draw your attention to the pages towards the

19   back, the beginning of the footnotes.

20   A.  What page?

21   Q.  My document lacks page numbers.  It is the page after the

22   signature page bearing your name.

23   A.  What would you like me to acknowledge here?

24   Q.  Do you see the bold and capitalized letters in the second

25   paragraph stating, "Be advised that the laws of each state can

Fc1dvid1                        Bradley - cross

1    vary significantly"?

2    A.  Yes.  "The company/corporation does not guarantee the

3    accuracy or currency of these end notes.  Questions about any

4    of these end notes or your state specific laws should be

5    referred to an attorney and/or accountant in your state to

6    confirm their accuracy and currency."

7    Q.  Do you recall where you got this document from?

8    A.  Probably The Company Corporation.

9    Q.  What do you mean by "The Company Corporation"?

10   A.  The Company Corporation is the company that I licensed my

11   LLC under, like I did it online.

12   Q.  I understand.

13   A.  So, The Company Corporation.

14   Q.  I think in your testimony and as stated in your affidavit

15   that your ownership of the LLC is related to your ownership to

16   the furniture that is at issue in this matter?

17   A.  I mean, Vidivixi owns the furniture.

18   Q.  When you say Vidivixi, what do you mean?

19   A.  I mean Vidivixi.

20   Q.  Do you mean -- are you referring to the LLC?

21   A.  Yes.

22   Q.  So your testimony is that the LLC that you formed in late

23   August owns the furniture?

24   A.  Of course.

25            THE COURT:  Why do you say that?

Fc1dvid1                          Bradley - cross

1                  THE WITNESS:  Well, because --

2                  THE COURT:  Hold on.  Are we talking about specific

3       pieces of furniture that had been created before you created

4       the LLC?

5                  THE WITNESS:  Yes.  But they were Vidivixi pieces, you

6       know.  The collaboration, the outcome of that, it's for

7       Vidivixi.  So, you know, it belongs -- in this case, I mean,

8       there was some imbalance in how these pieces were created so

9       it's up for dispute.  I would like nothing more than the

10      furniture to come back home so it can be further examined and

11      made correctly in the future so it doesn't get sold and it's

12      not breaking and customers aren't unhappy.  But if something

13      is -- the way I see it is that we embarked on something

14      together, and if there is a third party, meaning the company

15      now, it belongs to the company, you know.

16                 THE COURT:  The furniture pieces were created at a

17      time when you thought you were in a collaboration with Mark

18      Grattan, right?

19                 THE WITNESS:  Yes.

20                 THE COURT:  And then you created the single member

21      LLC; you went online and got the document?

22                 THE WITNESS:  Mm-hmm.

23                 THE COURT:  Did you file the document anywhere?

24                 THE WITNESS:  Yes.  I believe so, yes.

25                 THE COURT:  Where did you file it?

Fc1dvid1                    Bradley - cross

1          THE WITNESS:  I don't remember exactly off the top of

2     my head.  I'm sorry.  I have just been through so much in the

3     last few months.

4          THE COURT:  OK.  When you created this LLC, did you

5     physically transfer any assets to it?

6          THE WITNESS:  Just -- I mean, assets in, like, how

7     say?

8          THE COURT:  Leases, pieces of furniture.

9          THE WITNESS:  Well, yes.  I mean, everything, yeah.  I

10    mean, it's the -- Vidivixi is where my business is.  It's

11    where -- you know, it's who I am.  So like the assets that

12    apply to it are all of my assets, the assets that have been

13    creating the furniture, sustaining the project to the point of

14    where it could get this far.  You know what I mean?

15         I was -- at that point I had worked so hard to get it

16    this far and then just to find out what was happening behind my

17    back.  There was no logical reasoning coming from the other

18    side so I needed to do something, and the smartest thing I

19    could possibly do was to lock it down so it's under control and

20    get the best attorney I can afford to explain to me what's

21    going on and why and how do I never let this happen to me

22    again.

23         THE COURT:  Is that why you created the LLC?

24         THE WITNESS:  No.  The LLC was created because it was

25    going to be created, you know, within that time period anyhow.

Fc1dvid1                    Bradley - cross

1    It was just sort of like an eye opener, the email that I was

2    sent -- that was sent to me from Mark, it scared the life out

3    of me because I realized that someone was about to try to

4    conspire to push me out of something I was -- you know, was my

5    brainchild.  This is my -- my everything, you know.

6             THE COURT:  OK.

7    BY MR. RAO:

8    Q.  Mr. Bradley, you previously testified about Jean Lin.

9    A.  Right.

10   Q.  Can you describe the circumstances under which you met Jean

11   Lin?

12   A.  Yeah.  We met Jean.  We reached out to her and then we got

13   invited to have a meeting.  We had a young lady that was

14   helping us do the logistics of sales and email inquiries and,

15   you know, just admin stuff and she helped us get our foot in

16   the door.  The meeting went poorly.  We -- and then we got

17   invited back and we got invited to be part of the showroom.  It

18   is a co-op so we signed a lease and we started making payments.

19   Q.  Were you at the meeting?

20   A.  Yes.

21   Q.  When you say the meeting went poorly, what do you mean?

22   A.  The first meeting with Somari was just kind of talking

23   about irrelevant subject matters, stuff that we weren't ready

24   for yet, getting the idea of the brand, kind of incorrectly

25   overly ambitious.  She was trying to do right thing but just

1    the wrong time.  So we looked like we didn't know what

2    decisions we, you know, are comfortable with making and where

3    the direction of Vidivixi was going to be going.

4           She was talking, you know, factory development.  We

5    are talking custom, maybe limited-run editions but we weren't

6    there yet, and we decided it was just going to be a line.  And

7    we were working on pricing, and all of that was happening while

8    we were maintaining the space at Jean Lin Good Colony to at

9    least get, you know, a clean, pristine environment to showcase

10   the work in rather than put it in storage.

11   Q.  Who is Somari?

12   A.  Somari was a friend of Mark's who wanted a job to help us

13   market our brand.  We weren't ready yet.  It didn't work out

14   very well.  The agreement between Mark and I was that we would

15   hire her on for about one round, which was four payments.  And

16   she wasn't cheap so we needed the results that we needed and we

17   weren't getting them.  I paid the first two installments to

18   Somari.  By the time it was Mark's turn to start making

19   payments, he decided that it would be better if he fired her.

20          Upon firing her, he must have scapegoated most of what

21   he felt through me because he had to face his friend, and I

22   got -- that was the beginning of me getting labeled the money

23   guy.  Somari threatened to sue me for not living up to our

24   contract.  So it caused some major turmoil between Mark and I.

25   And I told him this is your idea, this is your friend, you

Fc1dvid1                         Bradley - cross

1   brought this person into our lives, you have to settle this.

2   And then I paid Somari and that's that.  Somari was happy she

3   got paid.

4              But that was the first very frustrating big warning

5   sign that this was going to not work.  And my potential

6   business partner was not only using my kindness to gain some

7   sort of control over his inability, and to sustain that, then

8   that was just dysfunctional for me.  So I was trying very hard

9   to separate that and eliminate those situations from arising

10  again so we didn't bring anyone else on board except anyone

11  from outside -- outsourced fabrication.

12  Q.  So Somari is somebody that you said we hired and when you

13  said "we" you meant?

14  A.  It was Mark's idea.  I sat down at the meeting with her.

15  We signed a contract, the three of us.

16  Q.  Was the word "Vidivixi" used in that contract?

17  A.  Of course.

18  Q.  And who was identified -- who were the signatories on the

19  contract?

20  A.  Both of us.

21  Q.  Was Somari at the first meeting with Jean Lin that I asked

22  you about before?

23  A.  Yes.

24  Q.  Do you recall in the affidavit that you submitted in this

25  action attaching a copy of an agreement called Independent

Fc1dvid1                          Bradley - cross

1    Designer Agreement with Colony?

2    A.   Right.   Yeah.

3              MR. RAO:   Your Honor, I would like to show the witness

4    what's been premarked as Defendants' Exhibit E and offer the

5    same in evidence.

6              THE COURT:   All right.

7              (Counsel conferred)

8              THE COURT:   Mr. Bradley, do you still have your

9    affidavit in front of you, Defendants' Exhibit A?

10             THE WITNESS:   I believe so.   Yes.   It is all out of

11   order.   Here.

12             THE COURT:   On the first page of that affidavit, in

13   Footnote 2, it refers to the single member, member-managed

14   operating agreement for the LLC.   And it says though merely a

15   template for single member LLCs that was never executed, it

16   still tends to show and further confirm at the outset that at

17   no time was Vidivixi even conceived to include more than one

18   owner.

19             Was that accurate, that the agreement was -- that the

20   single-member LLC was never actually executed?

21             THE WITNESS:   I mean, it was a type of -- I did it --

22   it was my first time kind of going online and, you know,

23   setting up a company so I could have made some mistakes here

24   and there.   Not being fully aware of what I was doing or just

25   knowing that, you know, I wanted to be an LLC, I thought that

Fc1dvid1                          Bradley - cross

1    if things were to work out, then obviously like it could

2    change -- you can change things around.  But, yeah, I just was

3    trying to really just save it from devastation, you know, in a

4    lot of ways and not lose what I was working towards for two

5    years because, umm.

6             THE COURT:  OK.  Go ahead.

7    BY MR. RAO:

8    Q.  All right.  Do you recognize this document as the

9    Independent Designer Agreement I was referring to earlier?

10   A.  I never received your paperwork.

11   Q.  Oh, I'm sorry.

12            (Pause)

13            THE COURT:  No objection, Defendants' Exhibit E

14   received in evidence.

15            MR. PEK:  No objection.

16            (Defendants' Exhibit E received in evidence)

17   BY MR. RAO:

18   Q.  Could you turn to the second-to-last page of the document

19   that I have just handed you, Defendants' Exhibit E?

20   A.  The Independent Designer Agreement?

21   Q.  Yes.  What do you see on the second-to-last page of that

22   Independent Designer Agreement?

23   A.  Business name, business type, tax ID, Social Security

24   number, address, city, phone, zip, email, signature, print

25   name, title, signature, print name, title.

Fc1dvid1                          Bradley - cross

1   Q.  Do you see that there are blanks where it appears the

2   parties would have signed the agreement?

3   A.  There is not -- this is completely blank.

4   Q.  Yes.  Do you recall attaching this document to your

5   affidavit in this case?

6   A.  I recall attaching I think part of this document.  I

7   couldn't find the entire document where I signed my -- I

8   imprinted my name.  I believe we found like the first page of

9   this.

10          THE COURT:  There is a final page to the document

11   which appears to be an invoice number.

12          MR. RAO:  Your Honor, this exhibit was taken from a

13   Pacer filing that combined two documents as an exhibit to the

14   Bradley affidavit.  I am just showing him exhibits to his

15   affidavit.

16          THE COURT:  Yes, it is an exhibit to the affidavit.

17          MR. PEK:  Your Honor, if I just may clarify?  That was

18   my suggestion to include the invoice as an exemplar of the way

19   payments were made pursuant thereto in the absence of a signed

20   written agreement that we would later locate.

21          THE COURT:  OK.  The document is what it is.  It was a

22   exhibit to Mr. Bradley's affidavit.

23   BY MR. RAO:

24   Q.  Mr. Bradley, I am now going to show you what's been marked

25   as Defendants' Exhibit AE.

Fc1dvid1                          Bradley – cross

1          (Pause)

2          And with apologies for the initial quality, do you

3     recognize this to be the signature page of the document we were

4     just looking at?

5     A.   Yeah.  My signature is on there, my telephone, my studio

6     address, the address of Vidivixi.

7     Q.   Do you also see -- actually, can you identify the

8     signatures on this document?

9     A.   Mark Grattan and Francis Bradley and Jean Lin.

10    Q.   And I take it you and Mark Grattan are signing for

11    Vidivixi?

12    A.   Of course.

13    Q.   And then under "Title," what does it state as to your

14    title.

15    A.   It says, "Independent Designer, Signature, Print Name,

16    Title, Business Name, Vidivixi."

17    Q.   What's written after the word "Title"?

18    A.   "Co-owner."

19          THE COURT:  All right.  No objection, Defendants'

20    Exhibit AE received in evidence.

21          (Defendant's Exhibit AE received in evidence)

22          MR. RAO:  Your Honor, just give me one minute.

23          (Pause)

24          Your Honor, we are done with the cross-examination of

25    Mr. Bradley.

Fc1dvid1                        Bradley - redirect

1              THE COURT:  No further questions?

2              MR. RAO:  No further questions.  I apologize.  It has

3    been a crazy --

4              MR. PEK:  Your Honor, if I may have just a moment of

5    redirect?

6              THE COURT:  Yes.  Go ahead.

7    REDIRECT EXAMINATION

8    BY MR. PEK:

9    Q.  Good afternoon, Mr. Bradley.  Just a few quick questions.

10             To pick up in reverse order, was it clear to you when

11   you were just asked to read from your affidavit, the footnote

12   in particular, that the Vidivixi term had already been defined?

13             Or do you still have before you your affidavit?

14   A.  Yes, I do.

15   Q.  Do you recall moments ago Judge Koeltl and Mr. Rao asking

16   about Footnote 2 and the single member member-managed operating

17   agreement?

18             (Pause)

19             Would you mind reading the last sentence, the second

20   and last sentence of Footnote 2?

21   A.  Where it says "though merely"?

22   Q.  Yes.

23   A.  "Though merely a template for single member LLCs that was

24   never executed, it still tends to show and further confirm at

25   the outset that at no time was Vidivixi even conceived to

Fc1dvid1                          Bradley - redirect

1   include more than one owner."

2   Q.  Mr. Bradley, do you see where Footnote 2 arrives -- do you

3   see -- do you find where I find it at the end of paragraph 2?

4   A.  In paragraph 2 on the first page here?

5   Q.  Yes.

6   A.  It says, "I should mention that I am now and have always

7   been the sole owner and the only member of my recent

8   incorporated company, Vidivixi, LLC."

9   Q.  Do you understand the parenthetical that follows?

10  A.  Somewhat, to make it clear.

11  Q.  Was it clear to you when you were just asked as to whether

12  in fact Footnote 2, I think -- I don't recall the exact

13  wording, but whether in fact it was true at the moment, at the

14  time that you stated it?

15          THE COURT:  The point of the question, Mr. Pek, was to

16  attempt to understand from the witness whether he actually

17  recalls signing the LLC agreement and filing it, because the

18  footnote says that it was, quote, never executed.  It was not a

19  question directed to --

20          MR. PEK:  Which entity.

21          THE COURT:  -- which entity.  It was a question

22  directed to attempting to clarify the witness' testimony and

23  recollection as to whether he ever signed that document and

24  filed it.

25          MR. PEK:  Understood.

Fc1dvid1                          Bradley - redirect

1   BY MR. PEK:

2   Q.  Mr. Bradley, have you ever incorporated a business before,

3   before Vidivixi, LLC?

4   A.  Not solely by myself, no.

5   Q.  The Independent Designer Agreement that Mr. Rao was just

6   asking you about, at the time you entered into that with

7   Mr. Grattan, had you yet applied for the LLC or for

8   incorporating Vidivixi, LLC?

9   A.  No.

10  Q.  Why did you incorporate Vidivixi, LLC?

11  A.  Well, I was planning to and there was like a direct threat,

12  you know, email to me with sort of like an ultimatum, and it

13  was completely irrational and out of this world and it was

14  going to be a very difficult thing to reason with because it

15  was already -- what was written was -- sort of made no sense

16  whatsoever.  So clearly we were in two different worlds and we

17  see business functioning in two drastically different ways.  So

18  there wouldn't be any casual conversation that would make it

19  clear that could resolve this.  It's just not going to happen.

20  And when I got the computer back I realized that, you know, I

21  had done the best thing I could possibly do for Vidivixi,

22  separate it from Mark.

23  Q.  Did you pay somebody -- did you consult counsel, rather,

24  before endeavoring to incorporate this LLC?

25  A.  No.

Fc1dvid1                    Bradley - redirect

1   Q.  You did it by yourself?

2   A.  What?

3   Q.  Incorporate Vidivixi, LLC.

4   A.  I called my friend Jay who, you know, I designed his store.

5   He opens up businesses a lot.  So I just asked what would be

6   the most, you know, easiest way.  He actually did it for me

7   while I was sitting there.

8   Q.  I heard you say The Company Corporation.  Is that -- how

9   would you describe that company?

10  A.  Yeah.  You just pay them the fee.  They take care of

11  everything for you.  You get your LLC and all your information

12  in the mail a few days later.

13  Q.  Did they -- did you speak with anybody at The Corporation

14  Company?

15  A.  No.  It was just online.

16  Q.  And did you read through the entire agreement and to your

17  satisfactory understanding before paying the fee?

18  A.  Not really.

19  Q.  Was this a reactionary measure?

20  A.  I would say, yeah.  50 percent yes.

21  Q.  OK.

22  A.  50 percent, you know, I was planning on doing it as soon as

23  possible anyway, you know.

24  Q.  Back to the furniture just for a moment.

25          THE COURT:  Mr. Bradley, the Independent Designer

Fc1dvid1                          Bradley - redirect

1   Agreement, when did you sign that?

2            THE WITNESS:  That was signed when we moved into the

3   showroom.  It's Good Colony's sort of lease agreement in a way,

4   like co-op agreement.

5            THE COURT:  And when was that?

6            THE WITNESS:  That was done I believe in late May or

7   early June.  There were a few meetings leading up to -- I think

8   in February we started talking to her and after the

9   Architectural Digest in March we started moving in and stuff --

10  furniture into that space.  So it had to be after March but

11  before, you know, April, May, June, you know, that kind of time

12  period.

13           THE COURT:  Of 2015?

14           THE WITNESS:  Yes.  Yes.

15           THE COURT:  OK.  Go ahead.

16  BY MR. PEK:

17  Q.  Mr. Bradley, you were questioned earlier about the pieces

18  of furniture and also the photographs of those pieces of

19  furniture.

20           To clarify the record, there are 14 total pieces of

21  furniture?

22  A.  Yes.

23  Q.  Could you speak into the microphone?

24  A.  Yes.

25  Q.  And is there a piece of furniture called the folding --

Fc1dvid1                          Bradley - redirect

1   the --

2   A.   The Double Fold?

3   Q.   The Double Fold I am aware of.

4        The fold bookshelf?

5   A.   Yes.

6   Q.   How much wood does that have in it?

7   A.   Well, it can have no wood if it is just glass shelving or

8   it can have a wooden drawer, a drawer box, depending on what

9   variation you buy it as.

10  Q.   Does the one that sits in your studio -- is there one that

11  sits in your studio?

12  A.   Yes, yeah.

13  Q.   And does that have any wood on it?

14  A.   Right now I display it without any wood.  The drawer box

15  was damaged in like a move or something, so.  But it's just --

16  yeah, it was made originally with one drawer, center drawer in

17  the middle hovering off the steel shelf.

18  Q.   Are there pieces of those 14 pieces that have no wood?

19  A.   Yes.  Yeah.

20  Q.   Did you design any of these pieces?

21  A.   Yes.

22  Q.   And did you -- withdrawn.

23        THE COURT:  The 14 pieces, are they in a condition to

24  be sold or are they used as models?

25        THE WITNESS:  They are the first runs of these designs

Fc1dvid1                    Bradley - redirect

1   so they should not be sold.  They need to be sort of product

2   tested and further developed and then sort of, you know, they

3   need to be tested by the industry to get regulations on, you

4   know, weight capacity, how much can this bookshelf hold in

5   weight and so we can kind of -- you know, I don't want a lot of

6   liability falling back on me after someone knocks down a glass

7   bookshelf on them.

8              There was an issue with the --

9              MR. PEK:  I wanted to ask you about --

10             THE COURT:  Stop, please.

11             MR. PEK:  Forgive me.

12             THE COURT:  Hold on.  Let the witness answer the

13   question.  OK.

14             THE WITNESS:  When I received my computer back, there

15   was correspondence between Mark and the person who bought the

16   nine chairs, and they were very upset that one of the chairs

17   that he had sold, you know, behind Vidivixi's back was received

18   by the client, were used during a holiday dinner and then one

19   of the chairs failed and the grandfather or someone elderly

20   collapsed in the chair, and they were unhappy.  They wanted

21   either their money back or something.

22             So when I saw that dialogue I was really upset because

23   these are things that we were trying to -- it is one thing to

24   show the work and -- but it needs to be further developed

25   before it is formally cataloged and ready to be either mass

Fc1dvid1                           Bradley - redirect

1   produced or, you know, it is a major problem.

2              THE COURT:  OK.  And those 14 pieces are being stored

3   now?

4              THE WITNESS:  Right.  Yes.

5              THE COURT:  Where?

6              THE WITNESS:  Half of them are in my studio and where

7   we store most of the majority of the work and photograph all

8   the work.  So they are wrapped up and stored there.  And the

9   five pieces that were in Good Colony, they are at Maqette.  It

10  is an art handling, shipping logistics company.  They are just

11  being stored in their storage that is now safe.

12             THE COURT:  OK.  Thank you.

13  BY MR. PEK:

14  Q.  Mr. Bradley, with respect to those nine chairs you were

15  just discussing, did you do any structural integrity tests,

16  quality control, inspection, any GSA standards, any regs, any

17  test?

18  A.  No, not as of yet, no.

19  Q.  And I had heard you just mention something seemingly very

20  unfortunate, one of those chairs broke; is that your

21  understanding?

22  A.  That is my understanding, yes.

23  Q.  Do you know what that client or what that customer

24  demanded, if anything, upon its breaking?

25  A.  They wanted reimbursement, but I haven't been able to

Fc1dvid1                    Bradley - redirect

1    access any of my emails since the site was crashed and my

2    server was changed.  So, therefore, there is no way for me to

3    understand what is going in and out of Vidivixi at this moment,

4    since September.

5    Q.  Are you aware that -- or whether that correspondence with

6    that, if I may, disgruntled customer was sent from

7    Mr. Grattan's Vidivixi.com email address?

8    A.  I believe so, yes, otherwise I wouldn't have been --

9    Q.  Just to refresh my memory --

10            THE COURT:  Well, it is not necessary to refresh your

11   recollection.

12            MR. PEK:  OK.

13   BY MR. PEK:

14   Q.  Mr. Bradley, in connection with the domain name, you had

15   mentioned that you paid for it from its inception, of

16   Vidivixi.com.  What is the significance or purpose of the

17   address 311 Adelphi Street?

18   A.  I believe -- I'm not sure if it is still the current

19   address, but I believe that is the address of Sebastian Silva,

20   a former friend -- boyfriend of Mark's that used to share the

21   apartment.

22   Q.  Are you friendly with this individual?

23   A.  Seb is a wonderful guy.

24   Q.  Is that where Vidivixi has any business?

25   A.  No, none whatsoever.

Fc1dvid1                    Bradley - redirect

1   Q.  Are you aware that that's still currently listed as the

2   registrant address for the Vidivixi.com website?

3   A.  Yes.  We were -- that became aware to us while we were

4   doing the research with GoDaddy to figure out what happened to

5   the website and who was -- who crashed it and why and what

6   they're doing and what gave them access to it.

7   Q.  Are you aware that in connection and as a necessary

8   consequence of purchasing a domain name from GoDaddy.com you

9   agreed to certain terms and conditions?

10  A.  Yes.

11  Q.  Would it surprise you to learn that it is a violation to

12  not keep your registrant information current and it provides

13  grounds for cancellation?

14  A.  I am aware of that, yes.

15          THE COURT:  Is this redirect directed at a subject

16  that was opened up on cross?

17          MR. RAO:  No, your Honor.  I was just going to make

18  that objection.  I don't recall ever asking Mr. Bradley about

19  this.

20          THE COURT:  Well --

21          MR. PEK:  OK.

22          THE COURT:  And, by the way, when you make objections,

23  it is customary to stand, right?

24  BY MR. PEK:

25  Q.  Mr. Bradley, of all the outsourcing that Vidivixi has done,

Fc1dvid1                        Bradley - redirect

1   can you estimate how many total upholsterers and steel makers

2   and what have you, the total vendors to whom you have

3   outsourced?

4   A.  Five or six, probably.

5   Q.  Have you ever had to change a vendor for the same material

6   or the same --

7   A.  Yes.  Yeah.

8   Q.  Can you give me an example?

9   A.  We had to change the vendor in Philadelphia because the

10  work wasn't up to par and we --

11  Q.  Was there ever a vendor at that would no longer do business

12  with you?

13  A.  Would no longer do business?

14  Q.  Or refuse to continue to do business?

15  A.  Not in particular with me --

16  Q.  With Vidivixi.  I'm sorry.

17  A.  With Vidivixi, no.  I think there were certain

18  circumstances where when ordering supplies and stuff like that,

19  there had to be a little sneaking around because Mark, they had

20  some claims on him for nonpayments and stuff like that.  So

21  they wouldn't sell us wood or anything.

22  Q.  So have there been occasions where you have had to change

23  suppliers or vendors as a result of something that you

24  understand to be Mr. Grattan or that was claimed to have been

25  Mr. Grattan's error or fault?

Fc1dvid1

1    A.   Possibly.  I have to think, yeah.

2    Q.   Just lastly, have you enlisted any of your networks or

3    contacts to assist in fabrication outsourcing?

4    A.   Yes.

5              MR. PEK:  OK.  Nothing further.

6              THE COURT:  Mr. Bradley, you are excused.  You may

7    step down.

8              THE WITNESS:  Thank you, your Honor.

9              (Witness excused)

10             THE COURT:  Call your next witness.

11             MR. PEK:  The plaintiffs call Anthony Bunda, who I

12   will go retrieve.

13             THE COURT:  We are going to break in about five

14   minutes of 1 and then we will resume at 2 o'clock.

15             MR. PEK:  I would prefer to -- well, if it pleases the

16   Court, I think it would be --

17             THE COURT:  I'm sorry.

18             MR. PEK:  If it pleases the Court, I am happy to begin

19   Mr. Bunda's testimony following the break.  If your Honor would

20   prefer us to begin now, that's fine.

21             THE COURT:  I would like to use the time because --

22             MR. PEK:  OK.  Understood.

23             THE COURT:  -- this afternoon we are only going to be

24   able to sit from about 2 until 2:45, when I have a criminal

25   matter, and then we are going to resume at 4 o'clock after I

Fc1dvid1                              Bunda – direct

1  deal with a couple of other criminal matters.

2            MR. PEK:  Understood.

3            THE COURT:  And then we'll go for some time and then

4  resume tomorrow morning.

5            MR. PEK:  OK.

6            THE COURT:  Go ahead.

7            (Pause)

8            THE CLERK:  Remain standing.

9   ANTHONY PETER BUNDA,

10       called as a witness by the plaintiffs,

11       having been duly sworn, testified as follows:

12            THE COURT:  Please state your full name for the

13  record.

14            THE WITNESS:  Anthony Peter Bunda.

15            THE CLERK:  Spell your last name.

16            THE WITNESS:  B-u-n-d-a.

17            THE COURT:  Mr. Pek, you may examine.

18  DIRECT EXAMINATION

19  BY MR. PEK:

20  Q.  Good afternoon, Mr. Bunda.

21  A.  Good afternoon.

22  Q.  You understand that you have been called as a witness here

23  as a result of a dispute concerning the business entitled

24  Vidivixi?

25  A.  Yes.

Fc1dvid1                              Bunda - direct

1    Q.  Are you familiar with Vidivixi?

2    A.  Yes.

3    Q.  Would you say you are very familiar with Vidivixi?

4    A.  I'm pretty familiar, yeah.

5    Q.  If I may, do you have -- are you currently employed?

6    A.  Yes.  I bartend down at the Jersey shore.

7    Q.  And have you been employed for the past two years

8    continuously?

9    A.  Yes.

10   Q.  How many hours would you say that you have spent, if any,

11   working for Vidivixi or contributing time or effort to

12   Vidivixi?

13   A.  Over the last two years, depending on my availability and

14   flexibility with my other job, I'd say upwards of 60 hours a

15   week.

16   Q.  60 hours a week?

17   A.  Yeah.  I usually spread out over three days, so like

18   Tuesday, Wednesday, Thursday.

19   Q.  Could you describe what kind of work you have done for

20   Vidivixi?

21   A.  Everything ranging from picking up supplies, from, you

22   know, lumberyards, different stores, Home Depot, to

23   transporting finished pieces to and from art shows, showrooms,

24   to different clients and a wide range of assembly and painting,

25   you know, working on the different pieces.

Fc1dvid1                         Bunda - direct

1    Q.  Where was the majority of your work done, if it was done in

2    one place?

3    A.  It was split up between the wood shop in Sunset Park and

4    the studio on Stewart Avenue.  I'm not sure of the area that it

5    is there.

6    Q.  Does 551 Stewart Avenue ring a bell?

7    A.  Yes.

8    Q.  Would you describe the kind of work that you've done?  What

9    you've just described, is that predominantly manual labor,

10   would you say?

11   A.  For the most part.  A lot of times when I would come in it

12   would be for the most physical part, but through the course of,

13   you know, those days, obviously, 20-hour days, discussions

14   would be had about future projects and, you know, small design

15   stuff with, you know, regards to the height of different

16   pieces, size.

17   Q.  Were you ever paid, compensated for your time by Vidivixi?

18   A.  There were times where I was partially compensated for my

19   time, but there are also times where I was going to be

20   compensated and chose to forgo compensation so that money could

21   go back into the business and whether it be for rent, supplies,

22   things of that nature to ensure that, you know, we can make

23   more money down the road and continue the business.

24   Q.  Would you say you are a supporter of the business?

25   A.  I believe so, yeah, between more time and labor than money

1    but definitely those -- time, labor and money for sure.

2    Q.  Did you before coming to court today ever have a chance to

3    review Mr. -- well, first I should ask, do you know the

4    defendant Mark Grattan?

5    A.  I do, yes.

6    Q.  How long have you known Mr. Grattan for?

7    A.  Roughly I would probably say 12/13 years.  I met him when

8    him and Francis Bradley were in school together in the city.

9    Q.  And you've known -- you've known Francis Bradley prior to

10   that or at the same time?

11   A.  I've know Francis going on 20 years or so.

12   Q.  Mr. Bunda, did you have a chance to review Mr. Grattan's

13   declaration in opposition to a motion for preliminary

14   injunction filed by plaintiffs in this action?

15   A.  Yes.

16   Q.  Do you recall any particular highlights or notable points,

17   any part or portion of that resonate with you or strike a chord

18   as being --

19            MR. RAO:  Objection.

20            THE COURT:  Sustained.

21   Q.  Did you contribute to the fabrication to any degree of any

22   Vidivixi furniture?

23   A.  Yes.

24   Q.  Did you transport Vidivixi furniture?

25   A.  I transported it, like I said, to and from the various

Fc1dvid1                          Bunda - direct

workshops, to showrooms, to the Architectural Digest show that

was over at Pier 98, I believe.  It was over by the Intrepid.

I picked up pieces from one of Mark's apartments and

transported that like to different showrooms for transport to

customers.

Q.  Of all the time, 60 hours a week, as you said, roughly, is

that for the past approximate two years?

A.  Yes.

Q.  How much -- during those work hours, did you work

exclusively with Mark or with Tim or with them together, or was

it a little bit of --

A.  It was a combination of all three.  There were times I

would just be working with Francis Bradley.  There were times I

was working with just Mark Grattan.  There were times I was

working with both of them.  And there are times where I was the

only one doing work and they were having discussions about

either, you know, upcoming shows or other aspects of the

business.

Q.  Are you aware or do you recall in reviewing Mr. Grattan's

declaration Mr. Grattan making a claim that he fabricated every

piece of Vidivixi furniture?

A.  Yes.

Q.  Is that accurate, in your estimation?

        MR. RAO:  Your Honor, we object to the competence of

the witness to testify as to accuracy of Mark Grattan's

Fc1dvid1                         Bunda – direct

1    statements in a declaration.

2              THE COURT:  Sustained.

3              Rephrase the question.

4    BY MR. PEK:

5    Q.  Mr. Bunda, were you an eyewitness to Vidivixi furniture

6    fabrication during those 60 hours a week for the past two

7    years?

8    A.  Yes.

9    Q.  And would you describe those 14 pieces as the product of

10   one person or a collection of people or --

11   A.  Well, it was a combination of, you know, many people, from,

12   you know, myself, Mr. Grattan, Mr. Bradley and then, I mean,

13   there is upholsterers and that type of stuff.  So, I mean, it

14   wasn't a one-man show.  There were many, many moving parts and

15   people to it.

16   Q.  Upholsterers, like -- are you familiar with the Puff Panel

17   Sofa?

18   A.  I'm familiar with the word.  I'm having a hard time

19   visualizing which one that exactly is.  I think that was a

20   black one at the second AD show, if memory serves.

21   Q.  Right, it is black.  What I was trying to ask is would

22   upholsterers fall under the category of outsourcing that

23   Vidivixi does that you have been a part of or ever witnessed?

24   A.  Yes.

25   Q.  But is it correct that you are not one of the folks -- the

Fc1dvid1                         Bunda - direct

1   vendors to whom such finishing work is or upholstery work is

2   done?

3   A.  No.  I never really did any of the major stuff.  I

4   stretched some leather over some panels for some of the beds

5   that we did, but nothing of the stuffing or, you know, the main

6   part that makes up the copy part of the furniture.

7            THE COURT:  You are not an upholsterer?

8            THE WITNESS:  Correct.

9   BY MR. PEK:

10  Q.  You are a bartender.

11  A.  I am a jack of many trades.

12  Q.  Is that 60-hour week for the past two years, give or take,

13  is it safe to say that those hours were expended on work done

14  pre-outsourcing?

15  A.  Yes.  I mean, there was work done and then, you know, we

16  would take the skeleton, if you will, of the furniture to the

17  upholsterer, and then they would put on the fabric and the

18  stuffing and all of that.

19           THE COURT:  But then you would have to take it back at

20  some point, right?

21           THE WITNESS:  Correct.

22           THE COURT:  And if you were going to take it to a

23  show, then you would take it to the show?

24           THE WITNESS:  Correct.

25           THE COURT:  Right.

Fc1dvid1                          Bunda - direct

1   BY MR. PEK:

2   Q.  If you didn't take it to the show, who did, who would, who

3   has?

4   A.  On a few occasions there were gentlemen that I didn't know

5   of.  It was just whoever they could find.  I don't know any of

6   their names or business names.

7   Q.  Do you have background working in any connection with the

8   art industry?

9   A.  I do.  I worked with Maccarone Gallery for a number of

10  years.  Duties ranging from packing up a piece of art for

11  shipment overseas or to collectors setting up and taking down

12  for art shows, which entailed everything from, you know,

13  hanging a painting on the wall to knocking down the existing

14  walls and putting up new ones.

15  Q.  Demolition?

16  A.  Demolition, construction, hanging heavy metal pieces from

17  ceilings.  It was a wide variety of applications.

18  Q.  Do you feel like in the work that you've done for Vidivixi

19  you have been able to apply the skill sets that you have

20  learned or acquired in, for example, working for the Maccarone

21  Gallery?

22      What I mean to say is were you an eligible laborer on

23  behalf of Vidivixi as a result of prior related experience

24  working for, for instance, the Maccarone?

25  A.  Yes.  I have worked with various artists on various

Fc1dvid1                        Bunda - direct

1    projects exclusively and, you know, under their direction, and

2    through that I've also done side jobs, you know, here and

3    there.  So all of that has in one form or another helped me to

4    contribute to the company.

5           THE COURT:  OK.  We are going to break now for lunch

6    and I'll see you all back at 2 o'clock.  Have a good lunch.

7           (Luncheon recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Fc1dvidh                    Bunda - direct

1                    **A F T E R N O O N   S E S S I O N**

2                              2:12 p.m.

3     ANTHONY PETER BUNDA,

4          Resumed, and testified further as follows:

5               THE COURT:  Good afternoon, all.  Please be seated.

6               The witness is reminded, you are still under oath.

7               THE WITNESS:  Yes, sir.

8               MR. RAO:  Judge, before we begin the proceedings,

9     there is a small matter that I wanted to raise with the Court.

10    I've conferred with plaintiff's counsel on this and obtained

11    consent.

12              We have three witnesses, nonparty witnesses, that I

13    had subpoenaed here.  Their availability is dicey at best for

14    tomorrow, and we had spoken to plaintiff's counsel about

15    putting them on after Mr. Bunda and before the conclusion of

16    the case in chief.  I think with the late start and a few other

17    issues, we are at least amenable to doing that and we would

18    appreciate the Court's allowing that.

19              THE COURT:  Fine.

20              MR. RAO:  Thank you.

21    DIRECT EXAMINATION (Resumed)

22    BY MR. PEK:

23    Q.  Good afternoon again, Mr. Bunda.

24    A.  Good afternoon.

25    Q.  So I'd like to ask you a few questions about your specific

1    work with regard to the 14 pieces, to the best of your

2    recollection, so as to inform the Court and -- inform the Court

3    as to how much time and effort and manpower and labor hours

4    have gone into each piece.

5              Do you have a specific recollection of, for example,

6    any particular of these 14 pieces being twice the amount of

7    work, say, than any other one, for instance, the Three Piece

8    Suit, or anything that required any special expertise or

9    knowledge for purposes of pre-outsourcing fabrication and

10   design?

11   A.  Let's see.  I do remember I believe it was called the

12   Jumping Jack Credenza.  It was a bar that was done for the

13   first AD show.  I remember picking up the glass top for that

14   bar and spray painting that bottom part black as to make the

15   glass a little bit more -- I believe the glass was like a blue

16   tint and it wasn't a clear one so they wanted me to try and

17   remove that.  I remember installing the jumping jacks, which

18   are the X-like signs on that, and then packaging, delivering

19   it, and setting up for the AD show, the first one.

20   Q.  Well, about the AD show --

21   A.  Yes.

22   Q.  -- at the AD show, how does each participant -- how are

23   they permitted to present or showcase their pieces?

24   A.  So each presenter gets a booth or however the space that

25   they require, and then they have I believe it was 24 hours

Fc1dvidh                        Bunda - direct

1    before the show opened to set up and, you know, bring

2    everything in.  And from that we obviously brought all the

3    pieces in, installed a wood floor to make the pieces stand out

4    because all the other booths were just an empty gray floor.

5    And then, you know, it was a matter of staging everything and

6    moving it around, see which best fit in the place and what

7    pieces complimented each other.

8    Q.  When you say 24 hours, does that mean that every

9    participant or artist displayer has just that short 24-hour

10   window to get their booth set up?

11   A.  Yes.  There is a certain amount of time that they allowed

12   you to put everything in, and then whatever electricians or

13   other people that they had to set up for the stuff, they left

14   that last but a time for them, you know, the -- my God, what's

15   the word -- proprietors of the show to allow all of that to be

16   done, the final touches.

17   Q.  And once the booths are set up, is it open to the public,

18   is it an invite only, or is it just a kind of --

19   A.  My understanding is you had to purchase some type of ticket

20   to get into the event and from there, you know, it was open.

21   Q.  So if I heard you correctly, you all laid down the wood

22   floor for the AD show this past -- was that this past March?

23   A.  This was two Marchs ago; not this year, the one prior.

24   Q.  And to the best of your knowledge, Vidivixi has been

25   invited to, has participated in or has been shown at two AD

Fc1dvidh                          Bunda - direct

1    shows?

2    A.  Correct.

3    Q.  The same show two years in a row here in New York?

4    A.  Correct.

5    Q.  And did you work on setting up the booth and the showcase,

6    for lack of a better word, at each show?

7    A.  Yes, I did.

8    Q.  Would you describe that work as heavy lifting in the way of

9    setting up within 24 hours so that a very high-end expo can --

10            THE COURT:  Is this relevant?

11            MR. PEK:  Yes, it is.

12            THE COURT:  OK.

13            MR. PEK:  The point I am trying to make, your Honor,

14   is that --

15            THE COURT:  Go ahead.

16            MR. PEK:  OK.

17   BY MR. PEK:

18   Q.  During that 24-hour period, who were you working with to

19   set up the booth -- who set up the booths at the AD shows?

20   A.  Myself, Francis Bradley.  Mark was there at points, and

21   there was -- I feel like there was one other person, I forget.

22   I think it was a female that had something, like a lamp or

23   something, that was in there.

24   Q.  And so it was your job to set up the booth, get it ready,

25   and then --

Fc1dvidh                        Bunda - direct

1   A.  It was to deliver all the furniture.  The place did not

2   provide any assistance for transporting the pieces in, setup,

3   the installation of the wood floor, and then cleaning up the

4   area.

5   Q.  After the show was complete -- or before it, rather?

6   A.  Before the show opens, yes.

7   Q.  Is it your understanding or recollection that these AD

8   shows were of much value in terms of exposure for Vidivixi as a

9   business?

10  A.  Well, the first year we won an award for best design or

11  whatever they were giving out, and that, you know, got some

12  notoriety and exposure for the company.

13  Q.  Do you happen to know if the show this year, this past

14  March, resulted in any awards or selections?

15  A.  I know we didn't win the award that we won the year prior.

16  I don't know if any awards were given for this show.

17  Q.  Can you think of any other -- earlier this morning we heard

18  Mr. Bradley discuss the Factory Floor Expo.  I don't know if I

19  am saying that correctly.  Were you part of the Factory Floor

20  setup as well, an expo by the name of Factory Floor?

21  A.  The name doesn't sound familiar but I could have worked on

22  it before.  I don't remember.

23  Q.  Do you remember any other showcase opportunities, expos or

24  the like, like the AD show that you worked on for Vidivixi?

25  A.  I remember going to different showrooms but I'm not sure I

Fc1dvidh                          Bunda - direct

1   can remember this Factory off the top of my head.

2   Q.  Did you spend -- do you have an idea of how much time of

3   the 60 hours approximate per week that you spent working, it

4   sounds like you were something of a fly person who did -- or,

5   put differently, you were doing whatever was most important to

6   be done at the time, and it sounds like somewhat specializing

7   in heavy lifting and physical work.  I mean, I guess a better

8   question is did you design any of these pieces?

9   A.  Some pieces I was involved in discussions as to, you know,

10  various heights, colors.  It all depends on at what stage in

11  the project I was involved in.  Some I was involved in the from

12  the beginning, some in the middle, some just final touches.  It

13  just depended on where the project fell when I happened to

14  arrive.

15  Q.  Is it also specific to each piece, the process, as you

16  recall it, how these pieces came to be fabricated, or was there

17  not an assembly line but was there something of a Vidivixi

18  protocol for how you all take a concept and bring it to a

19  tangible physical beautiful piece of furniture?

20  A.  Well, yeah.  We would start with the idea and then

21  discussions about materials, color, you know, placement of

22  certain things.  I forget.  The floating desk -- a desk, I

23  remember there was talks about, you know, placement of knobs

24  and the triangle piece to make it not look like -- I think it

25  was to make it not look like a face, so much to look like a

Fc1dvidh                          Bunda - direct

1   face.  Some were fine details.  Some were abstract.

2   Q.  And is it -- earlier this morning Mr. Bradley was

3   testifying about the -- well, were you within earshot or part

4   of the design element or the design process for any particular

5   piece more so than any other piece or any pieces at all?

6   A.  Oh, yeah.  We definitely had discussions throughout the

7   various times, whether it be at the 551 Stewart studio or the

8   Sunset wood shop.  You know, it would be varying degrees of

9   shelf placement, like I said, color, overall layout.

10  Q.  So did you spend -- you spent time in the wood shop working

11  as well?

12  A.  Correct.

13  Q.  All right.  Did you operate any machinery in the wood shop?

14  A.  Yes.

15  Q.  Did Mr. Bradley?

16  A.  Yes.

17  Q.  And Mr. Grattan as well?

18  A.  Yes.

19  Q.  Did anybody else for Vidivixi, based on your firsthand

20  personal knowledge?

21  A.  Not that I can remember.  Most of the time when I was

22  working it was with Mr. Bradley and Mr. Grattan at various

23  points.

24  Q.  And do you have a sense of whether the majority of the time

25  was spent in the wood shop versus the studio or was it just a

Fc1dvidh                          Bunda - direct

1    little bit of a mixed bag?

2    A.   It was wherever we needed to be.  If, you know, some of the

3    pieces were cut out and ready to be assembled and, you know, we

4    needed the space at the Sunset Park shop, we, you know, could

5    bring it to the studio and work on it from there.  But, I mean,

6    it was split up maybe 60/40 for the Stewart to the wood shop.

7    Q.   Was there any kind of chain of command in the way as from

8    your perspective, was there a visionary for any particular

9    piece as commanding, you know, directing you all, or the other

10   folks to make their vision a reality?

11   A.   Well, I mean, as far as the chain of command, I was the --

12   I was the lowest.  For the most part, Francis was telling me

13   what to do.  I mean, Mark would tell me how to do certain

14   things as well.  But most of my direction came from Francis

15   Bradley.

16   Q.   Have you ever heard the word "Vidivixi" before 2013?

17   A.   Not in the context that it came out.  I've heard of --

18   there is a saying "veni, vidi, vici" I think is the saying.

19   That is the closest that I have heard of it.

20   Q.   Were you aware of prior to the collaboration between

21   Mr. Grattan and Mr. Bradley the appearance or existence or

22   manifestation of Vidivixi in any form or medium prior to the

23   Vidivixi business that we have been discussing?

24   A.   Sorry, I don't understand the question.

25   Q.   Did Vidivixi -- are you aware of any Vidivixi lighting

Fc1dvidh                          Bunda - direct

1    installations or music installations, for example?

2              MR. RAO:  Objection.  Leading.

3              THE COURT:  Sustained.

4    Q.  Are you aware of any non-furniture related Vidivixi

5    activities?

6    A.  Well, I mean, I know there were other instances where it

7    wasn't just furniture being made.  I remember there is I think

8    for the first AD show, I believe -- no, I'm sorry, the second

9    there was like a green vase light.  I'm trying to think.  There

10   were other lighting implements that were in this show.  I'm

11   just not -- I didn't work on them so I wasn't really -- I

12   couldn't really describe those.

13   Q.  If you can't remember that, that is fine.

14             Are the 14 pieces, as you know them to be, if you know

15   all 14 pieces, and I think -- well, do you?

16   A.  Yes, I know them.

17   Q.  Is that a correct figure?  Have you worked on all of them?

18   A.  Yes.

19   Q.  And would you characterize the resulting pieces in -- was

20   this -- withdrawn.

21             Do you regard or is your experience working with

22   Vidivixi a team effort?

23   A.  Yes, definitely.

24   Q.  Was it always a team effort?

25   A.  From what I saw, yes.

Fc1dvidh                         Bunda - direct

```
 1    Q.  So you had never -- withdrawn.
 2              Did you ever find yourself working for Vidivixi by
 3    yourself?
 4    A.  Oh, there were certain times when I would come in and I
 5    would give Francis and Mark time to collaborate, troubleshoot
 6    some problems while I worked on, you know, assembling or, you
 7    know, staining, waxing, whatever needed to be done for that
 8    particular piece at the time.
 9    Q.  Do you recall the last shift of work or last time -- last
10    instance that you invested time and effort in working for
11    Vidivixi?
12    A.  The most recent that I can recall would be for the second
13    AD show that was this past March.
14    Q.  After that AD show, did you experience less -- or did
15    Vidivixi appear to you to have less of a need for you?  Was
16    there a change in the last six months since the AD show?
17    A.  There was definitely a dropoff in the momentum that we had
18    been building up from the first AD show from all the buzz and
19    hype from that.
20              THE COURT:  Is there a witness in the courtroom?
21              (Pause)
22              MR. RAO:  He is not one of our witnesses.
23              THE COURT:  No.  OK, go ahead.
24    BY MR. PEK:
25    Q.  So in the last two years in all of the work that you have
```

Fc1dvidh                    Bunda - direct

1    done for Vidivixi, you testified earlier to it being a shared

2    effort but receiving some commands, maybe more so than anybody

3    else, from Mr. Bradley at least insofar as you are concerned?

4    A.  Correct.

5    Q.  Have you ever requested or sought to assert any proprietary

6    interest, any ownership interest in Vidivixi as a result of

7    your sweat equity, if you will?

8    A.  Yes, I did.  I mean, I've been working with Francis for

9    many years on many different projects, and this was one project

10   that I was hoping would be the fruitful gain of all of these

11   efforts over the many years and especially the last two.

12   Q.  How much computer-related work was involved or required in

13   connection with the fabrication and production of these pieces?

14        Did you have occasion to work on a computer yourself,

15   for example?

16   A.  No.  I'm pretty computer illiterate, but what I saw was all

17   hand drawn.

18   Q.  When you say "hand drawn," were these designs or were these

19   specs or --

20   A.  Designs, sketches, umm, you know, just trying to hammer

21   down the final idea.  So it may have started, you know, one way

22   and then the final product was different but, you know, all

23   projects work like that.

24   Q.  How would you describe the working relationship, as you

25   perceived it, as you experienced it, as between Mark Grattan

Fc1dvidh                        Bunda - direct

1   and Tim Bradley?

2   A.  At times good, at times strained, and definitely more

3   strained I saw on Francis through various multiple bad business

4   decisions on Mr. Grattan's part.

5           MR. PEK:  Just a moment, your Honor.

6           (Pause)

7   Q.  Did you ever do any work or do you recall doing any work

8   for just yourself and Mr. Grattan?

9   A.  Yes.

10  Q.  What type of work was that?

11  A.  One instance was a delivery of two pieces to someplace in

12  Connecticut, the Bridgeport area, I don't really remember.  And

13  then other times, you know, I would be in the shop with

14  Mr. Grattan and, you know, Mr. Bradley would have to go take

15  care of something else and vice versa.

16  Q.  In the last two years or in the two years that the joint

17  venture, the collaboration, the partnership, the business of --

18  business enterprise of Vidivixi -- well, were you -- withdrawn.

19  Were you privy or otherwise aware of any sales income, revenue

20  streams coming in?

21  A.  The only one that I was aware of was the piece that I

22  mentioned, the two pieces out to Connecticut.  I'm not sure if

23  that was a personal piece that Mr. Grattan had done by himself

24  or if it was a collaboration.  The only part I remember being

25  on that was the delivery.

Fc1dvidh                        Bunda - direct

1    Q.  You just helped delivering the pieces?

2    A.  Yes.

3    Q.  And you weren't present for any transactional aspect, any

4    changing of checks or money?

5    A.  No.

6    Q.  Have you ever had the occasion to visit the Vidivixi

7    website, or are you familiar with the Vidivixi website?

8    A.  I've visited -- I know I've seen the Instagram.  I maybe

9    visited, you know, a couple of times the Vidivixi.com, I

10   believe.

11   Q.  I just want to turn to one last topic, that being the

12   nature of these 14 pieces.

13          Would you describe these pieces as ready for use by an

14   end-user, or, in other words, were these prototypes, as you

15   understood them to be, or were they just one of each 14

16   different kinds of furniture, 14 different models?

17   A.  My understanding was that these pieces originally were

18   showpieces to spark orders and once they came in they would be

19   made to order.

20   Q.  Were you ever present for any inspection or any kind of

21   testing for, say, structural integrity or fitness for a

22   particular purpose or use?

23   A.  I mean, I sat on them after they were done.  I may have

24   lost some weight but they held me so I thought it was pretty

25   good.

1   Q.  To the best of your knowledge, are you aware of any

2   manufacturing operations whereby these prototypes -- if

3   Vidivixi has any kind of means of producing or filling orders?

4   A.  The only infrastructure that I know was set up was the work

5   that we were doing.  There was no outside factory or assembly

6   line, to my knowledge.

7   Q.  And having been a part of I think the heavy lifting, as I

8   believe you were a part of, was it ever your understanding that

9   these pieces were ready to be sold, orders ready to be fielded,

10  received?  Was there a business that could actually fill

11  orders, or were these just window pieces, proof of concept

12  pieces, prototypes from which a line could be generated on an

13  assembly line, for example?

14  A.  My understanding is that they were essentially floor

15  models, showpieces that were either going to be on the website

16  to spark interest in sales or to, you know, find a showroom and

17  get those in there for the same purpose.

18          THE COURT:  That is what you testified to before?

19          THE WITNESS:  Yes.

20          THE COURT:  Right.

21  BY MR. PEK:

22  Q.  And the two pieces that you helped Mr. Grattan deliver to

23  Connecticut, were they -- they were two chairs I think you

24  said?  What were they?

25  A.  They were two like end table, like desk type things, about

Fc1dvidh                        Bunda - direct

1    the size and width of this area right here (indicating).

2    Q.  Are those pieces, to the best of your knowledge, or were

3    they ever depicted on the Vidivixi website?

4    A.  Not to my knowledge, no.

5    Q.  Have you ever seen any photos of those pieces?

6    A.  No.

7    Q.  Have you ever done any work for Mr. Grattan in connection

8    with any personal venture separate from Vidivixi of

9    Mr. Grattan?

10   A.  The only thing I can think of right now are the two pieces

11   that got delivered to Connecticut.

12            MR. PEK:  OK.  No further questions, your Honor.

13            THE COURT:  OK.  I have a criminal matter at the

14   moment and criminal matters take precedence.  I will take a

15   break.  There is another criminal matter that follows this one.

16   Whether the parties are ready for that, I don't know.  If they

17   are not, we'll continue.  If they are, then we'll have to break

18   until about 3:30 or 3:45.

19            So let me move to the criminal matter.

20            You can step down and then go to the witness room.

21            (Recess)

22            (Continued on next page)

23

24

25

1

2              THE COURT:  All right.

3              THE CLERK:  The witness is reminded you are still

4     under oath.

5              THE WITNESS:  Yes, sir.

6              THE COURT:  All right.  Mr. Rao, you may examine.

7     CROSS-EXAMINATION

8     BY MR. RAO:

9     Q.  Good afternoon, Mr. Bunda.

10             Let's start.  You testified earlier that you have been

11    a friend of Mr. Bradley's for over 20 years, is that correct?

12    A.  Correct.

13    Q.  How did you first meet Mr. Bradley?

14    A.  Probably middle school.

15    Q.  I see.  Where would that have been?

16    A.  In Ridgewood, New Jersey.

17    Q.  Got it.  And you've known him since?

18    A.  Yes.

19    Q.  You also mentioned the Masarone Gallery?

20    A.  Maccarone.

21    Q.  Maccarone?

22    A.  Yes.

23    Q.  When were you working there?

24    A.  I was working there, gees, somewhere starting around maybe

25    2005 maybe; somewhere, give or take, that area.  I would help

Fc1dvidh                        Bunda - cross

1    on various projects and then as I helped them out more and

2    more, I was helping them out more and more.

3    Q.  Sure.  Was Mr. Bradley working at the Maccarone Gallery

4    while you were there?

5    A.  Yes.

6    Q.  And did you ever work together on projects?

7    A.  Yes.

8    Q.  What kind of projects?

9    A.  Various projects, from taking down the previous art

10   showing, setting up for the new one, working with artists for

11   pieces that were being made for those shows.

12   Q.  Did you, you personally, did you do any fabricating while

13   you were at the Maccarone Gallery?

14   A.  Yes.

15   Q.  What kind of fabricating?

16   A.  I worked with cement.  I worked with metal, different wood.

17   Whatever the project called for we worked on.

18   Q.  You started working there in 2005.  About when did you

19   leave the Maccarone Gallery?

20   A.  2011 maybe.

21        THE COURT:  Was that a full-time job?

22        THE WITNESS:  I mean, I wasn't there every day.  I was

23   there in between between the art shows.  So I would, for one, I

24   would take down, package, get rid of all the art from the

25   previous show, set up, and then however long that show ran,

Fc1dvidh                    Bunda - cross

1   five weeks, six weeks, whatever, come back and repeat the same

2   process.

3   BY MR. RAO:

4   Q.  Were you employed there or were you independently

5   contracted to them?

6   A.  Well, I mean, I received my paychecks from them.  As far as

7   whether I was an independent contractor or not, I wouldn't

8   really --

9   Q.  And did you and Mr. Bradley join the gallery around the

10  same time?

11  A.  No.  He joined first.

12  Q.  How is it that you came to the Maccarone Gallery?

13  A.  There was a project that Tim needed help on.  He called me

14  down and I helped him out, and that started the process of me

15  coming down and helping out for shows.

16  Q.  All right.  Did anyone else at the gallery -- was there an

17  interview process, a job interview process, or how is it that

18  they hired you?

19  A.  Well, I was hired through Tim -- I mean, through Francis

20  Bradley initially, but I met with the owner and the curator and

21  from there they continued to, you know, we'd like you to come

22  back and help out whenever you can.

23  Q.  OK.  And you stayed in touch with Tim since?

24  A.  Yes.

25  Q.  You also mentioned that you're currently bartending?

Fc1dvidh                          Bunda - cross

1    A.  Correct.

2    Q.  Where is that bar?

3    A.  It's two different bars.  One is Kelly's Tavern, Neptune

4    City.  The other is Wonder Bar in Asbury Park.

5    Q.  Where is Neptune City?

6    A.  New Jersey.

7    Q.  And Asbury Park?

8    A.  New Jersey, as well.

9    Q.  What kind of hours do you work the two bars, Kelly's Tavern

10   and I forget the name of the other one, actually?

11   A.  I mean, it's varied over the past three years.  Primarily

12   it's a Friday-through-Monday shift.

13   Q.  Do you work nights?

14   A.  Yes.  Nights, days.

15   Q.  How long have you bartended for?

16   A.  Three/four years.

17   Q.  Got it.  Do you have any other jobs?

18   A.  Just those and the work I was doing here in the city with

19   Vidivixi.

20   Q.  How long would it take you to travel from, say, one of the

21   bars in New Jersey to the Stewart Avenue studio?

22   A.  Depending on the time of day and traffic, anywhere from an

23   hour-and-a-half to two-and-a-half, three hours.

24   Q.  And what about the wood shop in Sunset Park?

25   A.  Again, about the same.

Fc1dvidh                          Bunda - cross

1   Q.  You testified earlier that you worked approximately 60

2   hours a week on Vidivixi, is that correct?

3   A.  Correct.

4   Q.  You also testified that that was primarily from Tuesday to

5   Thursday, is that correct?

6   A.  For the most part, yes.

7   Q.  Is that because your bartending job was a Friday to Monday

8   gig, as you just put it?

9   A.  Well, yes.

10  Q.  OK.  Does that mean you were working approximately 20 hours

11  a day on Vidivixi during the Tuesday through Thursday?

12  A.  Yes.

13  Q.  I see.  You also mentioned, or testified, that you had

14  operated machinery in the wood shop?

15  A.  Yes.

16  Q.  Do you recall ever signing a waiver to operate that

17  machinery?

18  A.  Several times, yes.

19  Q.  OK.  Are you familiar with Walter Goodman at the wood shop?

20  A.  Yes.

21  Q.  Did he ever explain to you a policy around machinery

22  operation and who was permitted to operate machinery?

23  A.  He handed me the paper and signed it and said it was a

24  waiver for the use of the equipment and the shop.

25  Q.  Did you pay any rent to Walter to use the shop?

Fc1dvidh                        Bunda - cross

1    A.   I never exchanged any money with Walter, no.

2    Q.   What machinery did you operate?

3    A.   Table saw, the -- I call it the big belt sander, the

4    planer.  I'm trying to think if there is anything else I might

5    have used.  You mean specifically the equipment that was

6    provided by the shop or just --

7    Q.   Correct.

8    A.   Yes.  Like the table saw, the big sander, the planer.

9    Those are things I can readily remember using quite often.

10   Q.   Had you used those before?

11   A.   I'm sorry.

12   Q.   Had you used those before working on Vidivixi projects?

13   A.   Yes.

14   Q.   Would that have been at the Maccarone Gallery?

15   A.   No, it would have been at the shop.

16   Q.   Did you work on non-Vidivixi --

17              THE COURT:  Could you spell for us the name of the

18   gallery that you have been referring to?

19              THE WITNESS:  To the best of my ability, it's

20   M-a-c-c-a-r-o-n-n-e, I think.  There might be two Rs or two Ns,

21   I'm not really sure.

22              THE COURT:  OK.

23   BY MR. RAO:

24   Q.  Were you working on non-Vidivixi projects at the Sunset

25   Park wood shop?

Fc1dvidh                          Bunda - cross

1    A.   A few times, yes.

2    Q.   And what were those?

3    A.   The one time I can remember clearly was in the beginning we

4    were working on stretcher canvases.

5    Q.   When you say "we," who is the other person?

6    A.   Primarily myself and Mr. Bradley.

7    Q.   Do you know what those stretcher canvases were for?

8    A.   They were for an artist.

9    Q.   Were you ever paid for that work?

10   A.   That, yes.

11   Q.   Who paid you?

12   A.   Francis Bradley.

13   Q.   Any other non-Vidivixi work that you might have done at the

14   wood shop?

15   A.   More work along those lines, the canvas stretchers, various

16   shapes and sizes depending on the artist's needs.

17   Q.   How did you meet Mark Grattan?

18   A.   I met him through Francis at Pratt University in the early

19   2000s.

20   Q.   You were a student at Pratt at the time?

21   A.   No, I was not.  I was just visiting.

22   Q.   I see.  Were you there visiting Mr. Bradley?

23   A.   Yes.

24   Q.   Did you ever meet Mark in the context of -- or withdrawn.

25            How did you first meet Mark in the context of

Fc1dvidh                          Bunda - cross

1    Vidivixi?

2    A.  Well, I mean, we had already known each other for several

3    years at that point.  I guess the first time where that would

4    have been with Vidivixi would have been about two years ago,

5    two and a half maybe.

6    Q.  And did you -- what was your understanding of Vidivixi or

7    Mark's role in Vidivixi?

8    A.  That it was a collaboration furniture business.

9    Q.  You also testified earlier that you were hoping to receive

10   some equity in Vidivixi, is that correct?

11   A.  Eventually, yes.

12   Q.  Had you had any conversations with Mark about equity in

13   Vidivixi?

14   A.  Not specifically.

15   Q.  Did you have any conversations with Mr. Bradley about

16   equity in Vidivixi?

17   A.  Not specifically.

18   Q.  How is it that you came to understand that you might get

19   equity in Vidivixi?

20             MR. PEK:  Objection, your Honor.  He is testifying for

21   the witness.

22             THE COURT:  Overruled.

23   A.  I'm sorry, could you repeat?

24   Q.  How did you come to think or understand that you might get

25   equity in Vidivixi?

Fc1dvidh                    Bunda - cross

1    A.  Well, my understanding was that it was a collaboration and

2    that it was -- you know, once the company got to a point where

3    it could sustain, you know, some type of division would be

4    taken from there.

5    Q.  Were there any documents or writings where you talked about

6    equity in Vidivixi?

7    A.  No.  No writings, no.

8    Q.  Did you ever have a Vidivixi email address?

9    A.  No.

10   Q.  You also testified earlier that you donated time to

11   Vidivixi, is that correct?

12   A.  Yes.

13   Q.  So just so I can be clear, there was time that you were

14   compensated for and time that you were not compensated for, is

15   that correct?

16   A.  Correct.

17   Q.  Approximately how much time would you say?  Is it 50/50, or

18   what proportion do you think between the two?

19   A.  I would say more along the lines of 70/30, 70 being the

20   part that I was not compensated for.

21   Q.  Got it.  You also --

22          THE COURT:  I'm sorry.  Someone did compensate you for

23   some of your time working on projects?

24          THE WITNESS:  Yes, sir.

25          THE COURT:  OK.  Who paid you?

Fc1dvidh                          Bunda - cross

1              THE WITNESS:  It was Francis Bradley.

2              THE COURT:  OK.

3    BY MR. RAO:

4    Q.  And I believe you testified earlier that your understanding

5    as to the Vidivixi furniture was that it was not sale ready, is

6    that correct?

7    A.  Meaning -- I'm sorry.  I don't understand.

8    Q.  You were asked by counsel whether these were prototypes or

9    ready for sale and I believe you testified they were

10   prototypes, is that correct?

11   A.  Correct.  Yes.

12   Q.  Did you have any expectation of when Vidivixi would have,

13   for lack of a better word, money coming in?

14   A.  I was hoping sooner rather than later but I think everyone

15   does that in their line of work.

16   Q.  Why did you think that money would come in if you believed

17   that the furniture were prototypes and not ready for sale?

18   A.  I was hoping that these prototypes pieces would spark

19   interest for people to buy them.  That was where I thought --

20   it wasn't through the sale of these individual pieces.

21             THE COURT:  OK.  I have a criminal matter.  I'm sorry,

22   Mr. Bunda, to interrupt your testimony again but I have to give

23   priority to the criminal matter and we will resume your

24   testimony.  So, thank you.

25             Before the parties leave in Vidivixi -- no, Mr. Bunda,

Fc1dvidh                         Bunda - cross

1   you can go to the witness room -- I should point out, this is

2   supposed to be an evidentiary hearing on a motion for a

3   preliminary injunction.  So you would expect that the testimony

4   that's elicited is very relevant to the issues on the

5   preliminary injunction motion.  This is not a time for

6   discovery depositions in the guise of testimony.  So I just lay

7   that out for both sides.

8           You have used a substantial part of the day and we'll

9   continue later today and then we'll continue tomorrow, but I

10  just tell you that the examinations could be more focused with

11  respect to the issues that are particularly relevant to the

12  motion for preliminary injunction.

13          All right.

14          MR. RAO:  I understand, your Honor.

15          (Recess)

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

Fc1dvid4                          Bunda - cross

1              THE COURT:  Good afternoon, all.  Please be seated.

2              Mr. Bunda is on the stand.  Mr. Fletcher.

3              THE CLERK:  Mr. Bunda, you are reminded you are still

4    under oath.

5              THE WITNESS:  Yes, sir.

6              THE COURT:  Mr. Rao.

7              MR. RAO:  I just have a few more questions, your

8    Honor.

9    CROSS-EXAMINATION (Resumed)

10   BY MR. RAO:

11   Q.  Mr. Bunda, you previously testified you worked

12   approximately 60 hours a week on Vidivixi, is that correct?

13   A.  Correct.

14   Q.  And that you split your time, as I recall, 60 percent in

15   the Stewart Avenue studio and 40 percent in the wood shop,

16   roughly?

17   A.  Roughly, yes.

18   Q.  So about 30 to 40 hours a week in the wood shop would be --

19   that would be the amount of time you would have spent, is that

20   correct?

21   A.  In the wood -- no, well, you are talking about the Sunset

22   Park wood shop, correct?

23   Q.  Correct, yes.

24   A.  So out of the 60-hour week, if I was there 40 percent of

25   the time, it would be 20 hours maybe; I mean, depending on the

Fc1dvid4                          Bunda - cross

1    week and the job, depending on where we were.

2    Q.  Sure.  Over the two years, approximately, how many times

3    would you say that you went to the wood shop to work on

4    Vidivixi projects?

5    A.  Ah, over in total over the two years, I don't know, 80

6    times maybe.

7               THE COURT:  How many?

8               THE WITNESS:  80 maybe.  You know, I mean if you count

9    a day as one time, then it might be different.  But I mean, I

10   had gone back and forth there, you know, throughout the day,

11   you know, sometimes two or three times a day if we are picking

12   up supplies or, you know, depending on whatever the needs were

13   transporting.

14   BY MR. RAO:

15   Q.  I understand.  You had testified earlier that you did not

16   attend Pratt.  Where did you attend college?

17   A.  I attended a couple of semesters at Bergen Community

18   College in Paramus, New Jersey, and a year and a half at the

19   Community College of Rhode Island.

20   Q.  And what was your -- what's your --

21   A.  I was liberal arts.

22   Q.  Liberal arts.  So you are not a sculptor?

23               THE COURT:  Liberal arts, OK.

24   Q.  You are not a sculptor, is that correct?

25   A.  Well, not by trade, no.

Fc1dvid4                     Bunda - cross

1    Q.  Or a designer?

2    A.  No.

3    Q.  An architect?

4    A.  No.

5    Q.  No, OK.

6             MR. RAO:  No further questions, your Honor.

7             THE COURT:  Mr. Bunda, you worked 60 hours a week over

8    three days?

9             THE WITNESS:  Yes, sir.

10            THE COURT:  That's 20 hours a day.

11            THE WITNESS:  Yes, sir.

12            THE COURT:  Did you live close to the wood shop?

13            THE WITNESS:  I live in Belmar, New Jersey, which is

14   roughly 70 miles from here.

15            THE COURT:  So it took you over an hour to -- did you

16   drive?

17            THE WITNESS:  Yes, sir.

18            THE COURT:  So 20 hours a day and over two hours of

19   driving?

20            THE WITNESS:  A lot of times I would come into the

21   city on a Tuesday and I wouldn't leave until the Thursday.  So

22   the traveling to and from New Jersey most times was limited to

23   once a week, but I would stay the entire time in the city.

24            THE COURT:  And you slept four hours a night?

25            THE WITNESS:  If I was lucky, yes, sir.

Fc1dvid4                        Benezra - direct

1          THE COURT:  OK.  All right.  Anything else?

2          MR. PEK:  No redirect, your Honor.

3          THE COURT:  OK.  Thank you, Mr. Bunda.  You may step

4     down.

5          THE WITNESS:  Thank you.

6          (Witness excused)

7          THE COURT:  The parties have agreed that Mr. Rao can

8     call some witnesses out of order, so go ahead.

9          MR. RAO:  Yes, your Honor.  We -- defendants would

10    like to call Amy Benezra to the witness stand.

11     AMY BENEZRA,

12         called as a witness by the defendants,

13         having been duly sworn, testified as follows:

14          THE CLERK:  You may be seated.

15          Please state your full name for the record.

16          THE WITNESS:  Amy Benezra.

17          THE CLERK:  Spell your last name.

18          THE WITNESS:  B-e-n-e-z-r-a.

19          THE CLERK:  Thank you.

20          THE COURT:  All right.  Mr. Rao, you may examine.

21    DIRECT EXAMINATION

22    BY MR. RAO:

23    Q.  Good afternoon.  To start, how did you -- do you know Mark

24    Grattan, the defendant in this action?

25    A.  Yes, I do.

Fc1dvid4                         Benezra - direct

1    Q.  How did you first come to know Mr. Grattan?

2    A.  I met Mark at Walter Goodman's shop where I was a tenant.

3    It was probably three years ago, roughly.  Mark was my neighbor

4    there, my immediate next-bay neighbor.  So we worked in close

5    proximity separated by my clamp rack, basically.

6    Q.  And how long were you at Walter Goodman's wood shop?

7    A.  About three years, two and a half, three.  Mark was already

8    there when I got there.

9    Q.  I understand.  And what's your professional background?

10   A.  I'm a professional woodworker.  I have been for 40-plus

11   years, and I make furniture, I build kitchens, do architectural

12   woodwork and specialize in art fabrication.

13   Q.  And do you know the circumstances that led Mark to rent

14   space in Walter Goodman's wood shop?

15   A.  No, I don't.

16   Q.  But you said you were neighbors or you shared bays, is that

17   correct?

18   A.  Yeah, Mark had the space -- it is an open shop.  There are

19   separate bays, as they are called.  Each bay encompasses a few

20   windows but there are no walls between.  So people have their

21   individual space and we share the machinery, which is in the

22   middle.  I'm not there now; I left in August.  But there are

23   no -- you work in close proximity to people, but you could be

24   across the shop from certain of your colleagues but Mark was in

25   the bay right next to mine.

Fc1dvid4                         Benezra - direct

1    Q.  I see.  So when or roughly what times of the day or week

2    would you be in the wood shop?

3    A.  I would be there mostly during the day, but I would arrive

4    kind of late and I would work usually until about 8 or 9.  I

5    worked on weekends very often.  Sometimes if I had an art

6    fabrication that had to go, I would have to be there late into

7    the night and, you know, kind of funny hours, different from

8    some of the other people, because the fabrication world is such

9    that if the show is going to open, the work has to be there.

10   So I'd be there funny hours.

11   Q.  Did you observe what hours Mark kept at the wood shop?

12   A.  Say that again.

13   Q.  Did you know what hours Mark kept at the wood shop?

14   A.  Oh, yeah.  Mark kept very similar hours to mine.

15   Q.  I see.

16   A.  In fact, if I went on a Sunday, Mark would be there

17   invariably, and he was there often very late into the night.

18   Q.  Do you know Mr. Tim Bradley or Mr. Francis Bradley, the

19   plaintiff in this action?

20   A.  I met him.  I was introduced to Tim by Mark at the shop.

21   He was introduced to me as his partner.

22   Q.  And what did you understand that to mean?

23   A.  They were in business together, and as I understood it,

24   Mark designed and built the furniture and Tim came by

25   occasionally.  I don't know what he actually did.  I never saw

Fc1dvid4                          Benezra – direct

1   him -- he would talk to Mark, but the description given to me

2   by Mark was that Tim was the producer and he paid for stuff.

3   Q.  Did you ever observe Tim operate the machinery in the wood

4   shop?

5   A.  No, never.  Tim wouldn't have been allowed to use the

6   machinery in our shop.  He wasn't a tenant there.

7   Q.  You stated earlier that the machinery was centrally

8   located, is that correct?

9   A.  Right.

10  Q.  Was it visible to anybody else in the shop?

11  A.  Oh, sure.  Visible to everyone else in the shop.  Whoever

12  was on a machine could easily be seen by anyone in any of the

13  bays that surrounded the central machinery.

14  Q.  I see.  Is that because of the layout of the shop?

15  A.  Yeah, it's because you want basically the bays to have

16  windows.  It's more pleasant for the individual workers.  The

17  machinery is in the middle because logistically things move

18  better that way.

19  Q.  How often was Tim at the wood shop in Sunset Park -- sorry,

20  Mr. Bradley?

21  A.  How often?  I saw him there maybe like a dozen times over

22  three years, if that.

23  Q.  I see.  Typically what did you see him doing when he was at

24  the wood shop?

25  A.  Talking with Mark.  Usually looking at a thing, deciding

Fc1dvid4                          Benezra - direct

1   whether it worked for whatever it was going to, and sometimes

2   he would help him wrap stuff.  He may have put finish on things

3   when they were in a hurry to get something to a show.  I think

4   I have seen him put finish on stuff.

5   Q.  Had you ever heard the term "Vidivixi" before today?

6   A.  Yeah, sure.  That was Mark's and Tim's company, as I

7   understood it.

8   Q.  And when did you first hear about Vidivixi?

9   A.  From Mark.  Just in chatting, I asked him the name of his

10  company or -- oh, no.  It was one of his first shows and I was

11  going to see the show, and he told me which booth it would be

12  in and so he told me the name was Vidivixi.  That was how I was

13  going to locate it at wherever it was.

14  Q.  Do you remember what show that was?

15  A.  I think the first one was at -- well, I think this one was

16  at the Javits.  The first one I saw was at the Industry City

17  gallery.

18          THE COURT:  I'm sorry, it was where?

19          THE WITNESS:  Javits Center.

20          THE COURT:  Oh, the Javits Center?

21          THE WITNESS:  Yeah.

22  Q.  And when was that?

23  A.  I don't remember.  A year ago?

24  Q.  Did you talk to Mark occasionally about his work?

25  Frequently?  How often?

Fc1dvid4                        Benezra - direct

1    A.  Oh, daily.

2    Q.  What do you recall Mark working on in the wood shop?

3    A.  Mark made a lot of furniture pieces.  He made a number of

4    beds, chairs.  He made a bar for the Javits Center show that

5    was quite beautiful, and then he took elements of that bar and

6    put it horizontally into a couch; I remember that.  That was a

7    very beautiful element and he turned it sideways but then

8    didn't like it and scrapped it and did something else with it.

9    But he made mostly furniture.

10   Q.  How often would Mark -- you said he didn't like that piece

11   and scrapped it.  How often would that happen?

12   A.  Very often.  Mark would -- Mark would produce a piece.  He

13   would put in incredible hours.  We would talk about it.  That's

14   what woodworkers do with each other.  Whoever is there could be

15   called upon to give an opinion about was this proportioned

16   nice, what do you think of this color.  And I was there a lot

17   alone with Mark because we kept the same hours.  And, yes, I

18   have seen him scrap something entirely, have, you know, have

19   parts up to here, decide that he didn't like an element, scrap

20   the thing and start something again at 11 o'clock that was

21   going to go out the next day.

22   Q.  And what would that then entail in terms of working hours?

23   A.  Oh, he probably stayed all night whereas I did not.  I

24   would leave maybe at midnight.  I would leave Mark there many,

25   many nights and he would stay and I'd see him the next day.  He

Fc1dvid4                      Benezra - direct

1   looked tired but the thing got done overnight and it went.

2   Q.  And when you would observe Mark critiquing or scrapping one

3   of his own projects, do you recall if he consulted with

4   Mr. Bradley about design changes?

5   A.  Not in my experience.  No one else was there.  Maybe he

6   called him, I don't know.  He would ask me.  He would ask

7   Graham, another woodworker.  He would ask whoever was there.

8   And he would eventually make the decision and proceed.  I don't

9   know whether Tim was involved in that.  Tim wouldn't be there.

10  Q.  Did you ever see anybody come by the wood shop who was

11  interested in buying a Vidivixi piece?

12  A.  I wouldn't know.  If Mark had clients over -- this was the

13  case.  The etiquette in the shop was that if you had clients

14  over, you just don't enter and bother them at that point.  So

15  you can't hear the conversations.  The shop is loud.  So I have

16  no idea.  I mean, he had lots of visitors, yeah.  He had people

17  looking like clients.  He had some people he then described to

18  me later had been clients, but whether they were buying things

19  I have no idea.

20  Q.  Did Mark ever talk about work outside of Vidivixi or

21  separate from Vidivixi?

22  A.  Yeah.  He made some things for other designers.  He

23  fabricated occasionally things that he didn't particularly like

24  but had to earn money.  So, yeah, he made things outside of

25  that.

Fc1dvid4                    Benezra - cross

1              He made his own things, too.  I mean, he -- you know,

2    he played with stuff because he was designing stuff.  So he

3    would make his own piece, look at it, not like it, decide not

4    to make it, to change it.  You know, he was --

5    Q.  So he was tinkering, is that --

6    A.  Yeah, he was working.

7    Q.  How often would you say that the woodworkers in the shop

8    would talk about their work?

9    A.  All the time, actually.  I mean, intermittently but it's

10   ongoing, and it's a process everyone engages in.  It's nice to

11   have another set of eyes on something.  So you would go to your

12   colleague, call the person over, what do you think of this, do

13   you like this dimension; that happens a lot.

14              MR. RAO:  Just one minute, your Honor.

15              (Pause)

16              No further questions, your Honor.

17              THE COURT:  All right.  Mr. Pek, you may examine.

18   CROSS-EXAMINATION

19   BY MR. PEK:

20   Q.  Good afternoon, Ms. Benezra, is it?

21   A.  Yes.  Good afternoon.

22   Q.  How do you do?  Just a few quick questions.

23              You mentioned that you are no longer renting a bay at

24   Walter Goodman's shop, is that right?

25   A.  No.  I moved in mid-September.

Fc1dvid4                         Benezra - cross

1    Q.   Why did you move?

2    A.   Sunset Park was a long commute for me.  I found something

3    closer to where I live in Ridgewood, and the rent went up at

4    Walter's.

5    Q.   Is the rent at Walter's uniform or is it based on the size

6    of the bay?

7    A.   It's based on the size of the bay.

8    Q.   So you were immediately adjacent to Mark's bay, is that

9    right?

10   A.   Yeah.

11   Q.   OK.

12   A.   I had a half bay right next to Mark's bay.

13   Q.   You testified earlier that you are aware of Tim Bradley and

14   you did see him on occasion visiting with Mark, is that right?

15   A.   Sure.  We chatted.

16   Q.   I'm just curious.  It sounds like it is a very loud wood

17   shop and people are into their wood making.  How were these

18   conversations taking place so readily?

19   A.   You can hear people.  If you are in their bay you can talk

20   to them.  If someone is on the saw, you might wait.  If all the

21   machines are busy, it is louder.  They are not usually all busy

22   at the same time.

23   Q.   You mentioned that you had seen on occasion, I believe,

24   Mr. Bradley applying some finish to some piece of work?

25   A.   Yeah.  I couldn't be exactly sure, but, yeah, that's how it

Fc1dvid4                          Benezra - cross

1   looked.  He may have been dusting something.  I've seen him

2   wrap things with Mark.

3   Q.  "Wrap" meaning a finished product insofar as the wood

4   working is done for --

5   A.  Yeah.  A finished piece would be wrapped because it was

6   leaving.

7   Q.  Is it permissible under Walter's policy in Sunset Park to

8   keep and store finished pieces in the bay?

9   A.  You can do whatever you want in your bay if you have room.

10  Q.  Are not some bays shared?

11  A.  You do it in your part of the bay.

12  Q.  You also mentioned that you typically would see Mark on

13  Sundays?

14  A.  Yes.

15  Q.  Or more often on Sunday, is that fair?

16  A.  Not more often, but if I worked on a Sunday I would hope

17  that it would be quiet but invariably Mark would be there.

18  Q.  You also said that you spoke with him daily.  So I'm just

19  trying to ascertain if it was every Sunday or just whenever you

20  all --

21  A.  Oh, no.  He was there every day, pretty much every day,

22  also on weekends.

23  Q.  Were you there every day?

24  A.  Almost.  Sometimes, yeah.  Yes, I worked a lot.  Sometimes

25  a piece has to go out; that's what puts you there on weekends

Fc1dvid4                        Benezra - cross

1    as well as during the week.

2    Q.  So is it safe to say it's fairly customary in this somewhat

3    of a niche market of woodworkers to -- if there is a deadline

4    and there are some pieces to go out, time of day doesn't apply,

5    meaning people will work through the night and that's not

6    uncommon?

7    A.  Some people will, yeah.  I have.  I'm sure Mark has, I

8    know.  I mean, I used to do more when I was younger but, yeah,

9    it does happen.

10   Q.  You also mentioned that in the event that a client, I think

11   as you described yourself or Mark renting a bay from Walter,

12   had a visitor such as Tim, you kind of let them be and not

13   intrude?

14   A.  Yes.  If it clearly looked like business --

15   Q.  Oh, OK.

16   A.  -- yeah.  You don't...

17   Q.  Understood.  I just wanted to --

18   A.  Mm-hmm.

19   Q.  You mentioned that Mark had lots of visitors.  I'm trying

20   to understand, did you speak with these visitors?

21   A.  Not "lots."  He had, you know, occasional visitors.  He

22   didn't have more than the other people have.

23   Q.  So is it your -- in your experience, as a professional

24   woodworker, wood maker -- I'm sorry if I am not getting that

25   right -- is it fairly customary for other workers that are

Fc1dvid4                    Benezra - cross

1   working in conjunction with a woodworker who may be doing some

2   other facet, upholstery, for example, to come in, interface,

3   and maybe talk about the project; is that how it goes

4   because --

5   A.  Well, if you have an upholsterer, you are bringing the

6   thing to the upholsterer.  If you are using a finisher, you are

7   sending the thing to the finisher.  So, no, they don't come to

8   our shop.  If you've hired someone to help you, they come.

9   Q.  Was it your impression that Mark had hired Tim?

10  A.  No.  He said he was his partner.

11  Q.  And are you -- you were renting your bay in connection with

12  a business that you owned, or just was it a hobby or just --

13  A.  No.  No.  I am a professional.  I have been doing this for

14  about 40 years.

15  Q.  And still doing it just elsewhere?

16  A.  Yes.

17  Q.  Do you keep in touch with Mark?

18  A.  Yes.

19  Q.  Am I correctly understanding that you still speak with him

20  daily?

21  A.  No.

22  Q.  OK.

23  A.  No, I'm not in his shop anymore, so no.  But occasionally I

24  get an email from him if he has a piece that he doesn't want to

25  make, he might send it to me, ask me if I know someone who

Fc1dvid4                        Benezra - cross

1    could make it, or just how are you, how is the new shop.

2    Q.  Why do you suppose Mark scrapped so many pieces?

3    A.  He didn't like the way they looked.

4    Q.  Do you attribute that to a sense of perfectionism or is he

5    a perfectionist?

6    A.  I think it is a way that some people have of designing

7    while they are working because some things don't translate from

8    paper to the object, you have to make a part and look at it,

9    and he did that a lot.

10   Q.  Does wood itself come with a lease or do you have to

11   provide --

12   A.  No.  You have to buy your own material.

13   Q.  OK.  That makes sense.

14            Did you ever have any conversations with Mr. Bradley?

15   A.  Sure.  I understood he was an artist.  We chatted a little

16   bit.  He seemed very nice.

17   Q.  You mentioned that Mark was apparently always at work.

18   Whether at work or play, he was always at the wheel, so to

19   speak, or regularly enough as much as you.

20   A.  More than me, actually.  Mark I could say was there more

21   than I was.

22   Q.  Were I to visit you while you were there --

23   A.  Mm-hmm.

24   Q.  -- would I have to sign a waiver under Walter's rules?

25   A.  Just to come in and visit me?

Fc1dvid4

1    Q.   Yeah.

2    A.   To look at something I was making for you, you mean?  No.

3    Q.   I mean, I imagine a wood shop is an open-area wood shop,

4    that one would most likely have to wear goggles and maybe --

5    A.   No, you don't need goggles unless you are on a machine and

6    even that is up to you.  You don't need hearing protection if

7    you are happy to lose your hearing; that is up to you.  But if

8    you are coming in to look at something I am making for you, you

9    just walk into my space, we look at it, we talk about it and

10   then you leave because --

11   Q.   And you would have clients of yours routinely come in,

12   check in about the work?

13   A.   Sure.  Now and then, yeah.

14   Q.   Had you ever spoken with Mark Grattan about Mark Grattan

15   Design & Build?

16   A.   Not really.

17             MR. PEK:  No further questions, your Honor.  Thank

18   you.

19             THE COURT:  All right.  No further questions.  The

20   witness is excused.

21             THE WITNESS:  Thank you.

22             THE COURT:  You may step down.

23             (Witness excused)

24             THE COURT:  Call your next witness.

25             MR. RAO:  Your Honor, defendants call Richard Wright

Fc1dvid4                          Wright - direct

1    to the stand.

2     RICHARD WRIGHT,

3          called as a witness by the defendants,

4          having been duly sworn, testified as follows:

5               THE CLERK:  You may be seated.

6               Please state your full name for the record.

7               THE WITNESS:  Richard Hugh Wright.

8               THE CLERK:  Spell your last name.

9               THE WITNESS:  W-r-i-g-h-t.

10              THE CLERK:  Thank you.

11              THE COURT:  All right.  Mr. Rao, you may examine.

12   DIRECT EXAMINATION

13   BY MR. RAO:

14   Q.  Mr. Wright, can you describe your educational background?

15   A.  I'm a high school graduate, two years of college,

16   Philadelphia College of Art.  That's it.

17   Q.  And can you describe your professional background?

18   A.  Yes.  Since 1978 I have been doing woodworking for a

19   living.  I went to school for furniture design and building and

20   have been pursuing that ever since.  I work also full-time at

21   NBC as a carpenter and a stagehand.  In the shop where I met

22   Mark I have been in for over 25 years also.  So I do side jobs

23   there and work full-time for the last 20 years at NBC.

24   Q.  Is the shop you are referring to in Sunset Park in

25   Brooklyn?

Fc1dvid4                        Wright - direct

1  A.  Yes.  Sunset Park Woodworkers.

2  Q.  Do you rent space there --

3  A.  Yes.

4  Q.  -- from Walter Goodman?

5  A.  Yes.

6  Q.  And you --

7          THE COURT:  Could you keep your voice up, Mr. Wright?

8  Maybe move your chair in to the microphone.

9          THE WITNESS:  Sure.

10 Q.  You mentioned that you've been there for 25 years?

11 A.  Yeah.

12 Q.  Are you still there?

13 A.  Yes.

14 Q.  When -- what times of the day or week are you in the wood

15 shop?

16 A.  I'm usually there at night because I work on what's called

17 the night crew at NBC so my regular hours are 4 to midnight, so

18 I often go to the shop after that.  So I'll be in the shop from

19 like 12:30, 1 o'clock until 5 or 6 in the morning often and on

20 weekends often.

21 Q.  How did you first meet -- or, sorry, you mentioned that

22 you've met Mark Grattan?

23 A.  Yeah.  I met Mark at the shop.  I never knew him -- oh,

24 there he goes.  I never knew Mark prior to the shop, and I get

25 friendly with Mark in the shop.  I mean, I've never gone out

Fc1dvid4                    Wright - direct

1    with him or had a meal with him or anything like that.  Just my

2    relationship has strictly been at the shop.

3    Q.  When did you first meet Mark in the shop?

4    A.  Oh, probably over two years ago.  Right around the time

5    when he first started renting.  Actually, I don't remember

6    exactly when he started.  It's been at least a couple of years.

7    Q.  Did you ever meet Mr. Francis Bradley or Tim Bradley?

8    A.  Several times at the shop.

9    Q.  And how many times do you recall Mr. Bradley being in the

10   shop?

11   A.  Oh, I don't know, six or seven, maybe, at least.

12   Q.  Over what time period?

13   A.  Over the last year or so.

14   Q.  Have you ever spoken to Mr. Bradley?

15   A.  I actually spoke to him once at length and that was it.  I

16   mean, I spoke to him just hello, how are you doing, off and on,

17   but only really one time to any length.

18   Q.  Did you understand there to be any kind of relationship

19   between Mr. Grattan and Mr. Bradley?

20   A.  Well, he introduced himself as Mark's partner and with the

21   understanding that it was a business relationship.

22   Q.  Do you know what that business was?

23   A.  Mark designs furniture and Tim was involved with that.

24   Q.  Did you ever hear the name Vidivixi?

25   A.  I didn't until recently.

Fc1dvid4                      Wright - direct

1    Q.  You mentioned speaking with Tim at length, or, sorry,

2    Mr. Bradley at length once.  What was the nature of that

3    conversation?

4    A.  Mainly just a little history of him, of his.  He actually

5    was telling interesting stories about artists in Europe.  He

6    had been to Europe.  He told me he was in mixed media.  He said

7    artwork, mixed media, which I really wasn't familiar with and

8    didn't get much of an explanation.  And then just a little bit

9    about him and Mark, and my understanding was they, you know,

10   were partners in this business but --

11   Q.  You mentioned about six or seven times seeing him in the

12   shop, is that correct?

13   A.  Yeah.  Usually --

14   Q.  Go ahead.

15   A.  Usually it was a situation where they were like making mad

16   dashes to get work done, trying to finish projects like prior

17   to a show or something like that.

18   Q.  So you would see Mr. Bradley when a deadline was looming?

19   A.  Yes.

20   Q.  What did you see him do mostly?

21   A.  Mostly smoke pot and hang out.

22   Q.  Did he operate machinery in the shop?

23   A.  I never saw him on a piece of machinery.

24   Q.  Did you ever see him doing any design or fabrication work

25   with the furniture?

Fc1dvid4                     Wright - direct

1   A.  No.  The only work I ever saw him do was paint a black

2   finish onto some furniture that was made.

3   Q.  How often did you see Mark at the shop?

4   A.  Oh, he was there every day.

5   Q.  And --

6   A.  And often late.  So when I would come late Mark would be

7   there by himself.

8   Q.  What would you see Mark or Mr. Grattan doing?

9   A.  With Mark?

10  Q.  Mm-hmm.

11  A.  Mark did all the building as far as I could see.  He would

12  build everything.  He -- you know, we would actually discuss

13  designs now and then.

14  Q.  Did Mark ever identify work as Vidivixi work?

15  A.  No.  It was just -- no.  The understanding was it was just

16  Mark's designs and Mark's building.

17  Q.  Did you ever see Mr. Grattan consulting with Mr. Bradley

18  about design elements for a piece of furniture?

19  A.  No, I didn't.  I don't know if it happened.  I didn't --

20  you know, I mean, I'd be in my space and they'd be in their

21  space.

22  Q.  Did you ever see Mark operating machinery in the wood shop?

23  A.  Oh, of course, yeah.  He cut everything.  He put everything

24  together.

25  Q.  Are you aware of any policies in the wood shop about who

Fc1dvid4                      Wright - cross

1    can operate machinery?

2    A.   Yeah.  I mean, basically the only ones who could operate

3    machinery are people that are qualified and people that are

4    there all the time.  Yeah.

5    Q.   Do you recall anybody by the name of Anthony Bunda or Tony

6    Bunda?

7    A.   No.

8               MR. RAO:  Just one minute.

9               (Pause)

10              No further questions, your Honor.

11              THE COURT:  All right.

12   CROSS-EXAMINATION

13   BY MR. PEK:

14   Q.   Good afternoon, Mr. Wright.

15   A.   Hi.

16   Q.   Just a few quick questions.

17              You mentioned by memory you noticed or saw, witnessed

18   Tim Bradley six or seven times in the last two years in the

19   shop?

20   A.   Yeah, I guess.  It could have been more.

21   Q.   And you're still renting a bay?

22   A.   Yes.

23   Q.   Are you friendly with Walter Goodman?

24   A.   Yes.  He's one of my best friends.

25   Q.   Is that right?

1          Did you have any conversations with Mark Grattan or

2     Sid Rao prior to today in connection with this hearing?

3     A.   Yes.

4     Q.   And what was the nature of those conversations?

5     A.   Mainly logistics.  Mainly telling me that I would be

6     testifying way before now.  That's about it as with his -- with

7     Mark's lawyer.

8          With Mark I had very rough outlines of what was going

9     on, and none of that was recent.  I mean, he told me in general

10    what was going on quite a while ago but not really many

11    details.

12    Q.   Are you testifying today -- is the testimony you are giving

13    today based on your own firsthand personal knowledge?

14    A.   Yes.

15    Q.   OK.  You mentioned that they, being Tim and Mark as I

16    understood your testimony, were making -- would be -- you had

17    seen them making mad dashes to make a deadline for a show,

18    presumably?

19    A.   Yeah.

20    Q.   That seemed to be fairly routine among the woodworkers over

21    there, is that right?

22    A.   Unless you are very good at planning and you are able to,

23    you know, get a head start on all of this stuff.

24    Q.   How old are you, Mr. Wright?

25    A.   I'm 60.

Fc1dvid4                        Wright - cross

1    Q.  And you met Mark at the shop about two years ago or

2    two-plus?

3    A.  Yeah, whenever he moved in.  I actually don't remember how

4    long it has been.  Two or three years.

5    Q.  You have been there longer.  You were there when he --

6    A.  I've been there almost 30 years.

7    Q.  30 years.  Are you fairly familiar with the Sunset rules

8    and policies?

9    A.  Oh, yeah.

10   Q.  So how is it that the waiver works?  Can I go in there and

11   visit you if I wanted to by signing a waiver and strapping on

12   some eye protection?

13   A.  Are you talking about visiting me or working on machinery?

14   Q.  I'm talking about entering this open space that seems very

15   dangerous, but just to visit or let's say I were to

16   commission -- ask you to fashion me a bird house.

17   A.  I have often had clients in there that were looking -- that

18   I was showing them where the shop was and showing them examples

19   of my work, yeah.

20   Q.  Are there any supervisors on hand at the shop?

21   A.  There's nobody there who is a supervisor per se.

22   Q.  Is there any clock-in mechanism, any ledger to record when

23   somebody, when you check in?

24   A.  No.

25   Q.  Is Walter at the shop most days?

Fc1dvid4                      Wright - cross

1    A.  Pretty much every day, yeah.  I mean, not necessarily every

2    weekend but, sure, he's there as much or more than anyone else.

3    Q.  Would you say that you have known him to be there in the

4    late hours of the night or the early hours of the morning?

5    A.  If you are saying could somebody come in and use the

6    machinery and Walter or I or somebody else wouldn't know about

7    it?  I suppose that's true, if that's what you are getting at.

8    Q.  I actually wasn't but that's helpful to know.  I am just

9    wondering if Walter himself --

10   A.  He's there often late but not as late as I am.  On a

11   regular basis, I am there quite late.

12   Q.  What do you understand to be -- you mentioned -- you used

13   the word "qualified" earlier as being a prerequisite or --

14   A.  If somebody came into the shop and wanted to rent equipment

15   and did not have experience working on the machinery, they

16   would not be allowed to use the equipment.  They wouldn't be

17   rented the space and they wouldn't have had it.

18        The only way Mark got a place there was by showing

19   Walter that he knew what he was doing.  And if in the early

20   days of him being there if it was obvious that he didn't know

21   what he was doing, he would not have been welcome to stay.

22   Q.  Is there some sort of audition process to demonstrate, you

23   know, a certain skill to Walter so for maybe liability purposes

24   on Walter's end?

25   A.  Yeah, I would think so.

Fc1dvid4                        Wright - cross

1   Q.  Did you have to --

2   A.  I've know Walter since I was in my 20's so the answer is

3   no.

4   Q.  That doesn't necessarily mean that you, you know --

5   A.  I have been doing this all of my life.  I've shown Walter a

6   few things.

7   Q.  Is your bay close to Mark Grattan's bay?

8   A.  Yes.

9   Q.  You said you see him there all the time.  When are you

10  there?

11  A.  I don't see -- I don't see him all the time that he's there

12  I do not see him.  I often see him when I'm there late because

13  he is often there late.

14  Q.  And have you ever seen Tim Bradley there?

15  A.  I believe I already said I saw him six times at least.

16  Q.  Forgive me.  Right you are.  And --

17          THE COURT:  Six or seven but it could be more.

18          THE WITNESS:  Yes.

19  Q.  Six or seven and it could be more.

20          Did you also say that you've seen him applying finish

21  or painting or something of nature?

22  A.  Yes.

23  Q.  Rather than just idling around?

24  A.  Out of the six or seven times, once I saw him helping put

25  on finish to some pieces they were trying to get out.  I've

1   never seen him work a piece of machinery.

2   Q.  How is it that you understand Mr. Bradley to be smoking pot

3   in the --

4   A.  Because he was smoking pot.  It is very difficult not to

5   smell it these days.

6   Q.  And is that customary, in your estimation?

7   A.  No, not at all.

8   Q.  And you know for a certainty that this was pot and this was

9   Tim Bradley and --

10  A.  Yes.

11  Q.  OK.  Based on your experience with pot?

12  A.  Yeah.  I haven't smoked any in over 20 years.  I have been

13  sober for over 20 years, but I have quite an extensive history

14  with pot prior to my 20 years of sobriety.

15  Q.  Did Mark --

16  A.  And I had a friend who was working with me once who smoked

17  with him and was quite happy for having been there.  But I

18  personally don't smoke pot and haven't for actually it will be

19  20 years this December.

20  Q.  Isn't it true that Mark Grattan had smoked pot at the wood

21  shop?

22          MR. RAO:  Objection.  Relevance.

23          THE COURT:  Yes.  Sustained.

24  A.  I'm not really sure --

25          THE COURT:  That is all right.  I sustained it.

Fc1dvid4                        Wright - cross

1              THE WITNESS:  Oh, sustained.  I'm sorry.

2       BY MR. PEK:

3       Q.  Are you still working, Mr. Write?

4       A.  Am I still working?

5       Q.  Yes.

6       A.  Yes.  I missed a day of work for this, as a matter of fact.

7       Yes, I am still working.  I work full-time at NBC and I work

8       part-time at the shop in Brooklyn.

9       Q.  You mentioned earlier it could be possible that somebody

10      could gain entry to the shop and use -- get their hands on a

11      machine without yourself or Walter being the wiser?

12      A.  No.  My main point was that it would be very easy for me

13      not to be aware since I am only there at odd hours.  It would

14      be very unusual for somebody to come in and use the machinery

15      that isn't one of the major players there.  If it isn't

16      somebody who rents there, somebody who is there -- there is

17      always somebody there.  There is like, what, eight people, I

18      guess, who are there all the time pretty much.  They make their

19      livings building things there.  If somebody showed up who

20      didn't know what he was doing and decided to start cutting

21      stuff, it would never happen.  The only way somebody is going

22      to get on the machine is, first of all, if he is with somebody

23      and there has already been a conversation with Walter that

24      here's another person and he is qualified and, you know, like

25      that.

Fc1dvid4                      Wright - cross

1  Q.  When you rent a bay from Walter, do you get a key to the

2  premises?

3  A.  Yes.

4  Q.  Without the key --

5  A.  You can't get in.  The door locks as when you shut it.

6  Actually not so much lately because it is now -- the rents are

7  much higher, there is more and more people, but especially in

8  the early days it was a fairly dangerous neighborhood and we

9  were always concerned of theft and, you know, who would get

10  access and stuff like that.  So up until very recently nobody

11  is getting in there.

12  Q.  Would it surprise you to learn that in fact the gentleman

13  about whom Mr. Rao just asked you, Anthony Bunda, who doesn't

14  rent a bay in fact has signed waivers and delivered them to

15  Walter to --

16  A.  Yeah, that would surprise me.  But like I say, I'm not

17  there during the day.  I'm surprised that I hadn't heard about

18  that from Walter but -- so I don't think he was there very

19  often.  If you're saying that somebody named Anthony, or

20  whatever, was there quite often building stuff, I don't believe

21  that.

22  Q.  I am just asking.

23          MR. PEK:  No further questions, your Honor.

24          Thank you, Mr. Wright.

25          THE WITNESS:  OK.

Fc1dvid4                              Anderson - direct

1            THE COURT:  All right.  You are excused.  You may step

2    down.

3            (Witness excused)

4            THE COURT:  Call your next witness.

5            MR. RAO:  Your Honor, this is our last witness, Graham

6    Anderson.  Defendants call Graham Anderson to the stand.

7    GRAHAM ANDERSON,

8         called as a witness by the defendants,

9         having been duly sworn, testified as follows:

10           THE CLERK:  You may be seated.

11           Please state your full name for the record.

12           THE WITNESS:  Graham Anderson.

13           THE CLERK:  Did you say Gray?

14           THE WITNESS:  Graham.

15           THE CLERK:  Graham, OK.

16           THE WITNESS:  G-r-a-h-a-m.

17           THE CLERK:  And then Anderson?

18           THE WITNESS:  Yes.

19           THE COURT:  How do you spell Anderson?

20           THE WITNESS:  A-n-d-e-r-s-o-n.

21           THE COURT:  All right.  Mr. Rao, you may examine.

22   DIRECT EXAMINATION

23   BY MR. RAO:

24   Q.  Good evening, Mr. Anderson, and thank you for your

25   patience.

Fc1dvid4                        Anderson - direct

1              Just to start, do you know Mark Grattan, who is the

2     defendant in this action?

3              (Pause)

4              Do you know Mark Grattan, who is the defendant in this

5     action?

6     A.  Yes.

7     Q.  How do you know Mark Grattan?

8     A.  I first met Mark when my colleague Amy Benezra introduced

9     me to Mark because Mark was renting workshop space and I was

10    looking for workshop space.  I had recently become independent

11    as a cabinetmaker after working for different companies for a

12    couple of years.  I was looking for a space and Amy introduced

13    me to Mark and I started subletting from him.  I started

14    renting space with him in this workshop.

15    Q.  And around when was that?

16    A.  This was like -- it was two years ago.

17    Q.  OK.  And are you still at the wood shop in Sunset Park?

18    A.  No.  I left in August.

19    Q.  So did you share a bay with Mr. Grattan?

20    A.  I did, yeah, for just about a month, a month and a half, at

21    the very start of me working in that wood shop two years ago.

22    Q.  And then where did you go after that?

23    A.  Well, so I was still in the wood shop but I was working

24    different days in that shop.  So over a span of two years I was

25    separated from Mark and I started renting from Amy for a little

Fc1dvid4                    Anderson - direct

```
 1  while, and then I was renting directly from Walter Goodman, who
 2  is the guy who organizes the shop.
 3  Q.  What do you do professionally?
 4  A.  I am a cabinetmaker.
 5  Q.  And how long have you been a cabinetmaker?
 6  A.  For about 12 years.
 7  Q.  Did you -- where did you go to school?
 8  A.  I went to Cooper Union.
 9  Q.  Did you study anything relating to cabinet making?
10  A.  Well, no, I studied fine art but there was a lot of
11  instruction in woodworking when I was there, something they
12  want you to get to know because they figure it intersects with
13  fine art making in all kinds of ways.
14  Q.  So would you say you are a professional woodworker?
15  A.  Yes.  Absolutely.
16  Q.  During your time at the shop did you ever observe Mark to
17  be there?
18  A.  Yes.
19  Q.  And around -- what, you know, how frequently was Mark in
20  the shop?
21  A.  Oh, Mark was there pretty much every day.  And, yes, he was
22  pretty much there every day, yeah, working --
23  Q.  And when were you in the shop?
24  A.  Pretty much every day over the last two years, yeah.
25  Q.  Did you ever meet Tim Bradley or Francis Bradley?
```

Fc1dvid4                           Anderson - direct

1    A.   Yes.

2    Q.   How did you meet Tim Bradley?

3    A.   Through Mark.  I was there working pretty late one night

4    trying to rush to get a project finished for a deadline and

5    Mark was there pretty late also and Tim came by with another

6    friend to see Mark.

7    Q.   Do you recall who that other friend was?

8    A.   Yeah.  I think it was Tim's girlfriend.

9    Q.   Do you have any other connection to Mr. Bradley?

10   A.   I do, yeah.  Tim's an old friend of my cousin.  They went

11   to high school together.

12   Q.   Did you ever work with Mark on projects?

13   A.   Yeah.  It was last spring Mark was trying to get a lot of

14   work done for one of the furniture fairs that they were doing,

15   and he had a lot on his plate and the deadline was coming up.

16   So after my full workday doing my own projects I stayed on one

17   night to help him out, and I was working on a small walnut

18   cabinet for them.  It was for Vidivixi, and, yeah, I stayed

19   pretty late that one night trying to push things along for

20   them.

21   Q.   When you say "Vidivixi," what do you mean by that?

22   A.   Well, it was the furniture line that Mark and Tim were

23   working on together to be exhibited at this fair, you know,

24   under the brand Vidivixi instead of like just one or both of

25   their names.

Fc1dvid4                        Anderson - direct

1    Q.  And when did you first hear about Vidivixi?

2    A.  I can't remember but pretty soon after I met Mark.

3    Q.  And what did you understand Mark and Tim's relationship to

4    be?

5    A.  I understood it to be that they were both designing the

6    projects but that Mark would be producing it and Tim would be

7    sort of doing other aspects of the business and I think there

8    was like some financial aspects and organizing aspects, you

9    know, doing paperwork to get these fairs -- you know, to get

10   the booths in the fairs and things like that.

11   Q.  How often did you see Tim in the wood shop -- sorry,

12   Mr. Bradley in the wood shop?

13   A.  Maybe four times over the two years that I was there.

14   Q.  And what did you see him doing in the wood shop?

15   A.  You know, he would come by to like drop something off or

16   they would talk about something or he was like organizing a

17   pickup of, you know, of pieces that they were going to exhibit

18   for a fair or something like that.  Like the night that I was

19   working late last spring or this past spring for these guys,

20   Tim came by and they were talking about, you know, different

21   details that still could be worked out.  And he, you know, like

22   went out and got us sandwiches at some point because we were

23   working late and hadn't had dinner, and he paid me also for the

24   work that I did.

25   Q.  I see.  Did you ever observe Tim designing any furniture or

1    fabricating any furniture?

2    A.  No.  I never saw Tim working in the shop like actually

3    producing the stuff.

4    Q.  Did you ever see Tim operate any machinery in the shop?

5    A.  No.

6    Q.  Do you know anybody by the name Anthony Bunda?

7    A.  No.

8    Q.  During the time that you were in the shop, how frequently

9    would you say you and Mark talked about his work?

10   A.  Oh, all the time.  You know, it wasn't like every day but,

11   yes, at least like a couple of times a week.

12   Q.  What kinds of things did he talk about?

13   A.  You know, we were talking about design elements and, you

14   know, like what color something should be.  I remember, yeah,

15   in this -- in the lead up to that fair that I helped Mark

16   produce stuff on, we talked a lot about different color options

17   for pieces, and so that was something that was like Mark had a

18   lot of uncertainty about.  There was, you know, a lot of

19   questions about whether it should be like this or should be

20   like that.  And we talked about it a lot and went through

21   different iterations and we -- yeah, so it would happen one

22   way.  There would be like a certain color that it would be

23   produced in and we would talk about whether it would look good

24   or not and then it would change and things like that.  These

25   were the kinds of conversations that were really common between

Fc1dvid4                          Anderson - direct

1    Mark and I.

2    Q.  Do you have any specific examples of like a color change on

3    a piece or a design change?

4    A.  Yes.  Working that one case from the spring, they would

5    like talk about making -- like bleaching the wood.  It had been

6    made of a dark colored wood and it was bleached and stained a

7    bright pink, and that was like the first initial idea that Mark

8    and Tim had worked out.  And then to Mark it didn't seem right.

9    And I took a look at it and I thought, yeah, like it just

10   didn't look quite right.  And I don't know if that's because,

11   you know, the way it was done it could have looked good under

12   circumstances but it just -- you know.  So Mark decided to do

13   it a different way in the end.

14   Q.  Did you see Mark consult with Tim on changing that color?

15   A.  I don't know.  Maybe when he got there they talked about it

16   that evening, but I don't know specifically.

17   Q.  Did you ever see Mark consulting with Tim on design

18   elements of pieces?

19   A.  I don't know.

20   Q.  What was your impression in general?  Did Mark -- do you

21   think, was he subcontracted?  Did he have autonomy over designs

22   or what?

23   A.  Oh, yeah.  He definitely was making autonomous decisions

24   all the time.  You know, it's like a situation where you may

25   hash something out in a drawing or in a conversation about how

Fc1dvid4                        Anderson - direct

1   something should look but you start making it and you see what

2   it actually looks like and then you decide, no, it could look

3   better in one way or another, so you alter the actual product

4   to look the way you want it to look.  You know, like once you

5   see it, then you realize it could look better in this other

6   way.  So Mark was constantly making design decisions in that

7   way as pieces were being produced.

8   Q.  You mentioned that you were at one point renting part of

9   Mark's bay?

10  A.  That's right, yeah.

11  Q.  Did you ever hear or would you have heard who was paying

12  the rent for Mark's bay?

13  A.  No.  I figured it was Mark doing that.

14  Q.  Did you ever hear anybody say that Mark might be in danger

15  of being kicked out of the wood shop?

16          THE COURT:  Sustained.  "Did you ever hear anybody

17  say."  I mean, there are --

18          MR. RAO:  It has been a long day.

19  Q.  Did you ever get the impression that Mark was in danger of

20  being kicked out of the wood shop?

21  A.  Yes.

22  Q.  And when was that?

23  A.  I couldn't say specifically but there was maybe one or two

24  moments in the past -- in the past year or two that, yeah, that

25  was an issue.  I know because Walter, the guy who ran the shop,

Fc1dvid4                        Anderson - cross

1    would come and tell me that.

2              MR. RAO:  No further questions.

3              THE COURT:  Mr. Pek, you may examine.

4    CROSS-EXAMINATION

5    BY MR. PEK:

6    Q.  Good afternoon.  You just testified that Mark and Tim in

7    your experience, or firsthand experience, both did design work,

8    they both were designing.  You later then testified that you

9    never saw them discussing designing, and then testified that

10   Mark was always doing the designing.  So I'm just curious,

11   which actually is it?

12   A.  So specifically what I was saying, that my understanding

13   was that Mark and Tim would sort of come up with like general

14   design ideas, right.  And I never saw them discussing designs.

15   I wasn't listening to what they were saying, so I don't know

16   what they were talking about when I saw them talking to each

17   other.

18              And then lastly what I was saying is that like you may

19   start with a design on a piece of paper, right, and it looks

20   good on paper, but you start to put something into production

21   and you realize it could look better this way or that way and

22   so you just make new design decisions based on that experience.

23   Q.  How is it that you know -- by seeing people talking, that

24   you are able to know what it is they are talking about?

25   A.  Well, that is the thing.  I don't know what they are

Fc1dvid4                      Anderson - cross

1   talking about.

2   Q.  Oh, OK.  You were not a design major at Cooper Union?

3   A.  No.  I was a fine art and painting major.

4   Q.  Fine art, OK.

5           THE COURT:  Fine arts, painting?

6           THE WITNESS:  Yes.

7   Q.  You testified earlier that for somebody like yourself at

8   Cooper Union with that major, it was not at all uncommon to be

9   in the wood shop or to, how can I say, bridge the gap into

10  woodworking?

11  A.  Right.  It was very common.

12  Q.  It was very common?

13  A.  Yeah.  Because they had every art student take classes in

14  woodworking.  So you learned how to use all the machinery as an

15  incoming freshman, and so a lot of friends I knew were making

16  objects to paint on throughout the years that they were at

17  school, which is what I did.

18  Q.  So would it not surprise you to learn that, say, for

19  instance, not at Cooper Union but at Pratt, somebody with a

20  major such as yours in fine arts would, like yourself,

21  ultimately make the move or endeavor into woodworking as well?

22  A.  Yeah.  That seems normal.

23  Q.  Did you ever did you ever receive an email from Mark

24  Grattan regarding Tim Bradley?

25  A.  I don't know.  I don't remember.

Fc1dvid4                         Anderson - cross

1   Q.  Did you ever receive an email specifically referencing that

2   Tim was on a rampage and that the police had been contacted?

3   A.  No.  I can't remember one.

4   Q.  Have you ever -- withdrawn.

5        You mentioned that Tim paid you for some work in

6   connection with Vidivixi, some woodwork?

7   A.  Yes.

8   Q.  And forgive me if I missed it, do you know what piece

9   specifically or what piece of furniture that was to be applied

10  to?

11  A.  Yeah.  Like I said, it was a small walnut cabinet with a

12  door on it.

13  Q.  And you also mentioned that you had some -- well, do you

14  know Tim Bradley separate and apart from Mark?

15  A.  I met Tim through Mark, but he, like I said, he's -- he

16  also knows my sister.  I mean, both Mark and Tim know my sister

17  and her fiancé from their time at Pratt together, and,

18  additionally, Tim went to high school with my cousin.

19  Q.  And have you ever seen Anthony Bunda at the wood shop?

20  A.  I know --

21           MR. RAO:  Objection.  Asked and answered.

22           THE COURT:  Bunda, right?

23           MR. PEK:  Bunda.  Sorry.

24           THE COURT:  Do you want to just rephrase?

25  Q.  Have you ever seen -- do you know Anthony Bunda?

Fc1dvid4                     Anderson - cross

1   A.  No.

2   Q.  You mentioned earlier a number of different ways that you

3   know, your sister's fiancée.  Am I correct in my recollection

4   that you earlier testified that through a cousin you know

5   Anthony Bunda, or did I mishear that?

6   A.  I don't know Anthony Bunda.

7   Q.  OK.  Sure.

8           THE COURT:  You were talking about a cousin who

9   knows --

10          THE WITNESS:  Tim.

11          THE COURT:  -- Mr. Bradley?

12          THE WITNESS:  Mr. Bradley, yes.

13          MR. PEK:  My mistake.  Thank you for clarifying.

14  BY MR. PEK:

15  Q.  You mentioned that you -- or withdrawn.

16          Have you ever heard of -- when was the first time that

17  you've heard the word "Vidivixi"?

18  A.  You know, sometime in the past.  I'd say almost two years

19  ago.

20  Q.  And from whom?  From Mark?

21  A.  Yeah.

22  Q.  And do you know what that word means, the significance of

23  that word?

24  A.  No.

25  Q.  Do you understand that to be a business venture?

1          MR. RAO:  Objection.  Asked and answered.

2          THE COURT:  Overruled.

3   A.  Could you repeat the question?

4   Q.  What is your understanding of Tim Bradley and Mark

5   Grattan's relationship, if any?

6   A.  I understood them to be business partners and friends.

7   Q.  Did you ever witness any falling out of that friendship?

8   A.  No.

9   Q.  What are your usual hours at the wood shop?

10  A.  You know, they varied.  And I would get to the wood shop

11  anywhere between 9:30 and 11:30 and stay through the evening

12  until, let's say, like 7/7:30, 8/8:30.

13  Q.  And how often -- how many days a week are you at the wood

14  shop, roughly?

15  A.  Five days a week.

16  Q.  Five days a week.

17          And on a weekly basis, would you say you see Mark

18  every day or every other day?

19  A.  Every day.

20  Q.  Every day?

21  A.  Yeah.

22  Q.  But you can't know about the weekends?

23  A.  Right.

24  Q.  Because you are not there.

25          And are you -- it is also your -- is it customary for

Fc1dvid4                          Anderson - cross

1   you to work very late hours?

2   A.  I mean, you know, work until 8 was normal, yeah.

3   Q.  I'm speaking of early morning hours rather than -- through

4   the night.

5   A.  No.

6   Q.  Do you rent your own bay from Walter Goodman?

7   A.  So I left that -- I left Walter's shop in August and

8   started renting wood shop space in a different place in

9   September.

10  Q.  You mentioned Amy Benezra as being a colleague of yours, is

11  that right?

12  A.  Yes.

13  Q.  Do you rent space where she rents space now?

14  A.  Yes.

15  Q.  Is that a joint decision?

16  A.  Yes, it was.

17  Q.  Based on what?  Why did you both move?

18  A.  So the rent was going up dramatically in Walter's wood shop

19  space in Sunset Park and there was a lot of uncertainty about,

20  you know, like what the spaces were going to be and what the

21  timeframe for the leases were going to be.  You know, he told

22  me several different prices over the course of our discussions

23  about continuing to rent space from him, and, you know, there

24  was a lot of confusion about how long the leases would go and

25  that kind of thing.  And Amy went and found -- started looking

1   around for other wood shop spaces, and she found a space that's

2   close to my apartment out in -- well, the space she found was

3   in Ridgewood Queens.  I live in Bushwick.  It is about a

4   15-minute walk away.  So it was a nice prospect for me to move

5   there, as opposed to Sunset Park which is a really long

6   commute.

7   Q.  Do you still keep in touch with Amy Benezra?

8   A.  Yes, because we share space --

9   Q.  You share space?

10  A.  Yes.

11  Q.  OK.  And Mark Grattan as well?

12  A.  No.

13  Q.  Do you know -- withdrawn.

14          Is it right that since leaving you haven't spoken much

15  with Mark?

16  A.  Correct.

17  Q.  Did you speak with Mark or his lawyer, Mr. Rao, before or

18  in preparation for this hearing today?

19  A.  Yeah.  I talked to Mr. Rao about the logistics of the day,

20  like what time to show up and that kind of thing.

21  Q.  And everything else you've testified to here today is based

22  on your own firsthand personal knowledge?

23  A.  Yes.

24          MR. PEK:  Thank you.  No further questions.

25          THE COURT:  All right.  Nothing further.  All right,

Fc1dvid4

1    Mr. Anderson, you are excused.  You may step down.

2              (Witness excused)

3              THE COURT:  All right.  We'll resume tomorrow morning

4    at 9:15.  9:15.  All right.

5              MR. PEK:  Thank you, your Honor.

6              THE COURT:  I would go later but I have some other

7    conferences and I don't want to keep the other people waiting.

8              MR. RAO:  Thank you, your Honor.

9              THE COURT:  All right.

10             (Adjourned to 9:15 a.m., Wednesday, December 2, 2015)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                        Page

 3   FRANCIS TIMOTHY BRADLEY

 4   Direct By Mr. Pek  . . . . . . . . . . . . .10

 5   Cross By Mr. Rao . . . . . . . . . . . . . .56

 6   Redirect By Mr. Pek  . . . . . . . . . . . .89

 7   ANTHONY PETER BUNDA

 8   Direct By Mr. Pek  . . . . . . . . . . . . 101

 9   Cross By Mr. Rao . . . . . . . . . . . . . 125

10   AMY BENEZRA

11   Direct By Mr. Rao  . . . . . . . . . . . . 139

12   Cross By Mr. Pek . . . . . . . . . . . . . 146

13   RICHARD WRIGHT

14   Direct By Mr. Rao  . . . . . . . . . . . . 153

15   Cross By Mr. Pek . . . . . . . . . . . . . 158

16   GRAHAM ANDERSON

17   Direct By Mr. Rao  . . . . . . . . . . . . 166

18   Cross By Mr. Pek . . . . . . . . . . . . . 174

19                   PLAINTIFF EXHIBITS

20   Exhibit No.                         Received

21    1   . . . . . . . . . . . . . . . . . . .52

22                   DEFENDANT EXHIBITS

23   Exhibit No.                         Received

24    A  . . . . . . . . . . . . . . . . . . . .70

25    R and S  . . . . . . . . . . . . . . . . .74
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C . . . . . . . . . . . . . . . . . . . .76

E . . . . . . . . . . . . . . . . . . . .86

AE . . . . . . . . . . . . . . . . . . .88