Fc2dvidh

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   VIDIVIXI, LLC and FRANCIS T.
     BRADLEY,
 4
                    Plaintiffs,              New York, N.Y.
 5
              v.                             15 Civ. 7364(JGK)
 6
     MARK ANTHONY GRATTAN and MARK
 7   GRATTAN DESIGN & BUILD,

 8                  Defendants.

 9   ------------------------------x

10                                           December 2, 2015
                                             9:20 a.m.
11
     Before:
12
                         HON. JOHN G. KOELTL,
13
                                             District Judge
14
                              APPEARANCES
15
     GUZOV OFSINK LLC
16        Attorneys for Plaintiffs
     BY:  MATTHEW ADAM PEK
17
     RAO LAW GROUP
18        Attorneys for Defendants
     BY:  SIDDARTHA RAO
19        BRIAN BOHM

20

21

22

23

24

25
```

Fc2dvidh

1          (Hearing resumed)

2          THE COURT:  Good morning, all.  Please be seated.

3          Mr. Pek, call your next witness.

4          MR. PEK:  Your Honor, the witness we had here

5    yesterday, Mat LaBarbiera, obviously didn't have a chance to

6    testify yesterday.  I had been on the phone with him this

7    morning.  Our only other witness is the defendant.  However, we

8    would like to have Mat LaBarbiera on the record.

9          I have just forfeited my phone but Mr. LaBarbiera said

10   he is on his way.  I believe we would only need five to ten

11   minutes.  If there is any way that the Court would be willing

12   to wait, we would -- I have ten minutes at most of questioning

13   for Mr. LaBarbiera and Mr. Grattan --

14         THE COURT:  OK.  We can start with Mr. Grattan and

15   interrupt Mr. Grattan's testimony to take Mr. LaBarbiera's

16   testimony.  All right.

17    MARK ANTHONY GRATTAN, JR.

18       called as a witness by the plaintiffs

19       having been duly sworn, testified as follows:

20         THE CLERK:  Please state your full name, spell your

21   last name slowly for the record.

22         THE WITNESS:  Mark Anthony Grattan, Jr.

23   G-r-a-t-t-a-n.

24         THE CLERK:  Thank you.

25         THE COURT:  All right.  Mr. Pek, you may examine.

Grattan – direct

1    DIRECT EXAMINATION

2    BY MR. PEK:

3    Q.  Good morning, Mr. Grattan.

4    A.  Hi.

5    Q.  Good morning again, Mr. Grattan.

6         Mr. Grattan, could you please do a brief summary of

7    the history of your meeting my client, the plaintiff, Tim

8    Bradley, from the moment following graduation from Pratt where

9    you bumped into Mark -- excuse me, Mr. Bradley at the wood shop

10   and decided to go forward that moment we discussed yesterday?

11   A.  I guess I recall our first wood shop interaction to be with

12   his friend Nate Lowman.  They had asked him to build an object

13   for his home in Long Island, I believe.  And Tim asked me if I

14   would like to do the project with him.

15        My assumption as to why he wanted me to do the project

16   with him -- well, actually I didn't know this at first, but, I

17   mean, I think he took on the project wanting to help Nate but

18   didn't know how to execute the project, which is why he hired

19   me to help him with the job.  And that's how it all started.

20   Q.  Were you employed at the time when you crossed paths with

21   Mr. Bradley early in 2013?

22   A.  I was self-employed.

23   Q.  And were you doing business under the name Mark Grattan

24   Design & Build, is that correct?

25   A.  Yes.

Grattan - direct

```
 1   Q.  Have you ever described yourself as a freelance designer?
 2   A.  All the time, yes.
 3   Q.  Do you recall yesterday in court -- withdrawn.
 4            How would you describe your business relationship in
 5   your experience as you understood it to be with Mr. Bradley, if
 6   you had one?
 7   A.  At this point or -- I don't understand the question.
 8   Q.  Is it true that you crossed paths with Mr. Bradley at some
 9   point following your graduation from Pratt at the Sunset wood
10   shop?
11            MR. RAO:  Asked and answered.
12   Q.  Did you bump into Mr. Bradley at some point in 2013?
13   A.  I did not bump into him at the wood shop.  He came
14   specifically to see me at the wood shop.
15   Q.  How would he have known that you had been there?
16   A.  Because I would have told him I was there.
17   Q.  So you had an existing -- did you have an existing
18   friendship with Mr. Bradley at the time?
19   A.  Yes.
20   Q.  And have you ever heard the word "Vidivixi" before entering
21   into business with Mr. Bradley?
22   A.  No.
23   Q.  Did you enter a business with Mr. Bradley?
24   A.  Yes, an undocumented business but yes.
25   Q.  An undocumented business, is that your testimony?
```

Grattan - direct

1    A.   Yes.

2    Q.   And how would you describe that business relationship?

3    A.   It was fine.  We had a good time working with each other.

4    I enjoyed his company and I assume he enjoyed mine as well and

5    we worked well together.

6    Q.   How would you describe your skill set or your skill set

7    versus Mr. Bradley's skill set, if they are at all different?

8    A.   Well, for starters, I have a pretty extensive knowledge of

9    furniture design and build.  I have extensive knowledge in

10   generating technical drawings, graphic design, programs such as

11   Adobe PhotoShop, Adobe Illustrator, Indesign, and these are

12   skills that I've learned that was lacking in Tim's repertoire,

13   I guess, as time went on.

14   Q.   What specific skills did you find were lacking?

15   A.   The ones I just mentioned.

16   Q.   Well, can you be specific?

17   A.   Woodworking, generating technical drawings, graphic

18   layouts.  Even the easiest thing of responding to emails I

19   think he had difficulty doing.

20   Q.   At any point in time, was there a discussion between

21   yourself and Mr. Bradley regarding what it was that Mark

22   Grattan was to do in this business and what was it that Tim

23   Bradley was?

24   A.   No.  And that's something that I think I stated in the

25   declaration is that what happened with us was organic, and it

Grattan – direct

1   sort of just fell the way that it did because of the things

2   that we had to offer and bring to the table.

3   Q.  You mentioned that the first occasion or the first project

4   that you undertook with Mr. Bradley was for someone by the name

5   of Nate Lowman?

6   A.  Yes.

7   Q.  Were you compensated for that job?

8   A.  Yes.

9   Q.  And what was the job specifically?

10  A.  It was the building of the Jumping Jack Credenza.

11  Q.  What does the word -- in the Jumping Jack Credenza, what

12  does "Jumping Jack" refer to?  Does that have any specific

13  meaning?

14  A.  It's just the form of the details in the piece of furniture

15  that resemble someone doing a jumping jack essentially.

16  Q.  Does that jumping jack design appear anywhere in the 14

17  pieces we discussed yesterday?

18  A.  Yes.

19  Q.  Can you tell me which pieces specifically?

20  A.  Bugsy's Bar.

21          THE COURT:  What?

22          THE WITNESS:  Bugsy's Bar.

23  Q.  Prior to -- had you ever employed the jumping jack

24  mechanism in connection with any of your woodworking prior to

25  entering into business with Mr. Bradley?

Grattan - direct

1  A.  No.

2  Q.  Did you and Mr. Bradley jointly develop or design the

3  jumping jack style, if you will?

4  A.  Together?  Yes.

5  Q.  So was it a collaborative effort?

6  A.  Yes, it was.

7  Q.  Of the 14 pieces that we have been discussing and that we

8  heard testimony about yesterday, how many of those pieces did

9  you design?

10  A.  There was a -- design solo?  Probably about four or five of

11  them.

12  Q.  Can you tell me which ones specifically?

13  A.  The Low Credenza Blue, the Ash Baby.

14          THE COURT:  I'm sorry.  The what?

15          THE WITNESS:  A-s-h.

16          THE COURT:  Ash what?

17          THE WITNESS:  Baby.  It is a funny name.

18          THE COURT:  OK.

19  A.  The Vantage Chair.

20  Q.  Is it just those three?

21  A.  No.  I'm thinking.  I'm nervous up here.

22  Q.  Take your time.

23  A.  I think sole design was just those three pieces.  The other

24  ones were joint collaboration -- initial collaboration.

25  Q.  Did you provide a declaration in connection with this

Grattan - direct

1  action?

2  A.  Yes, I did.

3  Q.  Do you recall the contents of that declaration?

4  A.  Yes.

5  Q.  Do you recall -- has it ever been your position that you

6  designed all the pieces of the Vidivixi collection, the 14

7  pieces?

8  A.  The details of the pieces, yes.  The initial designs were a

9  collaboration between the two of us, but as the pieces

10  developed and were finalized I was left alone to design the

11  final elements and details of each of those pieces.

12  Q.  How would you describe your role in the Vidivixi

13  partnership, if it was a partnership?  Rather -- withdrawn.

14       Was it your understanding as you began work with

15  Mr. -- or was it your understanding that the work you were

16  doing and had begun to do with Mr. Bradley under the Vidivixi

17  name, that either one of you had a specific set of duties

18  exclusive to the other?  For example, was it that you were the

19  one and only person who would be doing wood shop work?

20  A.  I did what he couldn't do and he did what I couldn't do.

21  That was it.  I didn't have the capability of paying for

22  things.  He didn't have the capability of executing a piece of

23  furniture into a three-dimensional object.

24  Q.  What do you base that estimation on the valuation of

25  Mr. Bradley as not having the skills necessary, as you state in

Grattan – direct

```
 1   your declaration, to conduct the business of Vidivixi?
 2   A.  Because he didn't do it.  I don't know how else to -- how
 3   did I come up with that answer?  How did I come up with that
 4   reasoning?  Because he wasn't capable of performing those
 5   skills.
 6   Q.  Which specific skills was he incapable of?
 7   A.  Woodworking, graphic layouts, technical drawings.
 8   Q.  Technical --
 9   A.  Technical drawings used to be provided for outsourced
10   vendors specifically.  Technical drawings used for line sheets,
11   tear sheets that are specific to interior designers and other
12   industry, whatever, that needed information, dimensions, call
13   outs.
14            THE COURT:  Did you ever have any discussions with
15   Mr. Bradley over the creation of the Vidivixi Mark?
16            THE WITNESS:  I talked to him about what I liked.  I
17   talked to him about logos that I liked.  I talked to him about
18   spacing, the heaviness of the weight of the line, you know, the
19   business card layout, the website layout.  And a lot of the
20   times I would get, "Mark, do what you want, I trust you," which
21   is what I also got from him.
22            THE COURT:  I'm sorry.  You got what?
23            THE WITNESS:  "Mark, do as you want.  I trust you."
24            But, yeah, we would have initial conversations about
25   how it should be, why I thought it should be this way.
```

Grattan – direct

1          THE COURT:  When did you first start having

2   conversations with Mr. Bradley about Vidivixi?

3          THE WITNESS:  We first started having conversations

4   about Vidivixi when we did the exhibition in Industry City

5   called Factory Floor.

6          THE COURT:  I'm sorry.  When you did what?

7          THE WITNESS:  The exhibition in Industry City.

8          THE COURT:  And when was that?

9          THE WITNESS:  That was November 2011 –– 2012.  I'm not

10  sure.

11          THE COURT:  OK.  So ––

12          THE WITNESS:  It's in the timeline somewhere.

13          THE COURT:  Yes, but I want to understand your

14  testimony now to the best of your recollection.

15          So in connection with the exhibit in Industry City,

16  you began to have discussions with Mr. Bradley about Vidivixi?

17          THE WITNESS:  Yes.

18          THE COURT:  Did any of those discussions involve what

19  the nature of Vidivixi would be, what the nature of your

20  relationship with Mr. Bradley would be?

21          THE WITNESS:  Well, I think that was sort of –– we

22  never had that discussion, which is why I think we're sitting

23  here today is because we always kept it very friendly.  Maybe I

24  think the both of us found it difficult to talk to each other

25  about it, and at some point I think it needed to be discussed.

Grattan – direct

```
 1   And when we were embarking on sales, I needed to bring up the
 2   ultimate situation and --
 3           THE COURT:  What do you mean by that, "the ultimate
 4   situation"?
 5           THE WITNESS:  How the money is allocated, who gets
 6   what, where the money goes, who gets what percentage, so on and
 7   so forth.
 8           THE COURT:  When did you first have a discussion about
 9   that?
10           THE WITNESS:  We didn't have a verbal discussion.  It
11   was an email I sent last summer I think at the beginning of
12   August/late July.
13           THE COURT:  Of 2015?
14           THE WITNESS:  Yes, sir.
15           THE COURT:  OK.  Thank you.
16   BY MR. PEK:
17   Q.  Did you ever invest any money in the Vidivixi or contribute
18   any money to the Vidivixi enterprise or business?
19   A.  Well, for one, I -- we split the rent for Colony the first
20   month, April, 425 apiece.  The rent was 850 a month.  I paid --
21   where everything was fabricated in Industry City, I paid
22   monthly rent of 1280 a month.  I would consider that a
23   significant investment in Vidivixi.
24   Q.  Was there any documentary evidence of the money that you
25   paid that you just mentioned?
```

Grattan - direct

1   A.   The rent?  I mean, yes.  Through Walter Goodman, yes, the

2   landlord of the shop in Industry City.

3   Q.   Prior to today, in connection with this action, did you on

4   your attorney, Mr. Rao, contact Mr. Goodman in connection with

5   this action?

6   A.   Yes.

7   Q.   And did Mr. Goodman provide you with any records of proofs

8   of payment?

9   A.   Walter Goodman actually said he does not keep records, but

10  through email communication with me Walter Goodman said --

11  based on the testimony that Tim gave Mr. Bradley, it said that

12  Walter had been sending him invoices for quite some time, but

13  Walter actually had never written an invoice, neither did Tim,

14  neither did me.  My name was on the lease, and, I mean, if need

15  be, you would be able to retrieve that information from Walter.

16  Q.   Was it your testimony just now that Mr. Goodman does not

17  keep records, to the best of your knowledge?

18  A.   I mean, that's what he said in the email, but I'm sure if

19  the courts get involved in it, I'm sure there would be

20  information that he would be willing to give up.

21       THE COURT:  Sir, please keep your voice up.  Move your

22  chair into the microphone.

23       THE WITNESS:  Sorry.

24       THE COURT:  Towards the microphone.  Thank you.

25  BY MR. PEK:

Grattan - direct

1    Q.  I just want to step back for a moment and perhaps just to

2    confirm.  You mentioned that you had a difficult time earlier

3    remembering exactly which pieces you designed, is that right,

4    out of the Credenza, Ash Baby, as you said?

5    A.  Mm-hmm.

6    Q.  Of the 14 pieces, I think that -- I might be leaving out

7    one -- was there a chair, as well, that you designed?

8    A.  Yes.

9    Q.  Was there anything else that you alone designed?

10   A.  No.

11        MR. PEK:  Your Honor, I would like to approach the

12   witness with Mr. Grattan's declaration submitted in opposition

13   to plaintiffs' motion for preliminary injunctive relief.

14        THE COURT:  All right.  Please keep your voice up.

15   BY MR. PEK:

16   Q.  Mr. Grattan, do you recognize this document?

17   A.  Yes.

18   Q.  What do you recognize it to be?

19   A.  My declaration.

20        MR. RAO:  Your Honor, just a quick issue here.  I

21   can't hear what counsel is saying, and he has my copy of the

22   declaration so I also don't have a copy.  He is welcome to use

23   it but I need to be able to hear what --

24        MR. PEK:  (Handing to Mr. Rao)

25   Q.  Do you recognize this to be the same document?

Grattan - direct

1   A.  Yes.

2           MR. PEK:  Mr. Rao, would you like to see it?

3           MR. RAO:  I have a copy here.

4   Q.  Would you mind reading paragraph 16 of your declaration

5   into the record.

6   A.  "Very quickly I took the lead in everything related to the

7   design and promotion of the brand from the first exhibition."

8   Q.  Would you mind reading paragraph 20.

9   A.  "I handled all graphic design and fabrication of Vidivixi."

10  Q.  Is it your testimony today that you handled all graphic

11  design, brand promotion, all design and fabrication for

12  Vidivixi?

13  A.  Yes.  The lead role?  Yes.

14  Q.  I'm just -- do you recall testifying earlier to only having

15  designed three pieces that you can recall?

16  A.  Well, yes, but this is saying I -- I am not saying here

17  that I designed solely these pieces.  I said I took the lead in

18  these designs.

19  Q.  Would you mind reading paragraph 20 once more?

20  A.  "I handled all graphic design and fabrication of Vidivixi."

21  Q.  Do you recognize the discrepancy between that statement in

22  the declaration and what you just testified to today?

23  A.  Graphic design and design of furniture, those are two

24  different things to me.

25  Q.  And it's your testimony today that you handled all design

Grattan - direct

1   or graphic design?  I just want to be clear.

2   A.  I led all furniture design and I designed all graphic

3   design and, yeah, OK, of Vidivixi.

4   Q.  Were you in court in this courtroom yesterday, Mr. Grattan?

5   A.  Yes.

6   Q.  Do you recall your attorney calling certain witnesses to

7   the stand to testify on your behalf?

8   A.  Yes.

9   Q.  Do you recall the testimony of Mr. Graham --

10  A.  Anderson.

11  Q.  Yes.  Thank you.

12          Do you recall Mr. Anderson testifying that --

13          THE COURT:  Don't go over other people's testimony,

14  please.

15  Q.  How much money would you say you invested in Vidivixi in

16  total?

17  A.  I mean, my math is horrible.  I don't know how to pull it

18  off the top of my head, I'm sorry.

19  Q.  But --

20  A.  I mean, you could times the rent times 12 and whatever else

21  I think there is.  I don't know how to pull it through that

22  math?

23  Q.  OK.  I'll ask you a different question.

24          Of the total amount of money that you are aware had

25  been invested in Vidivixi by anybody, can you estimate what

Grattan - direct

1   proportion in a rough approximation as to what your

2   contribution represented?

3   A.   Sure.  It is nothing compared to what Tim put in

4   financially to the business.

5   Q.   You can't be more specific?

6   A.   70/30.

7   Q.   70/30, am I --

8   A.   20/80.  I don't know.  Yeah, his contribution was

9   ridiculous and I've never overlooked that.  I've always been

10  very aware and...

11           MR. PEK:  I'm sorry, your Honor.  Just one moment.

12           (Pause)

13  Q.   I want to direct your attention to paragraph 21 of your

14  declaration on the same page that you were just reading from.

15  Would you read the last sentence of paragraph 21, Mr. Grattan.

16  A.   "As the collaboration grew, Francis primarily contributed

17  to our cause by providing" finances -- "financing."

18  Q.   Is that your testimony today, that Mr. Bradley's primary

19  contribution to the -- withdrawn.

20           Is that -- did Mr. Bradley contribute anything

21  separate and apart from money to this -- to Vidivixi?

22  A.   Yes.  But it's saying here as the collaboration grew, his

23  primary contribution became the finances.  Initially he was

24  more -- we were more of a team, he was around more, but as time

25  went on he was more absent.  He wasn't around.  He wasn't

Grattan - direct

1   participating.

2   Q.  Do you have an understanding as to why he wasn't around

3   or --

4   A.  I wasn't -- that was none of my business.  I mean, he

5   wouldn't -- it was just I have things to do.  I don't know.

6   Q.  Do you have any idea -- I think you said the number was

7   ridiculous before, but do you have any idea of about how much

8   money Mr. Bradley has invested in Vidivixi?

9   A.  No.  Probably about 70/$80,000.

10  Q.  Did you ever receive any payment as compensation or as a

11  gift -- or any gift or a loan from Mr. Bradley?

12  A.  Sure.  Yes.  Compensation?  No.  Was he paying me?  No.

13  Q.  How much money has Mr. Bradley paid you to date in the past

14  two years?

15  A.  Probably about $2,000.

16  Q.  Mr. Grattan, later in your declaration -- withdrawn.

17          What do you understand the assets of Vidivixi to be?

18  A.  The furniture, the website, the logo, the photography.

19  Q.  When you say "the logo" --

20          THE COURT:  Could you keep your voice up, sir.

21          THE WITNESS:  Yes.

22  Q.  Can you be more specific when you said "the logo"?

23  A.  The logo design, the design of the logo, I consider that an

24  asset.  It was time-consuming to create that.

25  Q.  Did you create your own alphabet and your own font for

1   that?

2   A.  No.

3   Q.  So what font -- today, what is your understanding insofar

4   as the font that constitutes the logo that you say you

5   designed?

6   A.  What constitutes -- I don't understand the question.

7   Q.  I'm trying to understand what -- you said "the logo."  I'm

8   trying to understand what the logo of Vidivixi is.

9   A.  The logo of Vidivixi is line weight, spacing between

10  letters.  It's, you know, the size of the font.  It's the

11  graphic elements of the font.  It's how the font relates to the

12  letters that create the word "Vidivixi."  It's a lot of things.

13  Q.  What does "Vidivixi" mean?

14  A.  I came and I saw -- or I came, I saw, I conquered.

15  Q.  And did you -- prior to endeavoring into business with

16  Mr. Bradley, did you ever -- have you ever heard that word

17  "Vidivixi," that phrase?

18  A.  No.

19  Q.  So --

20  A.  Tim made it up.

21          THE COURT:  I'm sorry.  Who made it up?

22          THE WITNESS:  Mr. Bradley.

23  Q.  Mr. Bradley -- withdrawn.

24          Can you describe what specific steps and efforts you

25  took to create the logo for Vidivixi?

Grattan - direct

```
 1    A.  Well, there was a lot of --

 2              MR. RAO:  Your Honor, objection to relevance.  I don't

 3    understand the relevance of this questioning.

 4              MR. PEK:  Your Honor, this is a trademark.  We have

 5    trade --

 6              THE COURT:  Oh, please.  Answer the question.

 7    A.  It's a lot of iteration between different fonts.  It is the

 8    playing of, you know, different fonts and how they look on

 9    paper and how they represented the furniture itself.  It's a

10    lot of iteration.  It's going back and forth.  It's --

11              THE COURT:  You designed the logo?

12              THE WITNESS:  Yes, I did.

13              THE COURT:  Thank you.

14    BY MR. PEK:

15    Q.  What font is the logo in?

16    A.  Verlag.

17              THE COURT:  I'm sorry.

18              THE WITNESS:  Verlag, V-e-r-l-a-g, with a 100 curse,

19    in bold.

20    Q.  Is that a font that you designed?

21    A.  Yes, it is.

22    Q.  Do you have any proof -- is there any evidence, any

23    documentary proof of your designing -- of Verlag being your

24    creation?

25    A.  There is my email communications with Francis Bradley.
```

Grattan – direct

1    Q.  Mr. Grattan, to the best of your knowledge, did Vidivixi

2    ever make any money?

3    A.  No.

4    Q.  Did you ever receive any money in connection with the work

5    that you did for Vidivixi from anybody?

6    A.  No.

7    Q.  Did you ever create an invoice with the Vidivixi name or

8    logo on it?

9    A.  Yes.

10   Q.  Why did you have the occasion to create an invoice?

11   A.  It wasn't an invoice, it was a proposal.

12   Q.  Are you familiar with -- are you aware that Mr. Bradley had

13   submitted an affidavit in connection with this action?

14   A.  Yes.

15   Q.  Are you familiar with the exhibits?

16   A.  Yes.

17   Q.  And are you aware that one of those exhibits contains

18   invoices which were referenced and some witnesses testified

19   about yesterday?

20   A.  Yes.

21   Q.  Do you know how many invoices you created?

22   A.  No, I do not.

23   Q.  Is it your testimony today that none of those invoices

24   yielded any revenue?

25   A.  Yes.

Grattan – direct

1    Q.  Are you aware that -- are you aware of any third -- excuse

2    me.  Withdrawn.

3              Are you aware of any subpoenas that have been served

4    in this action to nonparties?

5    A.  Yes.

6    Q.  Prior to today, did you and/or your counsel have an

7    opportunity to review the subpoenas -- any subpoenas issued in

8    connection with this action?

9    A.  Yes.

10   Q.  Do you know who issued those subpoenas?

11   A.  You did.

12   Q.  And are you aware or has your counsel reviewed it with you

13   or informed you as to whether or not any responses were

14   provided to those subpoenas?

15             MR. RAO:  Your Honor, I am just going to object to the

16   extent --

17             THE COURT:  Sustained.

18   BY MR. PEK:

19   Q.  Mr. Grattan, how were you able to -- what was your source

20   of income -- or withdrawn.

21             Did you testify earlier -- withdrawn.

22             Is it your testimony today that you did in fact create

23   or author, draft certain invoices in connection with Vidivixi?

24   A.  I drafted proposals for Vidivixi, yes.

25   Q.  Did those proposals or any of those proposals bear the word

Grattan - direct

1    "invoice" on them?

2    A.  Yes.  It said "proposal/invoice."

3    Q.  Did every invoice say "proposal" on them?

4    A.  I'm not sure --

5    Q.  Have you had an opportunity to review the exhibits,

6    specifically Exhibit 6 to Mr. Bradley's affidavit, in

7    connection with this action?

8            MR. RAO:  Your Honor, I object to questioning about

9    documents that the witness has not been furnished.

10           THE COURT:  Overruled.

11   Q.  Can you answer the question?

12   A.  Can you repeat the question?  I'm sorry.

13           THE COURT:  Except I will sustain it as to form.

14           MR. PEK:  OK.

15           THE COURT:  Did you have an opportunity to review?

16   Q.  Did you have an opportunity to --

17           THE COURT:  Did you -- look, why don't you show the

18   witness, if you want, the exhibit that you would like him to

19   look at rather than to ask him whether his counsel reviewed an

20   exhibit with him, or ask him a question whether he has had an

21   opportunity to review an exhibit?  Simply show the exhibit to

22   him, if you wish, or move on to another question.

23   BY MR. PEK:

24   Q.  Are you currently employed, Mr. Grattan?

25   A.  Yes.

Grattan - direct

```
 1              THE COURT:  I don't mean to -- if that is a line that

 2     you think is important to you, you have every ability to show

 3     the witness documents, but it is your examination.  Go ahead.

 4              MR. PEK:  Well, your Honor, just to be clear, it's my

 5     understanding that Mr. Grattan -- that Mr. Rao intends to call

 6     Mr. Grattan as a witness in connection with defendants' defense

 7     and that I --

 8              THE COURT:  It is your case.  I don't know why you

 9     assume that Mr. Rao is going to call anyone.  Your motion for a

10     preliminary injunction.  You have the burden.  You may know

11     something about what Mr. Rao is going to do that I don't.

12     Perhaps Mr. Rao has assured you that he is going to call

13     Mr. Grattan.

14              (Pause)

15     BY MR. PEK:

16     Q.  Mr. Grattan, how have you been able to make a living and

17     sustain your cost of living over the past two years if

18     Mr. Bradley did not provide you with any compensation?

19     A.  I own a business as Mark Grattan Design & Build --

20              THE COURT:  Hold on.  We are keeping a transcript.

21     The reporter has to be able to hear you.

22              THE WITNESS:  I understand.

23              THE COURT:  I have to be able to hear you.

24              THE WITNESS:  Yes.

25              THE COURT:  Keep your voice up.  Speak into the
```

Grattan - direct

1   microphone.  And now answer the question.

2   A.  I have a business.  It's called Mark Grattan Design &

3   Build, and I -- it's the occupation of custom furniture design.

4   Q.  And how much money have you earned in the past two years

5   through Mark Grattan Design & Build?

6   A.  Enough to keep my apartment, enough to pay my bills.  I

7   don't know that off the top of my head.

8   Q.  So is it your testimony today that you have been

9   concurrently working with Vidivixi or for Vidivixi and also for

10  your own --

11  A.  Yes.

12  Q.  OK.  Do you have a sense or an estimation -- can you

13  approximate how much time or how your time is split between the

14  two roles?

15  A.  It's split pretty evenly.  Not during exhibition season but

16  in the meantime, yes, it's split pretty evenly.

17      MR. PEK:  Your Honor, I would like to examine the

18  witness with regard to Plaintiff's Exhibit 1 that was entered

19  into evidence yesterday.

20      THE COURT:  Go ahead.

21      MR. PEK:  Your Honor, if I may, I have had an issue

22  with premarking my exhibits, which is why I'm not approaching

23  the witness with these exhibits now.  Having admitted number 1

24  into evidence yesterday, it was not my understanding that I

25  would need to provide additional copies.

Grattan – direct

1          THE COURT:  Right.  You've kept a copy of your own

2    Plaintiff's Exhibit 1, right?

3          MR. PEK:  Yes.

4          THE COURT:  And so Plaintiff's Exhibit 1 is in

5    evidence.  You can approach the witness and show him

6    Plaintiff's Exhibit 1.

7          (Pause)

8    BY MR. PEK:

9    Q.  Mr. Grattan, at any point in time did you refer to --

10   withdrawn.

11         At any point in time, did you send an email or other

12   correspondence to persons other than Mr. Bradley regarding

13   Mr. Bradley and your business relationship with him?

14   A.  Yes.

15   Q.  Specifically within the last -- since or at or around the

16   time this action was commenced, do you recall --

17   A.  Probably a few months before, a month before, yes.

18   Q.  Were you present in the courtroom yesterday when

19   Plaintiff's Exhibit 1 was entered into evidence?

20   A.  I'm not -- I don't know what Exhibit 1 --

21   Q.  Did you ever send an email regarding Mr. Bradley being in a

22   rampage?

23   A.  Yes, I did.

24   Q.  Can you explain for me what that rampage was?

25   A.  He came into the shop.  He actually -- that was the day or

1    a week after I had wrote that letter, a proposal, to him, and

2    he didn't respond for an entire week.  I got a text message

3    from him that morning while I was in a meeting and he told me

4    he wanted to come collect his belongings.  I asked him, Did you

5    receive my email?  He told me, Yes, it was done.  And I was

6    taken back for a second.  I told him I will be in the shop

7    around 11 or noon.

8          He came in.  And the first thing he said was, What are

9    you doing?  Why is the sofa here?  I said, Well, this was

10   supposed to get done months ago.  It needed to be fixed so it

11   could sit in the showroom and potentially make a sale so I had

12   took it upon myself to do the task myself.  At that point he

13   started taking everything of his.  We were both pretty high

14   energy, pretty worked up at the time.

15         He -- his voice, he raised his voice.  He threatened

16   to call the police at one point when he was still in the

17   space --

18   Q.  Wait.  Is that verbally?

19   A.  Yes.

20         I went downstairs.  He was making a huge scene.  He

21   told me, I can't trust you.  You've never been a good friend.

22   You'll never make it on your own.  Good luck.  You'll be

23   hearing from my lawyer.

24         And I didn't understand why.

25   Q.  Was it after that conversation that you -- or did you send

Grattan – direct

```
 1   an email regarding that rampage after that conversation?
 2   A.  Yes, I did.  I sent it the day after.  I was nervous he was
 3   going to try to take things that did not belong to him and he
 4   felt that they had in fact belonged to him.
 5   Q.  What things in particular?
 6   A.  Any tools that were in the shop.
 7   Q.  Is it your testimony that Mr. Bradley took any tools from
 8   the wood shop that weren't his?
 9   A.  The ones that were his, yes.  The ones that did not belong
10   to him, no.  So, yes, everything was fine from there.
11        I asked him for my external hard drive.  He told me he
12   wouldn't give it to me.  I had information on there that I
13   needed for meetings that I had prepared for that he refused to
14   give me, and that's when I called the police.
15   Q.  You did call the police?
16   A.  I did, yes.
17   Q.  And did you file a police report?
18   A.  They wouldn't let me file a police report because they told
19   me it was business related and there's nothing that you could
20   do.  They related it to like a domestic altercation because
21   technically whatever it is belonged to the both of us.
22   Q.  Is that your understanding today, what you just stated on
23   the record, the reason for the police not being able to fill
24   out a report or --
25   A.  Yes, because they said it was business related.
```

Grattan – direct

1    Q.  Do you understand that to be -- that this was to be

2    business related?

3    A.  Well, yeah.

4    Q.  Have you ever solicited any sales under the Vidivixi name?

5    A.  No.

6    Q.  Have you ever exchanged any emails with any potential

7    buyers of any Vidivixi furniture or any work to be commissioned

8    by Vidivixi?

9    A.  Wait.  Go back.  Have I ever solicited any sales under the

10   Vidivixi name?  Yes.  I was the business partner.  Yes, of

11   course I did.

12   Q.  And is it your testimony today -- were any sales made?

13   A.  No.

14   Q.  Do you have an approximate estimation as to how much money

15   you earned -- Mark Grattan Design & Build earned or you earned

16   through Mark Grattan Design & Build in this calendar year,

17   2015?

18              MR. RAO:  Objection.  Asked and answered.

19              THE COURT:  Overruled.

20   A.  I don't know.  I don't know.

21   Q.  Do you have a sense of how much money you've earned this

22   year as a wood maker or a woodworker, a designer, or through

23   any other capacity?

24   A.  Probably about 60 to 80,000.

25   Q.  And of that 60 or 80,000, was that all earned -- was that

Grattan - direct

1    money earned under the Mark Grattan Design & Build name?

2    A.  Yes, it was.

3    Q.  Did you ever -- have you earned any money for any work done

4    in connection with Vidivixi?

5    A.  No.

6    Q.  Are you familiar with a person by the name of Hayme

7    Brunnet?

8    A.  Yes.

9          THE COURT:  Spell it, please.

10         THE WITNESS:  H-a-y-m-e first name.  Brunnet,

11   B-r-u-n-n-e-t, is the last name.

12   Q.  And how do you know Mr. Brunnet?

13   A.  He is a good friend of a friend of mine.

14   Q.  Has Mr. Brunnet ever paid you for anything?

15   A.  Yes, he has.

16   Q.  What did he pay you for?

17   A.  Two table vases I designed back in 2011.

18   Q.  When you say you -- well, how much money have you earned

19   from Mr. Brunnet?

20   A.  $300, if that.  I think it was a little less.  268 or

21   something.

22   Q.  And to be clear --

23   A.  After shipping.

24   Q.  Sorry.  And that was earned by -- your testimony today is

25   that was earned under the Mark Grattan Design & Build name?

Grattan - direct

1   A.   Yes.

2   Q.   Did you ever exchange any correspondence with Mr. Brunnet

3   regarding this work, this transaction?

4   A.   Yes.

5   Q.   And in those emails -- forgive me.  Withdrawn.

6          In those exchanges, were there any emails -- was it

7   done by email?

8   A.   Yes.

9   Q.   And did you -- in those emails, do you recall what email

10  address you were writing from?

11  A.   I mean, I guess if you're getting to the fact that I wrote

12  it with perhaps the mark@vidivixi.com email, there is potential

13  for that, yes.

14  Q.   Have you ever -- withdrawn.

15         Is it your understanding that -- withdrawn.

16         MR. PEK:  Excuse me, your Honor.

17         (Pause)

18  Q.   Are you familiar with a person by the name of Grant

19  Reynolds?

20  A.   Yes.

21  Q.   And how do you know Mr. Reynolds?

22  A.   I did a custom project for a firm that designed his

23  restaurant.  The name of the firm was Leroy Street Studios,

24  L-e-r-o-y.

25  Q.   Do you have an understanding as to the business of Leroy

Grattan – direct

1  Street Studios?

2  A.  It's an architecture firm.

3  Q.  To the best of your knowledge, is Mr. Reynolds an

4  architect?

5  A.  No, he is not.  He is a wine specialist at the restaurant

6  Charlie Bird, where the work that I did was at.

7  Q.  What work did you do?

8  A.  I designed a custom dining table for their private dining

9  room.

10  Q.  For the restaurant?

11  A.  Yes.

12  Q.  How much money did you make off of that job?

13  A.  Over $8,000.

14  Q.  And was that earned under the Mark Grattan Design & Build?

15  A.  Yes.

16  Q.  Is that entity incorporated?

17  A.  Is the company?  It is a d/b/a.

18  Q.  Can you explain that?

19  A.  Explain doing business as --

20  Q.  I don't know what a d/b/a means -- I know the acronym but

21  I'm not --

22  A.  It's "doing business as."

23  Q.  Is it -- but, again, have you ever incorporated this

24  business entity?

25  A.  No.

Grattan – direct

```
 1   Q.   OK.  Do you have an email address, Mark Grattan Design &
 2   Build?
 3   A.   No, I do not.  It is markgrattan.com.
 4   Q.   Do you employ -- in connection with these two roles that
 5   you have been playing, meaning in connection with the work that
 6   you have been doing for yourself under the d/b/a that you just
 7   mentioned, the Mark Grattan Design & Build, and the work that
 8   you have done for Vidivixi, have you ever taken any steps to
 9   distinguish your -- or withdrawn.
10           You mentioned there was some email exchange with
11   Mr. Brunnet in connection with a sale earlier.
12   A.   Mm-hmm.
13   Q.   Was there also some correspondence with Mr. Reynolds?
14   A.   Yes.
15   Q.   And is it your recollection -- do you recall whether or not
16   you had sent Mr. Reynolds any emails from your email address
17   mark@vidivixi.com?
18   A.   Probably.  Sure.  It's likely.
19   Q.   How is it that you are able to -- or do you have any
20   accounting method whereby you can distinguish the money that
21   you've earned from Vidivixi versus that that you've earned from
22   Mark Grattan Design & Build?
23   A.   Vidivixi hasn't made any money so that I didn't need to put
24   any of that into effect.
25   Q.   Do you have a signature block that you have been using in
```

Grattan - direct

1    connection with the mark@vidivixi.com email address?

2    A.  Yes.

3    Q.  Can you just briefly explain what that reads?

4    A.  It gives the name.  It gives the website.  It gives phone

5    number, address.

6    Q.  Have you ever sent any emails from the mark@vidivixi.com

7    email address where your signature block included both Vidivixi

8    or hashtag Vidivixi or the Vidivixi.com website and also Mark

9    Grattan Design & Build?

10   A.  Yes.

11   Q.  How do you determine whether or not you are doing a job for

12   yourself or Vidivixi if you are using -- or just how is it

13   that -- I'm trying to understand how you -- whether these

14   businesses are separate or not.

15   A.  Well, any inquiries that come through the website, it's for

16   Vidivixi.  Any inquiries who come through word of mouth go

17   through markgrattan.com.  Anyone that references a piece on

18   Vidivixi that belongs to Vidivixi, it's Vidivixi; otherwise

19   it's markgrattan.com.

20   Q.  Is it your testimony today that the only money you've

21   earned from Vidivixi has been from Mr. Bradley?

22   A.  I haven't earned any money from Mr. Bradley.  I don't

23   understand.

24   Q.  Did you receive any money from Mr. Bradley?

25   A.  Yes.

Grattan - direct

1    Q.  And what was that for?

2    A.  He paid a month at the shop -- he paid two months at the

3    shop.  I reimbursed him for one of those months.

4    Q.  Do you have any proof of that?

5    A.  Yeah.  I don't know.  No.  I'm sure I could find it

6    somewhere.  I don't --

7    Q.  Which is it, "yeah," "I don't know," or "no"?

8           THE COURT:  What?

9    A.  Yes, or no, I don't know.  I have to look.  I'm not sure.

10          Proof of reimbursement or proof of what are you

11   asking?

12   Q.  Proof of reimbursement or --

13   A.  Yeah, I am sure I could find it.

14   Q.  Did you receive a subpoena in connection with this hearing

15   today?

16   A.  No.

17   Q.  No?

18   A.  Perhaps.  I'm not sure.

19   Q.  Have you had any conversation -- when soliciting -- you

20   mentioned that you've made approximately 60,000, was it, this

21   year?

22   A.  Around.

23   Q.  And is it your testimony today that that has all been

24   earned in connection -- or how much of that has been earned

25   under the Mark Grattan Design & Build name?

Grattan – direct

1        THE COURT:  Actually, you said you earned about 60 to

2   $80,000 this year, is that right?

3        THE WITNESS:  Yes.

4        THE COURT:  OK.

5   Q.  And of that 60 to $80,000, what portion was earned from,

6   approximately, Mark Grattan -- excuse me, from Vidivixi?

7   A.  Vidivixi hasn't made any sales.

8   Q.  From Mr. Bradley?

9   A.  No.

10  Q.  Is it your testimony that you've never received any money

11  from Mr. Bradley?

12        MR. RAO:  Objection.  Mischaracterizes the prior

13  testimony.

14        THE COURT:  Sustained.

15  Q.  Has Mr. Bradley ever given you a loan?

16  A.  Umm, yeah.  The rent for the shop, yes.

17  Q.  Do you mean -- are you referring to the wood shop?

18  A.  Yes.

19  Q.  So is it your testimony today that Mr. Bradley has only

20  paid you in the form of two months at the wood shop?

21  A.  Plus the $1,500 he gave me for the fabrication of the

22  Jumping Jack Credenza.

23  Q.  You testified earlier that Mr. Bradley, to the best of your

24  knowledge, had invested somewhere between 70 to $80,000 in

25  Vidivixi, is that right?

Grattan - direct

1    A.  Yeah.  Something like that.

2    Q.  Do you have a recollection or understanding as to where

3    that money -- how that money was spent, where it went?

4    A.  Material, space for the exhibition, transportation.

5    Q.  Is that it?

6    A.  Yes.

7              THE COURT:  How about outsourcers?

8              THE WITNESS:  The outsourcers were free.  Actually, we

9    got that.  Except for the FW14 bookshelf, which I believe costs

10   us $600 for that metal frame.  But everything from the newest

11   collection was through my relationships with my vendors that

12   I've known.

13   BY MR. PEK:

14   Q.  Are you familiar with a woman by the name of Marcie Parmet?

15   A.  Yes.

16   Q.  How do you know Marcie Parmet?

17   A.  She emailed me back I think it was maybe even 2010, 2011.

18   She works for a large company that's called Chilewich,

19   C-h-i-l-e-w-i-c-h.  They focus on textiles -- high-end

20   textiles, and she -- they needed some pieces built for their

21   photo shoot and they commissioned me.

22   Q.  And so was it for one job?

23   A.  For one job.

24   Q.  They commissioned you for --

25   A.  I think I did the work for them twice, I believe.  They had

Grattan – direct

1  a show in Chicago as well and I built them some additional

2  pieces.

3  Q.  How much money have you received from Ms. Parmet?

4  A.  I don't know.  I would have to look that up.

5  Q.  Have you ever received any money from Ms. Parmet?

6  A.  Yes.

7  Q.  Was that money payment for services rendered?

8  A.  Yes.

9  Q.  And were those services fabrication of furniture or related

10 services?

11 A.  Yes.

12         THE COURT:  Mr. Grattan, am I right that there were 14

13 pieces of furniture that were created for Vidivixi?

14         THE WITNESS:  Yes, sir.

15         THE COURT:  And those pieces of furniture were model

16 pieces to try and get orders for those pieces?

17         THE WITNESS:  Yes.

18         THE COURT:  And all of those pieces were, to some

19 degree, a result of the collaboration between you and

20 Mr. Bradley?

21         THE WITNESS:  Yes, sir.

22         THE COURT:  Have you successfully obtained any orders

23 to sell any of those pieces?

24         THE WITNESS:  No, but we were -- that's why we were

25 embarking on orders, which is why I sent Francis that proposal

Grattan - direct

```
 1   so we could do this the right way, but, no, Vidivixi has not

 2   made any orders.

 3            THE COURT:  The other pieces that you have sold in

 4   order to make your income that you've testified about, were all

 5   of those pieces, other than the 14 pieces that were created in

 6   collaboration with Mr. Bradley, for Vidivixi?

 7            THE WITNESS:  No.  It is a client that comes to me

 8   that wants -- that has --

 9            THE COURT:  You said no?

10            THE WITNESS:  No.  Wait.  Can you repeat?

11            THE COURT:  Perhaps I phrased my question inartfully.

12            My question was you told me that there are these 14

13   pieces --

14            THE WITNESS:  Mm-hmm.

15            THE COURT:  -- that were created in some collaboration

16   with Mr. Bradley for Vidivixi, right?

17            THE WITNESS:  Yes.  Yes.

18            THE COURT:  And you've not made any sales of those

19   pieces.

20            THE WITNESS:  Right.  Yes.

21            THE COURT:  You haven't made any income from selling

22   those pieces?

23            THE WITNESS:  Right.

24            THE COURT:  So the income that you've earned, which

25   you've testified is anywhere from 60 to $80,000, came from
```

Grattan - direct

```
 1    selling pieces other than those 14 pieces?

 2              THE WITNESS:  Yes.

 3              THE COURT:  OK.  Go ahead.

 4    BY MR. PEK:

 5    Q.  Are you familiar with -- withdrawn.

 6              Are you familiar with an individual by the name of

 7    Nick Cope?

 8    A.  Yes.

 9    Q.  How do you know Mr. Cope?

10    A.  He is in the design industry.  He focuses on high-end

11    wallpaper.  It is called Calico.

12    Q.  Have you ever done any business with Mr. Coke?

13    A.  Yes.

14    Q.  Can you expand on that?

15    A.  I made the Dakku Bedframe for him.

16    Q.  Does the Dakku Bedframe -- is there another name for that?

17    A.  No.

18    Q.  The Dakku Bedframe, is that one of the 14 pieces?

19    A.  Mm-hmm.

20    Q.  And Mr. -- can you just confirm what exactly you did for

21    Mr. Cope?  You did the Dakku Bedframe for him?

22    A.  Yeah.  I made it at a discounted price, yes.

23    Q.  And do you recall how much money you received?

24    A.  2500.

25    Q.  And --
```

Grattan - direct

1   A.  Or something like that, 22/23.  I'm not sure.  Minus

2   material costs --

3   Q.  And --

4   A.  -- transportation.

5   Q.  That money that you've earned -- the money that you've

6   earned from Mr. Cope was strictly in relation to the Dakku bed,

7   is that right?

8   A.  Yes.

9   Q.  Did you ever earn any money -- did you ever receive any

10  payments from Mr. Cope for anything related to Vidivixi?

11  A.  Yeah.  The Dakku Bedframe that Tim -- Mr. Bradley helped me

12  build.

13  Q.  You testified earlier that Vidivixi has never made any

14  money.

15  A.  Yeah.  Well, Tim helped me build that piece.  Mr. Bradley

16  helped me build that piece.

17  Q.  Was he compensated?

18  A.  He was not compensated but he knew very -- he was very

19  clear, very aware of what was happening.

20  Q.  How would he be --

21  A.  Because we had a discussion about it.

22  Q.  Can you tell me a little bit more about that?

23  A.  He didn't want anything to do with it.  He helped me build

24  it.  He knew I didn't have the money so I kept it.

25  Q.  How was this discussion had, verbally or in writing?

                            Grattan - direct

1   A.   Verbally -- through text messaging or something.

2   Q.   Based on your -- the business relationship that Judge

3   Koeltl had asked you about before or that -- and myself with

4   Mr. Bradley, is it your understanding that you had

5   Mr. Bradley's consent, or did Mr. Bradley consent to any of

6   those 14 pieces being made or sold?

7   A.   He consented to the Dakku Bedframe which was built for Nick

8   Cope, yes.

9   Q.   He consented not -- he consented verbally, you said, or

10  through text messages, is that it?

11  A.   Sure.  I'm not positive but definitely verbally.  We had

12  the discussion and he was very clear what was going to happen.

13          THE COURT:  Mr. Grattan, I thought you had told me

14  before that none of the 14 pieces had been sold, that there was

15  never any sale from Vidivixi.

16          THE WITNESS:  Right.  That one I didn't assume would

17  be considered but obviously it is part of the Vidivixi

18  collection, but since Francis Bradley was aware --

19          THE COURT:  I'm not asking you about whether

20  Mr. Bradley was aware or not.

21          Other than that bedframe to Mr. Cope, have there been

22  any other sales of the 14 pieces?

23          THE WITNESS:  No, sir.

24          THE COURT:  So it was just one bedframe which was sold

25  for $2,500, which is the only sale of any piece of furniture

Grattan – direct

```
 1    from those 14 pieces?

 2              THE WITNESS:  Yes, sir.

 3              THE COURT:  OK.  And when was that sale, by the way,

 4    to Mr. Cope?

 5              THE WITNESS:  May 2015 -- June 2015.

 6              THE COURT:  OK.

 7              THE WITNESS:  Spring.  I don't know.

 8              (Pause)

 9    BY MR. PEK:

10    Q.  Could you just confirm once again how much money you made

11    from Mr. Cope or Mr. Cope paid you?

12    A.  I believe it's around $2,500 minus material and

13    transportation and overhead.

14    Q.  When you say material, transportation and overhead, is that

15    money -- did that come out of your pocket?

16    A.  That comes out of the money that Nick pays.

17    Q.  So what was your net income from this -- from Mr. Cope?

18    A.  Probably about $1,500.

19              MR. PEK:  May I approach, your Honor?

20              THE COURT:  Yes.

21    Q.  Do you recognize this document?

22    A.  Yes.

23    Q.  Did you author this document?

24    A.  Did I?

25    Q.  Author it.
```

Grattan - direct

1    A.   Yes.

2    Q.   Would you mind just for the -- excuse me.

3              (Pause)

4              Can you tell me what this document is that I just

5    handed you?

6    A.   This is the invoice that I sent Nick Cope, prepared for

7    Nick Cope, a description of work, the -- at the time it was

8    called the Cloud 9 Bed but now it's called the Dakku Bedframe.

9    The retail price is $5,000.  Upholstery textile 240, upholstery

10   padding 47, shipping paid, friends and family discount

11   50 percent.  That's --

12   Q.   What is the friends and family discount?

13   A.   That was the discount that we gave Nick Cope.

14   Q.   Who is "we"?

15   A.   Me and Tim.  That was the discount that we thought was fair

16   and that we -- what we decided it would be.

17   Q.   Is it your testimony today that Mr. Bradley consented to

18   your doing work for Mr. Cope?

19   A.   Yes.

20   Q.   Selling him a bed that was part of the Vidivixi line?

21   A.   Yes.

22   Q.   And that you would receive all monies earned therefrom?

23   A.   Yes.

24   Q.   So just to be clear, the Dakku Bedframe is or is not known

25   by the second name?

Grattan - direct

1    A.   I mean, it's got like three names.  Yesterday Tim called it

2    the Summer Bed.  Yes, that is the same bed.  Yes.

3    Q.   Do you have any understanding as to why -- or did

4    Mr. Bradley ever tell you why he was -- the basis for his

5    providing consent to give a discount for something that was --

6    for a Vidivixi piece that you were going to make and sell for

7    your own -- and receive money for it from Mr. Cope?

8    A.   Yeah.  Your question is why would he?

9    Q.   Do you have an understanding as to -- it seems to me

10   that --

11            THE COURT:  Oh, please.  Sustained as to form.

12            Did you have a conversation with Mr. Bradley about

13   giving a discount to Mr. Cope?

14            THE WITNESS:  Yes.  Nick Cope didn't want to pay the

15   full price for it so that was the best I could do.

16            THE COURT:  All right.  And that was the substance of

17   your conversation Mr. Bradley?

18            THE WITNESS:  Yes, sir.

19   BY MR. PEK:

20   Q.   Was there ever -- does the sale or the transaction with

21   Mr. Cope constitute the only instance where you provided or

22   fabricated a piece of Vidivixi furniture -- or a piece from the

23   Vidivixi line to some third party with Mr. Bradley's consent?

24   A.   Yes.

25   Q.   That was -- OK.  Thank you.

| | |
|---|---|
| 1 | THE COURT:  Well, actually, even without that |
| 2 | qualification about Mr. Bradley's consent, was there any other |
| 3 | piece that you fabricated and sold from the 14 pieces in the |
| 4 | Vidivixi line to anyone other than Mr. Cope? |
| 5 | THE WITNESS:  No. |
| 6 | BY MR. PEK: |
| 7 | Q.  What did you fabricate for Mr. Grant Reynolds? |
| 8 | A.  It was a dining table and benches. |
| 9 | Q.  Did it have a name, that dining table?  Was it custom made? |
| 10 | A.  It was a custom piece.  There was no name.  Custom pieces, |
| 11 | there were no names for them. |
| 12 | MR. PEK:  Your Honor, I'm handing Mr. Rao what will be |
| 13 | marked as Plaintiffs' Exhibit 2. |
| 14 | Q.  Mark Grattan, do you recognize this document? |
| 15 | A.  Yes. |
| 16 | Q.  What do you recognize it to be? |
| 17 | A.  That's the payment from Nick Cope. |
| 18 | Q.  I will leave this with you for a moment. |
| 19 | Does the document I just showed you accurately reflect |
| 20 | the amount -- or does that document -- what does that document |
| 21 | mean to you? |
| 22 | A.  The Exhibit No. 2? |
| 23 | Q.  Yes. |
| 24 | A.  That is the -- I assume, I think it is the Chase payment |
| 25 | from Nick Cope.  Nick Cope has an interior design firm called |

Grattan - direct

1   Dark Green, which is what the bed was sold under.  The king

2   bed, right here, the same as my invoice, king-sized bed 76 by

3   80.

4   Q.  Does the document before you show multiple payments being

5   made?

6   A.  Does the document -- yeah.  I don't understand.

7   Q.  Does this document relate to the sale --

8   A.  This is the same bed that was sold to Nick Cope.

9   Q.  OK.  Can you just explain how you arrived at the 587.57

10  number on the invoice you are reading from?

11  A.  The $1,500 that's on that was most likely the profit that

12  was made from the $2,200.  Plus, if you add the upholstery

13  padding which is 47.57.

14  Q.  Would you mind just reading the descriptions and the

15  corresponding amounts for each of the four --

16          THE COURT:  Well, actually, the exhibit isn't in

17  evidence.

18          Any objection?

19          MR. RAO:  No objection, your Honor.

20          THE COURT:  OK.  Plaintiffs' Exhibit 2 received in

21  evidence.

22          (Plaintiffs' Exhibit 2 received in evidence)

23          MR. PEK:  Thank you, your Honor.

24  BY MR. PEK:

25  Q.  Mr. Grattan, can you please read for each of the four

1  payments of Plaintiffs' Exhibit 2 the recipient, the

2  description and the amount.

3  A.   This is the payment notification was sent to Mark Grattan

4  on 10/30/2014.  Above that it says "Recipient Mark Grattan,

5  60 percent deposit of $1,500."  Payment was accepted.  We

6  completed the payment from the Dark Green checking account

7  ending in 5615.  Email address mark.grattan@Gmail.com with a

8  transaction number.

9  Q.   What was the amount for that one page?

10 A.   1500.

11 Q.   OK.  And can you go on to the next page and do the same, if

12 you wouldn't mind.

13 A.   The next page, it says, "Completed invoice 1108201401,

14 bed," for the amount of 587.57.  Invoice number matching the

15 invoice of that -- of the initial exhibit you just sent over.

16 Q.   And the description?

17 A.   "Bed."

18 Q.   And would you mind doing the same for the third and fourth

19 pages.

20 A.   This was for progress payment for bed, 700.  Payment

21 notification was sent to Mark Grattan on 11/4/2014 for $700.

22 Q.   What do the total payments of the four payments comprising

23 Plaintiffs' Exhibit 2 total up to?

24         THE COURT:  Please, let's not waste time.  All right?

25 $2,787.  I mean, that's the arithmetic, right?

1          MR. PEK:  I don't see it that way, your Honor.  There

2     are four payments made for 1500, 2250, 700 and 587.57.

3          THE COURT:  There are three that you've just gone

4     over.

5          MR. PEK:  There is four pages to the exhibit.

6     A.  Right.  I had done a custom project for them for an Upper

7     East Side residence.  That was a dining table -- a walnut

8     dining table for 2250, which is stated here, "60 percent

9     deposit on dining table."

10    Q.  That dining table is not a part of the Vidivixi collection?

11    A.  No.

12    Q.  And which job did you do first?

13    A.  I believe we -- I did the bed first.  I don't know.

14    Whatever the dates say.  I did the dining table first.

15    Q.  And the dining table -- was the amount you received for

16    making the dining table, just to confirm, 2250?

17         MR. RAO:  Objection.  Relevance.

18         THE COURT:  I'll allow it.  This is one of the few

19    cases, however, where a document comes very close to speaking

20    for itself.

21         The document reflects that the amount was $2,250, is

22    that right?

23         THE WITNESS:  Yes.  For the 60 percent deposit, yes,

24    sir.

25         THE COURT:  60 percent deposit, all right.

Grattan – direct

1          We'll take ten minutes.  Mr. Pek, please, move it

2     along.

3          MR. PEK:  Will do, your Honor.

4          (Recess)

5          THE COURT:  All right.  Please be seated.

6          THE CLERK:  Mr. Grattan, I remind you, you are still

7     under oath.

8          THE WITNESS:  Yes.

9          THE COURT:  All right.  Mr. Pek, you may proceed.

10         MR. PEK:  Thank you, your Honor.

11         Your Honor, I'm handing to you and to counsel what has

12    been marked as Plaintiffs' Exhibit No. 3.  It was also Exhibit

13    6 to the Bradley Affidavit.

14    BY MR. PEK:

15    Q.  Mr. Grattan, do you recognize this document?

16    A.  Yes.

17    Q.  I'm going to leave this with you and ask you a few

18    questions.

19         THE COURT:  Please keep your voice up.  The reporter

20    doesn't know if you are simply having a private conversation

21    with the witness or not.

22         MR. PEK:  My apologies, your Honor.  I will.

23    Q.  Do you recognize that document that has been premarked as

24    Plaintiffs' Exhibit 3, Mr. Grattan?

25    A.  Yes.

Grattan – direct

1    Q.  And what do you recognize it to be?

2    A.  It's an invoice to a past client of mine named Sean Watts,

3    W-a-t-t-s.

4    Q.  And was this an invoice that you created?

5    A.  Yes.

6    Q.  And did it result in any revenue being earned?

7    A.  Yes.

8    Q.  And how much revenue -- did you receive payment from

9    Mr. Watts?

10   A.  Yes.

11   Q.  And how much did you receive -- or what was the payment

12   for?

13   A.  A custom dining table.

14   Q.  OK.  Can you flip to the next page, please.

15          THE COURT:  You are reading exhibits which are not in

16   evidence.

17          MR. PEK:  Forgive me.

18          THE COURT:  Is there any objection to Plaintiffs'

19   Exhibit 3?

20          MR. RAO:  No objection, your Honor.

21          THE COURT:  All right.  Plaintiffs' Exhibit 3 received

22   in evidence.

23          (Plaintiff's Exhibit 3 received in evidence)

24   BY MR. PEK:

25   Q.  Mr. Grattan, if you wouldn't mind reviewing just very

1    briefly those documents.  Do you recognize these invoices, or

2    proposals, as you described them?

3    A.  Yes.

4    Q.  OK.  Did you create or prepare each of those documents?

5    A.  Yes, I did.

6    Q.  And did you -- and for what purpose were these invoices

7    created?

8    A.  For sales or potential sales.

9    Q.  For which business?

10   A.  Umm, depending on the description provided in the

11   description of work, it could be either Vidivixi or Mark

12   Grattan Design & Build.

13   Q.  Do you see the Vidivixi mark on these invoices?

14   A.  Yes.

15   Q.  Of the invoices before you which -- withdrawn.

16          Do you see the word "Vidivixi" on each and every one

17   of those invoices?

18   A.  Yes.

19   Q.  Is it your testimony today that each of these invoices does

20   not necessarily relate to the Mark Grattan Design & Build

21   business or Vidivixi, some for one and some for another?

22   A.  Yes.

23   Q.  Thank you, Mr. Grattan.

24          Why would there be a need -- or why would you include

25   the word "Vidivixi" at all in connection with the job and the

Grattan - direct

1   invoice prepared for work done not for Vidivixi?

2   A.   Honestly, I think it is just sloppy.  It shows a little bit

3   of unorganization.

4          THE COURT:  Would you go through the invoices for me,

5   Mr. Grattan, and tell me from those invoices, did any -- or

6   just tell me which, if any, reflected any of the 14 pieces of

7   furniture --

8          THE WITNESS:  Absolutely.

9          THE COURT:  -- that were created collaboratively for

10  Vidivixi?

11         THE WITNESS:  OK.  The first page, prepared for Sean

12  Watts and Rosemary Suh, S-u-h, that was a custom piece.  Sean

13  works for Leroy Street Studios who was referred to me because

14  of the dining table created for Charlie Bird, the restaurant

15  that we spoke of earlier.  Custom.

16         Michael Feldman, there is no Vidivixi Mark on that.

17  All there is is my emails and the Vidivixi.com and the

18  markgrattan.com.

19         Should I still --

20  Q.   Please, if you would.

21  A.   That was a custom piece, a desk, not related to Vidivixi.

22  Q.   You said it does not bear the mark?

23         THE COURT:  Hold on.

24         MR. PEK:  OK.  Sorry.  Forgive me.

25         THE COURT:  Just go through --

Grattan - direct

1           THE WITNESS:  And say which is Vidivixi and which

2    is --

3           THE COURT:  No.  I don't need you to on the record go

4    through each invoice.

5           THE WITNESS:  Right.

6           THE COURT:  Maybe someone else will ask you that, but

7    what I want you to do is to go over the whole stack of

8    invoices --

9           THE WITNESS:  OK.

10          THE COURT:  -- and point out to me if any of these

11   invoices are for one of the 14 pieces --

12          THE WITNESS:  Sure.

13          THE COURT:  -- of furniture that were --

14          THE WITNESS:  Got it.

15          THE COURT:  -- created collaboratively for Vidivixi.

16          THE WITNESS:  OK.  Invoice prepared for Sean Watts and

17   Rosemary Suh, not Vidivixi.  Invoice prepared for Michael

18   Feldman and Connie Hussain, not Vidivixi.

19          THE COURT:  You don't have to go through every

20   invoice --

21          THE WITNESS:  OK.  Sure.

22          THE COURT:  -- and read it.  Just tell --

23          THE WITNESS:  The ones --

24          THE COURT:  Hold on.  Take a moment.  Go through the

25   entire stack --

Grattan – direct

1          THE WITNESS:  Sure.

2          THE COURT:  -- and point out for me which, if any,

3  cover pieces of furniture of the 14 pieces that were

4  collaboratively done for Vidivixi.

5          THE WITNESS:  OK.

6          (Pause)

7          OK.  So I pulled those out.

8          THE COURT:  OK.  And so tell me which from this entire

9  stack relate to any of the 14 pieces.

10          THE WITNESS:  OK.  So we have the invoice prepared for

11  Nick Cope.  We have the --

12          THE COURT:  And that is the invoice for?

13          THE WITNESS:  The Cloud 9 Bedframe.

14          THE COURT:  OK.

15          THE WITNESS:  We have the invoice prepared for Elaine

16  Santos, the Three Piece Suit shelving system.

17          We have an invoice prepared for Alan Maleh for the

18  Puff Panel Sofa.

19          We have an invoice prepared for Robert Hennessey.

20          THE COURT:  For the Double Fold?

21          THE WITNESS:  Yes.

22          THE COURT:  All right.  Now, you've already told us

23  about Nick Cope.

24          With respect to Elaine Santos, that is the Three Piece

25  Suit shelving system, was that sold?

Grattan – direct

1              THE WITNESS:  No, it was not.

2              THE COURT:  Did you get any money from that invoice?

3              THE WITNESS:  No, I did not, sir.

4              THE COURT:  The invoice to Alan Maleh for the Puff

5    Panel Sofa, was that actually sold?

6              THE WITNESS:  No, it was not.

7              THE COURT:  Did you get any money from that?

8              THE WITNESS:  No, I did not, sir.

9              THE COURT:  And then the invoice for Robert Hennessey

10   for the Double Fold, was that actually sold?

11             THE WITNESS:  No, it was not, sir.

12             THE COURT:  Did you get any money from that?

13             THE WITNESS:  No, sir.

14             THE COURT:  Have we covered each of the pieces that

15   you mentioned were part of the 14 pieces?

16             THE WITNESS:  Yes, sir.

17             THE COURT:  OK.  How was it that you invoiced these

18   people and didn't get any money?

19             THE WITNESS:  Well, I sometimes consider a proposal an

20   invoice.  For instance, Robert Hennessey, Nick Cope and Alan

21   Maleh -- Alan Maleh was very interested in the piece and at the

22   very last minute dropped out.  Robert Hennessey, it turns out

23   there was a little bit of fraudulent activity on his part so

24   that sale did not happen.  Elaine Santos, which I believe the

25   plaintiff subpoenaed also, did not -- that was no sale as well.

Grattan - direct

1              THE COURT:  OK.  Thank you.

2    BY MR. PEK:

3    Q.  Mr. Grattan, did you ever --

4              With respect to the invoices Judge Koeltl just asked

5    you a few questions about, did you ever interface or discuss

6    with Mr. Bradley what I think you described, if I may

7    characterize -- I won't -- as potential sales the defendant

8    actually consummated?

9    A.  Yes.  He has been cc'ed on most of these emails.

10   Conversations with potential clients, conversations with

11   specifically Robert Hennessey, Alan, Elaine Santos.

12   Q.  These are invoice, not emails, though, right?

13   A.  Yes.

14   Q.  OK.

15             MR. PEK:  Your Honor, I've provided Mr. Rao with what

16   has been premarked as Plaintiffs' Exhibit 4, also Exhibit 7 to

17   the Bradley Affidavit submitted as part of this action -- as

18   part of this motion.  Forgive me.

19   Q.  Mr. Grattan, do you recognize this document?

20   A.  Yes.

21   Q.  Have you seen this document before?

22   A.  I assume that's my Gmail address, yes.

23             MR. RAO:  Your Honor, we have no objection except that

24   the document is several emails, since it appears to be several

25   documents.  Other than that, there is no objection to entering

Grattan - direct

1    this document.

2                THE COURT:  OK.  Plaintiffs' Exhibit 4 received in

3    evidence.

4                MR. PEK:  Thank you, your Honor.

5                (Plaintiffs' Exhibit 4 received in evidence)

6    BY MR. PEK:

7    Q.  Mr. Grattan, would you describe the first page of

8    Plaintiffs' Exhibit 4?

9    A.  It's an email between me and a former client of mine, Asia

10   Baker, who commissioned me for a large dining table for her

11   residence in Carroll Gardens, Brooklyn.

12   Q.  And having commissioned you, that was I imagine -- or

13   strike that.

14               Was this a non-Vidivixi-related piece that you did for

15   Ms. Baker?

16   A.  Yes, it was.  She had seen a piece on a website that it was

17   on, called "Custom Made," where on that website it included the

18   same vases that were sold to Hayme Brunnet that I designed back

19   in 2011.  She saw this dining table and wanted a similar

20   version to it for her client.

21   Q.  Was that dining table similar or the same as the one that

22   you provided for -- or fabricated for Mr. Reynolds, Grant

23   Reynolds?

24   A.  No, it was not.

25   Q.  Can you just confirm and read into the record the email

1    address this is sent from?

2    A.  Mark.grattan@gmail.com.

3    Q.  Are there any other email addresses or recipients cc'ed?

4    A.  Yes.  My Vidivixi email address, mark@vidivixi.com.

5    Q.  Does the word "Vidivixi" appear anywhere else on that

6    document?

7    A.  Yes, it does, and my signature.

8    Q.  Why would you use -- why would you include or cc

9    Vidivixi -- Mark, your own -- why would you cc yourself at

10   Vidivixi.com -- the Vidivixi.com email address and also include

11   a Vidivixi signature block for something that had nothing to do

12   with Vidivixi?

13   A.  Because I think it is important for clients to know what

14   else you are doing and what else is available.  It is a

15   marketing tactic, for sure.

16   Q.  Would you mind flipping to the next email, which I think is

17   the third page.  I believe after Asia Baker -- Mr. Grattan, how

18   many pages -- or would you, if you wouldn't mind, flip to the

19   next email following your email or correspondence with Asia

20   Baker and just identify the recipient and the sender and the

21   purpose?

22   A.  They one to Eric Kohler, perhaps?

23   Q.  Yes.

24   A.  OK.

25            MR. RAO:  I have a different email here.  I just want

 1   to make sure that I am looking at the same thing.
 2              (Counsel conferred)
 3              MR. PEK:  Forgive me, Mr. Grattan.  I believe I might
 4   have given you the document with pages out of order.
 5   BY MR. PEK:
 6   Q.  You mentioned Mr. Kohler before?
 7   A.  Yes.
 8   Q.  Who is Mr. Kohler?
 9   A.  Mr. Kohler is someone who was in a Housing Works show that
10   interior designers put on once a year.
11   Q.  What was the purpose or the subject matter of your email
12   exchange with Mr. Kohler?
13   A.  He saw our work at the housing work show.  Me and Tim
14   donated a version of the Jumping Jack Credenza to Housing
15   Works, which was a fundraiser for HIV and AIDS.
16   Q.  And did this email exchange yield any money?
17   A.  No, it did not.
18   Q.  You gave it as a donation?
19   A.  Yes, it was donated.  We built a piece and sent it off.
20   Q.  If you wouldn't mind flipping to the next email and just
21   identify the recipient?
22   A.  Hayme Brunnet.
23   Q.  Does that email exchange with Mr. Brunnet correspond with
24   the invoice to Mr. Brunnet?
25              MR. RAO:  In our document the pages are in a different

Grattan - direct

1    order.

2              THE COURT:  If there is an objection, you have to say

3    it in words sufficiently loud so that both the reporter and I

4    can hear it.

5              MR. RAO:  I apologize, your Honor.

6              The only objection is that the document that I have

7    marked Plaintiffs' Exhibit No. 4 seems to be in a different

8    ordering than whatever document they are looking at, which

9    makes it hard for me to follow to confirm that I have seen this

10   before.

11             THE COURT:  OK.  So, Mr. Pek, if you are referring to

12   a document, just refer to what the top of the page says.

13   BY MR. PEK:

14   Q.  Mr. Grattan, was it your regular practice to cc yourself --

15   or you testified earlier that the purpose of cc'ing yourself at

16   Vidivixi.com was networking?

17   A.  Cc'ing myself, no.  Putting the Vidivixi signature on the

18   bottom, yes.

19   Q.  OK.  And was that a regular practice for you?

20   A.  Yes.  It was a way to reach a broader audience for the

21   Vidivixi collection.

22   Q.  And did that marketing tactic pan out?

23   A.  I mean, I was optimistic that it would.

24   Q.  But it didn't -- but no money --

25   A.  I mean, there is no way to say.  I mean, someone could send

Grattan - direct

1    an email tomorrow asking for it, yeah.  I don't know.

2    Q.  Did you ever consider that including a Vidivixi signature

3    block on a Mark Grattan Design & Build-related job or sales

4    inquiry or request for you to provide services might lead to

5    confusion or it might send a mixed message as to whether it's

6    your personal business or the Vidivixi business?

7    A.  No, I never had any confusion with the two.  If it had --

8    if it was the work that me and Tim produced together, then it's

9    Vidivixi.  If it was my own personal work, then it was my

10   personal work.

11   Q.  Since you and Mr. Bradley acquired -- or since the Vidivixi

12   website was purchased -- well, let me ask a different question.

13            Have you ever registered any domain names?

14   A.  Yes.

15   Q.  Related to Vidivixi?

16   A.  Yes.

17   Q.  And what domain name would that be?

18   A.  Vidivixi.com.

19   Q.  And when did you register that domain name?

20   A.  Oh, early/middle of 2014.  I'm not sure.

21   Q.  OK.  And was there -- did you have a conversation with

22   Mr. Bradley prior to acquiring the domain name?

23   A.  Yes.

24   Q.  And can you just expound on that a little bit for us?

25   A.  We needed a website.

1    Q.  At that time did you have an existing website?

2    A.  I did, yes.  Markgrattan.com.

3    Q.  Has Mr. Bradley ever paid for the domain name associated

4    with that?

5    A.  I set up the domain.  I paid for the domain.  I set up the

6    emails.  I paid for the emails.  Halfway through Mr. Bradley

7    paid for the emails.

8    Q.  Do you have an understanding as to why, or was there a

9    discussion?

10   A.  An understanding as to why he paid for the emails or --

11   Q.  Did you ask him to begin paying for your emails?

12   A.  Yes.  We were in the middle of the AD show 2015.  The email

13   went down because it expired.  I frantically called him and

14   said we need to take care of this now, and he did.

15   Q.  Did Mr. Bradley also -- withdrawn.

16          Who paid -- did you pay for the Vidivixi.com domain

17   name?

18   A.  I bought the domain, yes.

19   Q.  And when you say bought, who did you buy it from?

20   A.  I didn't buy it from anyone.  The domain was available on

21   GoDaddy and I purchased it.

22   Q.  OK.  Are there monthly recurring annual fees associated

23   with that?

24   A.  It is yearly.

25   Q.  Is it your testimony today that you paid for the entire

Grattan - direct

1   life of this -- or you paid all fees associated with this

2   domain name?

3          MR. RAO:  Objection.  Mischaracterizes prior

4   testimony.

5          THE COURT:  Rephrase.

6   BY MR. PEK:

7   Q.  Did you make all payments to GoDaddy for the use and the

8   rights to the domain name?

9   A.  Yes.

10  Q.  Do you have -- how much money did you pay in total?

11  A.  It is about $16 a year.

12  Q.  I'm sorry.  16?

13  A.  Yes.

14  Q.  Is that for the domain name itself or --

15  A.  It's for the domain name, yes.

16  Q.  Is there a separate charge for emails?

17  A.  Yes, there are.

18  Q.  Did you pay for that as well?

19  A.  I'm halfway through.  Now, they're all paid up for the next

20  year.

21  Q.  Has Mr. Bradley ever paid for it?

22  A.  Yes.  Like I said, back in April or March 2015.

23  Q.  Well, I think -- you said he paid for your personal

24  website?

25  A.  No.  That's not -- he paid for the Vidivixi emails

Grattan - direct

1   associated with the Vidivixi domain.

2   Q.   OK.   When you registered the domain name vidivixi.com,

3   where were you residing?

4   A.   311 Adelphi.

5   Q.   Are you still residing at 311 Adelphi?

6   A.   No, I am not.

7   Q.   Are you aware whether -- are you aware that 311 Adelphi

8   Street is still listed as the registrant's address for

9   vidivixi.com?

10              MR. RAO:   Objection.   Relevance.

11              THE COURT:   Overruled.

12  A.   No, but sure.   I mean, no, I'm not aware of that.

13  Q.   When you purchased the domain name vidivixi.com from

14  GoDaddy.com, were there any terms and conditions?

15              MR. RAO:   Objection.   Relevance.

16              THE COURT:   What is the relevance?

17              MR. PEK:   The relevance is that the email server and

18  the domain name itself are the trademark at issue here and --

19              THE COURT:   And what is the relevance on the

20  preliminary injunction motion what the terms and conditions of

21  the email were?

22              MR. PEK:   Because not --

23              THE COURT:   Oh, answer the question, if you know.

24              THE WITNESS:   I don't know what the question is.

25              THE COURT:   Rephrase the question.

                                     Grattan – direct

1             MR. PEK:  I'm going to withdraw the question.

2    BY MR. PEK:

3    Q.  At any point in time in the last -- or in this calendar

4    year, to the best of your recollection, has the vidivixi.com

5    website gone inactive or gone down?

6    A.  Yes.

7    Q.  Do you remember when that was?

8    A.  Late summer.

9    Q.  Do you know why that was, or how that came to become

10   inactive?

11   A.  Because I had tried to do something to the website and

12   could not figure out how to get it back on, up and running.

13   Q.  Do you control that website?

14   A.  It's under my name, yes.  I do have control.

15   Q.  Did you design the content?

16   A.  Yes, I did --

17   Q.  Do you --

18   A.  -- with a Web designer.

19   Q.  Who was your Web designer?

20   A.  His name is Cameron Moss; C-a-m-e-r-o-n Moss.

21   Q.  And did you pay Mr. Moss for his services?

22   A.  Yes.

23   Q.  And how did you pay him?

24   A.  In exchange for a piece of furniture.

25   Q.  Is it one of those 14 pieces?

Grattan - direct

```
 1  A.  Yes, it is.

 2  Q.  Can you tell me which one?

 3  A.  The Kapstok Wardrobe.

 4  Q.  Was that the only Kapstok Wardrobe that was ever fabricated

 5  for --

 6  A.  No, it was not.

 7  Q.  It wasn't.  So how many were fabricated?

 8  A.  There's two.

 9  Q.  And what was Mr. Bradley's contribution to that particular

10  piece, if you can recall?

11  A.  There was no contribution.  I built it and send it to

12  upstate -- or, excuse me, to Connecticut for an exhibition,

13  which it's still residing at that exhibition in that space.

14  Q.  Did you have a discussion with Mr. Bradley about --

15  A.  Yes.  He's fully aware.

16  Q.  To the best of your knowledge, how many wardrobe pieces

17  remain?

18  A.  There are two.  One in Cameron Moss's home and one in

19  Connecticut.

20  Q.  OK.  So of the 14 pieces that we have been discussing, in

21  fact, the wardrobe was one of those pieces?

22  A.  Yes.

23  Q.  So there is no more wardrobe to showcase?  Is there --

24  A.  Not until one is built, no.  Yes.

25  Q.  You testified earlier about a credenza that you designed
```

Grattan – direct

1    yourself.

2    A.   Which?

3    Q.   Are you familiar with the Blue Credenza piece?

4    A.   Yes, I am.

5    Q.   Did you design that piece?

6    A.   I did, yes.

7    Q.   And how many pieces did you -- how many pieces are you

8    aware were fabricated, or did you fabricate?

9    A.   All of them.

10   Q.   And how many were there?

11   A.   About 14.

12   Q.   14 Blue Credenzas.  Were those sold?  Were any of those

13   sold?

14   A.   No, except for the Dakku Bedframe that we discussed about

15   an hour ago.

16           I don't understand the question.

17   Q.   I'm sorry.  The Blue Credenza model --

18   A.   Yes.

19   Q.   -- you designed?

20   A.   I did, yes.

21   Q.   Were any additional products -- were any additional

22   copies --

23   A.   Copies of those?

24   Q.   If you will, were any additional Blue Credenzas fabricated?

25   A.   No.

Grattan – direct

1   Q.  Just the one?

2   A.  Yes.

3   Q.  And where is that?

4   A.  It's in my home.

5   Q.  OK.  Are you familiar with the five pieces that –– the five

6   Vidivixi pieces that were at the Good Colony showroom?

7   A.  Yes.

8   Q.  And how many pieces in addition to the five pieces that

9   were in the Good Colony showroom remain in existence that have

10  been fabricated?

11          Withdrawn.

12          Of the 14 pieces that Vidivixi has created, are you ––

13  do you have an understanding as to the location or whereabouts

14  of the nine pieces that were not part of the Good Colony?

15  A.  They are in Francis Bradley Studio except the Credenza,

16  which is in my home and another piece that Tim actually has in

17  his apartment in the Lower East Side.

18  Q.  What piece is that?

19  A.  It's something we built for the Architectural Digest Show

20  of 2015, last March.

21  Q.  And ––

22  A.  That was very similar to the credenza inspired by the

23  Bugsy's Bar.

24  Q.  So to the best of your knowledge, is there a wardrobe piece

25  in Mr. Bradley's studio?

1    A.  No, there is not.

2    Q.  OK.  I'm just trying to discern the actual number of

3    additional pieces in addition to the five that were at Good

4    Colony that actually remain fabricated and, you know, available

5    to you all.  By my count -- well, I'm not...

6              (Pause)

7              Did you design all the pieces in the Good Colony

8    collection?

9    A.  I would -- solely designed?  No.  In initial collaboration?

10   Yes, like I stated earlier.

11   Q.  So is it your testimony today that those pieces you didn't

12   design exclusively yourself were a joint effort between

13   yourself and Mr. Bradley?

14   A.  Initial joint effort, yes.

15   Q.  Can you explain what you mean by initial joint effort?

16   A.  Initial joint effort is I mean conversations and looking at

17   inspiration images, and then oftentimes I was left alone to

18   figure out details alone.  And details are the things that make

19   the piece the piece.  I mean, if the detail is wrong then the

20   whole piece is ruined.  It is a very crucial time of the design

21   development.

22   Q.  Have you ever built a Vidivixi piece for any purpose that

23   later broke or failed?

24   A.  No.

25   Q.  Did you ever sell any chairs under the Vidivixi name?

1   A.   No.

2   Q.   Can you identify what, if any, chairs are included within

3   the Vidivixi 14-piece collection or the universe of Vidivixi

4   furniture?

5   A.   There is a glass chair.

6   Q.   And what is that chair called?

7   A.   It is called the Vantage Chair.

8   Q.   How many Vantage Chairs, to the best of your knowledge,

9   have been fabricated by you that have been sold?

10  A.   I have a version of the Vantage Chair that I designed back

11  in 2011 that was sold, nine of them, which I designed for a

12  company called Makers Alley.  They invited me to design a

13  collection of furniture.  One included the chair, the Vantage

14  Chair.  Another piece included a bench and the dining table.

15  Q.   How many of -- you said that it's a version of, just to be

16  clear, the Vantage Chair.  Is that -- the Vantage Chair refers

17  to the chair that's part of the Vidivixi collection?

18  A.   The version of the Vantage Chair that's included on the

19  Vidivixi website is the glass version with the glass seat.

20  Q.   And is that version --

21  A.   That was a piece I had donated to the partnership early on

22  along with a couple of other pieces that were donated because

23  Vidivixi had no content to present.

24  Q.   Do you know where that piece is now?

25  A.   They're -- I don't understand.  Those pieces -- what do you

Grattan – direct

1    mean?  The glass one?

2    Q.  Yes, the Vantage Chair.

3    A.  They were at the showroom.

4    Q.  Which showroom?

5    A.  Colony.

6    Q.  But the Good Colony showroom, did it contain five or six

7    pieces?

8    A.  Well, those chairs had been stored at Colony so I don't

9    know what...

10   Q.  Are those chairs for any reason so sufficiently distinct

11   from the two walnut wooden dressers, the Puff Panel Sofa, the

12   Puff Panel Chair, the Three Piece Suit -- and the Three Piece

13   Suit that they wouldn't be included and be sitting with Maqette

14   right now?

15            MR. RAO:  Objection, your Honor.

16   A.  I'm not sure --

17            THE COURT:  Sustained as to form.

18   Q.  How many pieces did Vidivixi deliver to Jean Lin of Good

19   Colony?

20   A.  How many pieces?  Those came -- all of those pieces were

21   delivered right after the exhibition so I don't know what --

22   Q.  I want to know how many.

23   A.  Five plus the two chairs, plus a dining table, which I

24   don't know its whereabouts.

25   Q.  Which is not a Vidivixi -- is that a Vidivixi --

Grattan - direct

1    A.  Yes, it is.

2    Q.  How many pieces has Vidivixi created in total?

3          MR. RAO:  Objection.  Asked and answered.

4          THE COURT:  Yes.  Sustained.

5    BY MR. PEK:

6    Q.  Do you have any proprietary interest in any dining table or

7    chairs that were given to -- that were delivered to Good Colony

8    showroom?

9    A.  No, I do not.

10   Q.  Did you build any dining table?

11   A.  I did, yes.

12   Q.  Was it delivered to the Good Colony showroom?

13   A.  Yes, it was.

14   Q.  And --

15   A.  But it was not on display.  I know it was being stored on

16   the top floor.  And Francis Bradley was aware of that as well.

17   Q.  Did he have any part in designing or fabricating that

18   dining table?

19   A.  Yes.

20   Q.  Is that dining table at all similar or related to the

21   dining table that you sold to Grant Reynolds?

22   A.  No, it is not.

23   Q.  And I'm curious where that dining table is right now.  Do

24   you not care about that dining table?

25   A.  I do.  But I assumed it was in Francis Bradley's studio

Grattan - direct

1     space.

2     Q.  Are you aware that at the outset of this action a company

3     by the name of Maqette Fine Art Services, or Storage Services,

4     excuse me, retrieved the Good Colony collection -- the Good

5     Colony collection of Vidivixi, the five pieces?

6     A.  Yes.

7     Q.  Is there any reason why the dining table and the two

8     Vantage Chairs you just referenced would not be included as

9     part of --

10    A.  I don't know.  You -- the plaintiff was responsible for

11    removing all objects from the showroom.  I have no idea.

12    Q.  According to what?  What do you base that on?

13    A.  According to the agreement that you made with my attorney.

14    Q.  What was that agreement?

15            MR. RAO:  Objection.

16            THE COURT:  Sustained.

17    Q.  So do you know where the Vantage Chairs are?

18    A.  No, I do not.

19    Q.  And do you have any reason to believe that they are in

20    Mr. Bradley's studio?

21    A.  Do I have any reason to believe?  They could be at

22    Mr. Bradley's -- I don't know where they are.

23    Q.  Is there any material difference between the Vantage Chairs

24    that we just discussed that you designed, or that were part of

25    the Vidivixi collection, compared to those chairs that you

Grattan - direct

1  testified earlier you were bringing up to Connecticut, I think
2  you said?
3  A.   Those chairs were delivered to eastern Long Island, in the
4  Hamptons.
5  Q.   How many chairs was it?
6  A.   It was ten chairs.
7  Q.   And did you receive payment for those chairs?
8  A.   Yes, I did.
9  Q.   Do you recall how much you were paid?
10 A.   I was paid -- each chair was $910.
11 Q.   So that would be 9,100 for ten chairs?
12 A.   Close to $10,000, yes.
13 Q.   Did you have a discussion with Mr. Bradley before selling
14 those chairs?
15 A.   No, I did not.
16 Q.   Do you regard those chairs as being part of the Vidivixi
17 collection?
18 A.   No.
19 Q.   Why?
20 A.   Because it was designed by myself back two years before the
21 business became a business, before its creation.
22 Q.   To the best of your knowledge, has any chair that you've
23 ever designed or fabricated broken?
24 A.   Yes.
25 Q.   Was -- how many have broken?

Grattan – direct

1    A.  I believe it was one.  It was for a client in Connecticut

2    for six chairs, six upholstered chairs, with a sling back.

3    They have nothing to do with Vidivixi.

4    Q.  Did you communicate with that client by your

5    mark@vidivixi.com email?

6    A.  Potentially, yes.

7    Q.  Have any of the Vidivixi pieces, the 14 pieces or 15,

8    however many it is that you all designed and fabricated, have

9    they been tested for fitness for a particular purpose, or are

10   they ready to be sat on or --

11   A.  Yes, but chairs break.  I mean, things happen.  I mean,

12   it's not factory tested with things sitting on it every half a

13   second.  It's custom furniture and things happen.  And you just

14   do your best.  You do whatever you can to make sure nothing

15   happens to them.

16   Q.  Have any Vidivixi pieces, to the best of your knowledge,

17   ever broken?

18   A.  Not that I know of.

19   Q.  Is there a Vidivixi piece in Paris right now?

20   A.  Yes, there is.

21   Q.  Has anyone from Paris contacted you about that piece?

22   A.  Nope.  I had the gallery owner coming to New York for a

23   visit but they flaked out at the last minute by the name of

24   Jacques something.  I don't remember his last name.

25   Q.  Do you know an individual by the name of Blair Triode,

Grattan - direct

1    T-r-i-o-d-e?

2    A.   Yes.   She was the one I was in communication with about the

3    exhibition in Paris, yes, for Paris Design League.

4    Q.   Was that a Vidivixi gig, if you will?

5    A.   Yes, it was.

6    Q.   And to the best of your knowledge, is that piece still on

7    display in Paris?

8    A.   It is still in Paris at La Bonne, Marseille.

9    Q.   Have you ever received any communications or indication

10   that any sales increase or any -- of any interest to purchase

11   that piece from the showcase in Paris?

12   A.   No, other than we love the work, we love your piece, we're

13   getting great feedback, we'll be in touch.

14   Q.   Have you ever received any email or other communications

15   from the folks in Paris who are showcasing this piece regarding

16   the functionality or the state of that chair?

17   A.   Yes.   They said it was slipping and we resolved the issue

18   immediately.

19   Q.   How had you resolved it?

20   A.   Based on the recommendation from my upholsterer, we fixed

21   it by using a standard method of adding Velcro to the underside

22   of the cushion seat and it proved to be successful.

23   Q.   Did you go to Paris and apply that?

24   A.   No, I did not.

25   Q.   Do you have any firsthand knowledge of that actually taking

Grattan - direct

1    place?

2    A.  I mean, if it didn't work, I mean, she said -- no, I don't,

3    actually.  I assumed it was OK.

4    Q.  Did you tell them what to do based on your upholsterer's --

5         MR. RAO:  Objection.  Relevance.

6         THE COURT:  Sustained.

7         The witness has been on the stand for over

8    two-and-a-half hours.  This is not a discovery deposition.

9    It's not an opportunity to explore whatever ideas come to your

10   mind in the course of the examination.  It is an evidentiary

11   hearing on the preliminary injunction motion.

12        Move along.

13        MR. PEK:  No further questions, your Honor.

14        And with the witness nowhere to be found,

15   Mr. LaBarbiera, the plaintiffs rest.

16        THE COURT:  Do you want to call Mr. LaBarbiera now

17   before cross, if he is waiting?

18        MR. PEK:  My last conversation with Mr. LaBarbiera is

19   that he's going to do his best to get here but if he doesn't

20   make it by 10 he's not going to be able to come.  He had a

21   prior obligation.  This was earlier this morning so -- which

22   was not foreseen yesterday, which is why we were happy to have

23   the out-of-order testimony.

24        But, in any event, your Honor, we -- the plaintiffs do

25   not -- are happy to rest our case in chief anyhow.

Grattan - cross

```
 1              THE COURT:  All right.

 2              Mr. Rao, you may examine.

 3   CROSS-EXAMINATION

 4   BY MR. RAO:

 5   Q.  Good afternoon, Mr. Grattan.  I'm just going to ask you a

 6   few questions.

 7              You had testified earlier or were questioned earlier

 8   about financial contributions of yourself and Mr. Bradley

 9   respectively.  You mentioned that you paid the wood shop rent.

10   Is that at the Sunset Park wood shop?

11   A.  Yes.

12   Q.  How much is that rent?

13   A.  $1,280 a month.

14   Q.  Has it always been $1,280?

15   A.  It was actually more.  It was actually 13 -- like 1350, and

16   then I moved to a smaller space because it was better for me.

17   Q.  And how many months of rent were you paying during the time

18   you were working on Vidivixi furniture?

19   A.  How many months of -- I don't understand the question.

20   Q.  Sorry.  I will rephrase the question.

21              How long were you working with Mr. Bradley on

22   Vidivixi?

23   A.  Approximately two years, two-and-a-half years.

24   Q.  And during that time were you paying the rent for the wood

25   shop?
```

Grattan - cross

1   A.  Yes, I was.

2   Q.  And you previously testified that you, roughly, are

3   splitting your time half-and-half, is that accurate --

4   A.  Yes.

5   Q.  -- between Mark Grattan Design & Build and Vidivixi?

6   A.  Yes.

7   Q.  I recall you mentioned that during exhibition times that

8   the ratio might change?

9   A.  Yes.

10  Q.  Could you clarify that?

11  A.  The ratio changes and more time is allocated for Vidivixi.

12  I would pretty much drop everything and just focus on our

13  collaborative.

14  Q.  OK.  Have you ever purchased materials for Vidivixi?

15  A.  Yes, I have.

16  Q.  And what were those?

17  A.  The last two pieces, the commodes, the two walnut cabinets,

18  I had purchased that material.

19  Q.  And approximately how much was that?

20  A.  Probably about $1,100.

21  Q.  I wanted to also explore some earlier questioning.  You had

22  stated that the 14 Vidivixi pieces were a result of

23  collaboration between you and Mr. Bradley, is that correct?

24  A.  Yes.

25  Q.  I believe you also testified that there were certain pieces

Grattan - cross

1  that you created solely.  Are those among the 14, or are those

2  different pieces?

3  A.  They are among the 14.

4  Q.  And which ones are those?

5  A.  It is the Low Credenza.  It is the Vantage Chair.  It is

6  the Ash Baby.

7  Q.  And were those made prior to Vidivixi being a partnership

8  between you and Mr. Bradley?

9  A.  The two were made prior to Vidivixi.  The Low Credenza was

10  something I was working on in my free time and found a liking

11  to it and donated it to the partnership.

12  Q.  And what's the approximate retail value of those three

13  pieces?

14  A.  Probably about 12,000 to $16,000.

15  Q.  Did you -- you testified you paid for the website, is that

16  correct?

17  A.  Yes, I did.

18  Q.  You bought the domain when it was initially registered?

19  A.  Yes.

20  Q.  Did you also renew the domain?

21  A.  Yes.

22  Q.  Did you at any point pay for email?

23  A.  I paid the initial fees to get the emails activated.

24  Q.  Did you ever pay for rent at the showroom known as Good

25  Colony?

Grattan - cross

```
1   A.   Yes.  We split the first month's rent.  We both paid cash.

2   Q.   You had earlier testified that you had procured design

3   services of Cameron Moss for the website, is that correct?

4   A.   Yes.

5   Q.   And you traded, as I recall, a wardrobe in exchange?

6   A.   Yes.

7   Q.   Which wardrobe was that?

8   A.   It was the Kapstok Wardrobe from the spring 2014

9   collection.

10  Q.   Was that a Vidivixi wardrobe?

11  A.   Yes, it was.

12  Q.   How was that wardrobe designed, if you would just take me

13  through the process?

14  A.   It was based off an image that was found on the Internet

15  and from there sort of re-evolved into more of a Vidivixi

16  image.

17  Q.   Who found the image?

18  A.   I found the image.

19  Q.   What was Mr. Bradley's role in creating the wardrobe?

20  A.   He helped with assembly.  He helped with the finishing.

21  Yes.

22  Q.   And your role in creating the wardrobe?

23  A.   Fabrication, cutting, ordering materials, proportions.

24  Q.   And what's the retail value of that wardrobe?

25  A.   It's I think right now it's at 3250.
```

Grattan - cross

1          MR. PEK:  Objection.  Speculation.

2          THE COURT:  That's $3,250?

3          THE WITNESS:  Yes.

4          THE COURT:  What is that based on?

5          THE WITNESS:  What's that based on?  What it says on

6     the website currently, or what is in the database for pricing.

7          THE COURT:  Overruled.

8     BY MR. RAO:

9     Q.  You previously testified, as well, that Vidivixi was able

10    to get free outsourced labor, is that correct?

11    A.  Yes.

12    Q.  Can you describe what that was?

13    A.  Well, it was some -- the upholstered pieces in the current

14    collection, the fall 2015 collection, has two upholstered

15    pieces.  Both of them were fabricated for free.  I had built a

16    relationship with the upholsterer in the sixth floor of my

17    building.  I had built the frame to the upholstered pieces and

18    sent the frame upstairs to him, where his guys created the

19    upholstered mechanism for the wooden base.  The metalwork --

20    the majority of the metalwork for the Vidivixi collections was

21    made from a friend of mine that I was introduced to probably

22    five or six years ago.  He is a high-end metalworker located in

23    Boerum Hill, Brooklyn.

24    Q.  Is that Juan Alfaro --

25    A.  Juan Alfaro, yes.

Grattan - cross

1  Q.  Were any of your other contacts involved in providing

2  outsource work for Vidivixi?

3  A.  I had also been introduced to a leather worker -- a leather

4  distributor in Queens through a friend of mine who designs

5  leather handbags.  She referred me to Jesse, who owns a large

6  leather distribution company, and he showed us around, gave us

7  an amazing price and, yep.

8  Q.  Have you heard an allegation in this case that Mr. Bradley

9  financed a hundred percent of the operations of Vidivixi?

10  A.  Yes, I have.

11  Q.  Is that true?

12  A.  No, it's not.

13  Q.  Mr. Grattan, I just want to briefly discuss with you the

14  various third parties who have been subpoenaed in this matter.

15  I will try not to belabor the point because we have already

16  seen the invoices.

17           Could you describe your connection to Curious Yellow

18  Std.?

19  A.  Specifically Chloe Pollack-Robbins, she is someone I met.

20  She was looking at my website, markgrattan.com, back in 2011.

21  Her client came for a visit at the wood shop, was very

22  interested in the work.  At that point her client brought --

23  the client brought Chloe to the wood shop, and from there me

24  and Chloe have been doing work since.  The last piece we did

25  together was last summer.

Grattan – cross

1    Q.   And what's your connection to Elaine Santos?

2    A.   I don't know Elaine Santos.  She just inquired about the

3    Three Piece Suit.

4    Q.   You previously described Sean Watts.  Could you explain in

5    more detail your connection to Sean Watts?

6    A.   Sean Watts is the -- is a partner at Leroy Street Studios

7    of which the Director of Interiors had hired me to custom

8    design a dining table for a restaurant.  Since then the

9    Director of Interiors had referred Sean Watts, the partner, to

10   me because he was looking for a talented designer to build his

11   dining table for his residence.

12   Q.   Was that a connection you made after Vidivixi?

13   A.   That was done in connection with Vidivixi.

14   Q.   How did the sale to Hayme Brunnet -- is that the correct

15   name?

16   A.   Yes.

17   Q.   -- of the table vases, how did that come about?

18   A.   I was moving shops, throwing things away, and I had these

19   two table vases that were studies for something that I had been

20   working on years ago.  I posted these two vases on Instagram

21   saying please take them, I'm moving shops, they need a great

22   home, and he responded, and then I sold them to him.

23   Q.   Was that on your personal Instagram?

24   A.   Yes, it was.

25   Q.   That was not on the Vidivixi Instagram?

1    A.  No, it was not.

2    Q.  Could you describe briefly your connection to Grant

3    Reynolds?

4    A.  Grant Reynolds is the wine expert, the wine specialist at

5    Charlie Bird, of which I made that dining table for Leroy

6    Street Studios.  He was also recommended to me by Leroy Street

7    Studios.

8    Q.  Was that a Vidivixi connection?

9    A.  No, it was not.

10   Q.  What about Asia Baker, what is your connection to Asia

11   Baker?

12   A.  Asia Baker found me on a website called Custom Made.  I had

13   been on the website since 2010.  She saw some work of mine, and

14   we designed a custom dining table for her residence in Carroll

15   Gardens.

16   Q.  And was that a Vidivixi connection?

17   A.  No, it was not.

18   Q.  Do you recall at any point an individual by the name of

19   Nate Lowman being involved with Vidivixi?

20   A.  Yes.

21   Q.  Do you recall what his connection to Vidivixi was?

22   A.  We built him a Credenza, the Jumping Jack Credenza.  We

23   also made him a custom sofa that was inspired by a sofa that we

24   presented at the Architectural Digest Show 2014.

25   Q.  And what was the process of building the sofa?

Grattan - cross

1   A.  I had to build a frame for the sofa.  I designed the wooden

2   turned leg for the sofa, and my upholsterer on the sixth floor

3   of my building did the upholstery work.

4   Q.  Did Mr. Bradley work on this sofa?

5   A.  No, he did not.

6   Q.  Were you paid for that sofa?

7   A.  Mr. Bradley -- I was not paid for that sofa.  He -- we went

8   half, actually, on a machine called a Festool Domino.  So, no,

9   I did not.  I did not get paid.

10  Q.  Was that sofa ever sold?

11  A.  Yes.  It was sold in April and May.

12  Q.  Who was paid for that sofa?

13  A.  Francis Bradley.

14  Q.  There was some testimony yesterday about the Vidivixi

15  website.  I just want to ask you, you testified earlier that

16  you control the website, is that correct?

17  A.  Control the updates, yes.  Control -- yes, I do.

18  Q.  So what do you mean by "control the website"?

19  A.  Meaning if there is any updates that need to be done,

20  that's the only sort of control I could think of.

21  Q.  Are you aware that there is an allegation in this case that

22  you hacked into the website?

23  A.  Hacked into the web -- I am not aware of that allegation.

24  Q.  Do you have a computer science background?

25  A.  No, I do not.

Grattan - cross

```
1    Q.  Do you know any programming languages, computer programming
2    languages?
3    A.  No, I do not.
4    Q.  You had testified earlier that the Vidivixi pieces were the
5    result of a collaboration.  Could you describe in more detail
6    what Mr. Bradley's role in that collaboration typically would
7    be?
8    A.  I mean, I hate to say it but the money.  I spent a lot of
9    time -- I spent time at exhibitions alone.  I had to
10   organization the exhibitions alone.  I had to send drawings out
11   to the vendors alone.  I had to work with the outsources
12   vendors alone.  I had to design the website alone.  I had to go
13   to the showroom meetings alone.  I had to communicate with
14   potential clients alone.  I had to -- yeah, I had to do a lot
15   alone.
16   Q.  During the time that you and Mr. Bradley were
17   collaborating, did you ever refer to him as your business
18   partner?
19   A.  All the time.
20   Q.  Did you ever hear him refer to you as his business partner?
21   A.  No, I did not.
22   Q.  Was it your understanding that you were business partners
23   with Mr. Bradley?
24   A.  Absolutely.
25   Q.  Are you aware that Mr. Bradley has applied for a trademark
```

Grattan – cross

1    in the word or name "Vidivixi"?

2    A.   I was aware that he did this, but I was concerned that my

3    name was not on it but I had let it go because I figured he

4    had -- there was something nice and honest about it.  Again, it

5    was worrisome to me but I figured it was going to be OK.

6    Q.   When did you find out about the trademark application?

7    A.   This was after the AD Show.  He told me he was working on

8    trademarking and also setting up the LLC, but he actually did

9    this all by himself without me included.

10   Q.   Did he ever tell you not to use the name Vidivixi?

11   A.   No, he did not.

12   Q.   Did he ever object to your sending emails from

13   mark@vidivixi.com?

14   A.   No, he did not.

15   Q.   Did he ever object to you marketing Vidivixi to others?

16   A.   No.

17   Q.   Did he object to you using the signature block of Vidivixi?

18   A.   No.

19   Q.   Could you briefly describe who was responsible for

20   marketing and promotion of the Vidivixi brand between you and

21   Mr. Bradley?

22   A.   I was.

23   Q.   And what were your responsibilities with respect to that?

24   A.   I had to create target lists for past clients.  I had to

25   create target lists for all of Francis Bradley's targets.  I

Grattan - cross

```
 1   had targets that were provided to us by colleagues of mine.  I

 2   had -- those were all generated.  I created a MailChimp

 3   account.  Business cards, email blasts, social obligations,

 4   openings, anything that -- anything design related I tried to

 5   attend and push the brand.

 6   Q.  And you mentioned business cards.  Are you saying that you

 7   designed the business cards?

 8   A.  I designed the business cards, one for Francis Bradley, one

 9   for myself, yes, with our title on them as well.

10   Q.  What were your titles on those cards?

11   A.  Co-owners.

12   Q.  Did Mr. Bradley object to those titles?

13   A.  No, he did not.

14   Q.  You testified earlier about a Paris exhibition.  Do you

15   recall that?

16   A.  Yes.

17   Q.  The Blair Triode --

18   A.  The Triode Gallery in Paris, yes.

19   Q.  Do you recall signing a contract in connection with that?

20   A.  Yes, we did.  Both of us signed the contract.

21   Q.  And what did you -- do you recall what your title was?

22   A.  The title was co-owners.

23           MR. RAO:  One second, your Honor.  I have the contract

24   here.  I will enter it into evidence.

25           (Pause)
```

Grattan - cross

1          Apologies, your Honor.  I should have my documents

2    with me.

3          (Pause)

4          I am handing the Court and the witness what's been

5    premarked Defendants' Exhibit AC.

6          THE COURT:  Any objection?

7          MR. PEK:  Just a moment, your Honor.

8          (Counsel conferred)

9          MR. PEK:  No.  No objection, your Honor.

10          THE COURT:  Defendants' Exhibit AC received in

11    evidence.

12          (Defendant's Exhibits AC received in evidence)

13    BY MR. RAO:

14    Q.  Do you see an email at the bottom of the first page of this

15    document?

16    A.  Yes.

17    Q.  Is it from you to your Vidivixi and -- your Vidivixi

18    address and the address of Mr. Bradley?

19    A.  Yes.

20    Q.  Mr. Grattan, do you note that there is a PDF attached

21    indicated on that email?

22    A.  Yes.

23    Q.  Can you look at the second page of this document?

24    A.  Sure.

25    Q.  To the best of your recollection, is this the PDF

Grattan - cross

1   attachment that you attached to that email?

2   A.  Yes.

3        MR. PEK:  Your Honor, I just want to note that I

4   understand, as well, this appears to be an incomplete document.

5        Is that how it is intended to be offered into

6   evidence?

7        MR. RAO:  No.  My understanding was that Mark scanned

8   the signature page of the contract and that's the only

9   attachment.

10  Q.  Do you see any signatures -- first of all, do you recognize

11  this document?

12  A.  Yes, I do.

13  Q.  And what is it?

14  A.  Well, it's the Triode consignment agreement.

15  Q.  Is it the full agreement or --

16  A.  It's the signature page.

17  Q.  Do you see any signatures on this?

18  A.  Yes, I do.

19  Q.  Whose signatures appear?

20  A.  Mark Grattan and Francis Bradley.

21  Q.  And what titles are indicated there?

22  A.  Principals, Mark Grattan and Francis Bradley.

23  Q.  And what's the date of this agreement?

24  A.  7/15/2015.

25  Q.  You testified earlier that you had sent a proposed

Grattan - cross

1  partnership agreement to Mr. Bradley, is that correct?

2  A.  Yes, I did.

3  Q.  When or around when did you do that?

4  A.  Probably mid-August to end of August.

5  Q.  And why did you send that partnership agreement?

6  A.  Because we needed to be grownups about the situation.  We

7  needed to take this seriously.

8  Q.  Do you recall what Mr. Bradley's response was?

9  A.  He told me it was done.

10  Q.  Did he have any other response?

11  A.  No, he did not.

12  Q.  Did he react in any way to the proposal?

13  A.  I assumed that was his reaction, that he needed my proposal

14  that I had worked on needed to be disregarded.

15  Q.  You've also testified that outside of the sale to Nick Cope

16  there were no other sales of Vidivixi pieces, is that correct?

17  A.  Yes.

18  Q.  Was it your intention had there been a sale -- or what was

19  your intention had there been a sale?  What was your intention

20  with respect to the proceeds of the sale?

21  A.  Well, my theory was there was no sale because we had

22  nothing in writing, something about the stars and karma, and I

23  needed to get it out there.  I had been conversating with Jean

24  Lin about a potential sale, and it was just I needed to speak

25  with Tim but I was having difficulty talking with him because

Grattan - cross

1   we were already having issues.  So instead of speaking with him

2   directly, I sent an email -- out of fright, really.

3   Q.  What email are you referring to?

4   A.  The proposal.

5           MR. RAO:  No further questions, your Honor.

6           THE COURT:  I'm sorry.  You sent the proposal which

7   was to sell the piece of furniture to Mr. Cope?

8           THE WITNESS:  No.  It was a proposal I sent to Francis

9   Bradley about a percentage of how we would -- a proposal for

10  the partnership.

11          THE COURT:  OK.  With respect to the sale of the

12  furniture to Mr. Cope, did you have a conversation with Mr.

13  Bradley about that?

14          THE WITNESS:  Yes, we did.

15          THE COURT:  When did that conversation occur?

16          THE WITNESS:  That occurred before I accepted payment

17  from Nick Cope.

18          THE COURT:  And about when was that?

19          THE WITNESS:  That was a little bit after -- during

20  mid-May of 2015 to early June of 2015.

21          THE COURT:  Was that before Mr. Bradley had rejected

22  your written proposal for the partnership?

23          THE WITNESS:  Yes.

24          THE COURT:  And what was the conversation between

25  yourself and Mr. Bradley about the sale to Mr. Cope?  What did

Fc2dvidh                        Grattan - redirect

1   you say to him?  What did he say to you?

2           THE WITNESS:  I told -- Tim thought that the price was

3   low and it wasn't worth it, and I told him that I needed the

4   money and I needed to do it.  And he agreed, and I continued on

5   and built a piece and delivered it to Nick Cope.

6           THE COURT:  OK.  Did you exchange any email about that

7   sale?

8           THE WITNESS:  With Francis Bradley?

9           THE COURT:  Yes.

10          THE WITNESS:  No, I did not.  He is very minimal with

11  his email communication.

12          THE COURT:  OK.  Thank you.

13          MR. RAO:  The defense rests, your Honor.

14          THE COURT:  All right.  Redirect.

15          MR. PEK:  Briefly, your Honor.

16          THE COURT:  Limited to cross.

17          MR. PEK:  I'm sorry, your Honor?

18          THE COURT:  I said, "limited to cross."

19          MR. PEK:  OK.

20  REDIRECT EXAMINATION

21  BY MR. PEK:

22  Q.  Mr. Grattan, you just testified that you sent a proposal --

23  a partnership proposal to Tim Bradley, is that right?

24  A.  Yes, I did.

25  Q.  And you sent that fairly recently, is that true?

1  A.  About four months ago, five months ago, I don't know.

2  Q.  Also, put differently, like 16 months after you had been

3  ongoing in business in the partnership, right?

4  A.  Yes.

5  Q.  Why did you wait so long?

6  A.  Because maybe it -- because we were friends and I didn't

7  know how to deal with the situation.

8  Q.  What do you mean by "the situation"?

9  A.  Deal with confronting the issue, like I knew -- in the back

10 of my head knew there was potentially going to be an issue.

11 Q.  OK.  Did you write that proposal yourself?

12 A.  I had help writing it.

13 Q.  And who helped you write it?

14 A.  A couple of friends of mine along with Jean Lin.

15 Q.  And you are aware that she is a former defendant in this

16 action?

17 A.  Yes.

18 Q.  How did she help you?

19 A.  She helped me -- I would come there.  I was concerned that

20 I didn't know what to do, I didn't know how to pull off the

21 conversation with him.  She was also in conversation about his

22 lack of participation and how absent he was, and I was becoming

23 very frustrated and resentful towards that.  And she was

24 coaching me along the way and helped me write this because she

25 has been in the industry for quite some time and has had

Fc2dvidh                    Grattan - redirect

1  experience with this matter.

2  Q.  Is she the only one that helped you?

3  A.  No, she is not.

4  Q.  Who else helped you or how many other people?

5  A.  Another colleague of mine, Farrah Sit.

6  Q.  And did you ultimately accept and adopt their language or

7  their --

8  A.  No, I did not.

9  Q.  Why?

10  A.  Why did I not adopt their language?

11  Q.  I mean, why did you not take their suggestion if you needed

12  help from these people?

13  A.  I did take their suggestions but I also put into account me

14  and Francis Bradley's relationship.

15  Q.  I might have misheard earlier.  Did you use the word "out

16  of fright" that you -- am I correct?

17  A.  Yeah.  He was having erratic reactions to our conversations

18  and towards the middle of the summer.

19  Q.  Those conversations being had on what?  The email?  Phone?

20  Text message?

21  A.  Phone, text.

22  Q.  You are frightened by his texts?

23  A.  Yeah.  He's quite emotional and I think he has difficulty

24  dealing with his anger sometimes.

25  Q.  Would you say the same of yourself?

Fc2dvidh

1          MR. RAO:  Objection.  Relevance.

2          THE COURT:  No.  Overruled.

3   A.  No.

4   Q.  And what were you afraid of?

5   A.  I was afraid of -- I was most afraid of not being able to

6   get my ideas out clearly, which was another reason I wrote the

7   email, because I had difficulty dealing with confrontation.

8          MR. PEK:  Nothing further, your Honor.

9          Thank you, Mr. Grattan.

10          THE COURT:  All right.  Mr. Grattan, you are excused.

11   You may step down.

12          (Witness excused)

13          THE COURT:  All right.  Mr. Pek, anything further?

14          MR. PEK:  No, your Honor.  That's it.

15          THE COURT:  All right.  Mr. Rao.

16          MR. RAO:  Very briefly, your Honor.

17          As the Court has previously pointed out, it was

18   plaintiffs' burden to show evidence as to why this Court should

19   issue an injunction.  Defense respectfully submits that

20   plaintiff has submitted little to no relevant evidence bearing

21   on the injunction.

22          The evidence as far as we understand it and the

23   relevant evidence so far as we understand it shows several

24   documented instances of Mr. Bradley and Mr. Grattan holding

25   themselves out as a partnership.  The evidence suggests

Fc2dvidh

1    Mr. Bradley's contribution to the fabrication of furniture was

2    minimal and that Mr. Grattan not only purchased the website but

3    designed the website, the logo, handled the marketing, and in

4    many ways contributed to the assets of the partnership, whether

5    it be through labor, through contacts, through marketing, or

6    actual financial contributions.

7              At the heart of this case, as I stated yesterday, is a

8    failure to --

9              THE COURT:  Can I stop you for a moment?

10             MR. RAO:  Yes, your Honor.

11             THE COURT:  You're giving what would appear to be a

12   closing argument on the evidentiary hearing.  To the extent

13   that it is a motion to deny the preliminary injunction at the

14   conclusion of the plaintiff's offer of evidence, I will reserve

15   on that until I have heard all of the evidence.  So if you have

16   any evidence that you want to submit, I'll turn to you for any

17   evidence you wish to submit, and then after the evidence is

18   closed I will listen to both of you with respect to any

19   arguments that you want --

20             MR. RAO:  Understood, your Honor.  You are correct, I

21   was leading up to a motion and it is premature and understood.

22   I have nothing further to say, your Honor.

23             THE COURT:  OK.  So I'll reserve on any motion by the

24   defense to deny the motion for a preliminary injunction.

25             Did you want to make any motion, Mr. Pek, at the

Fc2dvidh

1    conclusion of your case?

2          MR. PEK:  Well, I'm a little bit confused.  Make a

3    motion with respect to the pending motion that we are --

4          THE COURT:  Right.  Yes.  There is a preliminary

5    injunction motion that's pending.  We just finished your

6    presentation on your evidence, and the defense made a motion to

7    deny the preliminary injunction based upon the record so far.

8    Is there any motion that you had wanted to make?

9          MR. PEK:  Sure.

10          THE COURT:  I'm not saying you should.

11          MR. PEK:  OK.  I'll move for a directed verdict on the

12    defamation per se claim, the commercial defamation, based on

13    Plaintiffs' Exhibit 1.

14          THE COURT:  Whoa.  Whoa.  This is an evidentiary

15    hearing on the preliminary injunction.  So you are seeking a

16    preliminary injunction.  It's not the time for a motion for

17    summary judgment on the defamation per se claim.  I mean, we

18    had this evidentiary hearing for purposes of any evidentiary

19    disputes so that I could rule on the preliminary injunction

20    motion.  I'm not suggesting that when you finished presenting

21    your evidence there is any appropriate motion that you should

22    be making.

23          MR. PEK:  OK.

24          THE COURT:  But if there was, I would listen to it,

25    because the defendant said, Judge, based on the record so far,

Fc2dvidh

1    deny the motion for a preliminary injunction.  I said I will

2    reserve on that until I have heard all of the evidence,

3    including whether the defendant has any evidence to present.

4          Now, simply in fairness I turn to you to ask whether

5    there is any motion that you had wanted to make after you were

6    finished with your evidence on the preliminary injunction.

7          MR. PEK:  No.  It does somewhat escape me as to what

8    motion I would make unless your Honor is speaking with respect

9    to a motion to preclude or strike or something like that.  I

10   just want to remind the Court that there is a motion to compel

11   that is on for today that the witness didn't appear for, but

12   that is a separate issue.  So, no, I don't have any motion.

13         THE COURT:  OK.  So now, Mr. Rao --

14         MR. RAO:  Apologies, your Honor.  I neglected to

15   mention one thing, which is that these proceedings have dragged

16   out far beyond any of our -- at least on this side --

17   anticipation, and we are seeking some measure of fees and costs

18   for the preliminary injunction hearing based on plaintiffs'

19   default on the 15th --

20         THE COURT:  You've got to speak up.

21         MR. RAO:  Apologies, your Honor.  Is this better?

22         THE COURT:  It is, but you really don't have to do

23   that.  Just put the mike back on the desk, stand up, and speak

24   a little louder and the mike will pick up your voice.

25         MR. RAO:  Yes, your Honor.  I was saying --

Fc2dvidh

1            THE COURT:  Much better.

2            MR. RAO:  I was saying that we are moving for fees and

3    costs relating to this preliminary injunction hearing.

4            THE COURT:  OK.  I will reserve on that also.

5            Now, do you have any evidence that I'll -- it's the

6    defendant's opportunity to present anything in addition in

7    opposition to the motion for the preliminary injunction.

8            MR. PEK:  Your Honor, can I just interject very

9    quickly on the fees and costs request?  I just want to reserve

10   the right for posthearing briefing on the issue of fees.

11           THE COURT:  All right.  Mr. Rao.

12           MR. RAO:  No further evidence beyond what was in the

13   papers and in this hearing.

14           THE COURT:  OK.  So the plaintiff has rested, the

15   defendant has rested, and it is the plaintiff's motion for a

16   preliminary injunction.  I'll listen to anything that Mr. Pek

17   wants to tell me.  Then I will listen to anything Mr. Rao wants

18   to tell me.

19           MR. PEK:  May I take the podium, your Honor?

20           THE COURT:  Yes.  Sure.

21           MR. PEK:  Your Honor, I do agree and I do apologize

22   for this taking longer than it perhaps ought to have.  However,

23   I do absolutely respectfully submit that we have demonstrated a

24   likelihood of success on the merits of certain claims

25   pertaining directly to our motion for injunctive relief, as

Fc2dvidh

1     many of our claims seek equitable relief, for example, the

2     defamation per se claim but more to the point the false

3     designation of origin claim.  We have in evidence now emails

4     that confirm, on their face, that they're likely to confuse.

5     And this is not an infringement action versus -- we are not

6     claiming trademark infringement but it is a false designation

7     of origin action, and it is certainly confusing when, just

8     having established that the defendant has as a matter of course

9     commingled these two -- you know, wearing both hats when

10    Mr. Grattan testified that it was a marketing technique, I said

11    that's an elegant way -- I said to myself that is an elegant

12    way of saying something quite different.

13              And the evidence -- the documents that are in evidence

14    establish and satisfy, although there is not a wealth of

15    evidence, that the Nick Cope-related payments speak for

16    themselves.  As your Honor suggested, they come close to

17    speaking for themselves.  And we have established, although I

18    haven't had the opportunity to lay the foundation without

19    obtaining depositions or the witnesses themselves to prove the

20    $25,000 that had been unearthed pursuant to our subpoenas, so I

21    wouldn't burden the Court or belabor the Court with

22    inadmissible evidence.  However, one thing is certain, that we

23    have been very active and have not been sitting on our hands

24    since your Honor suggested that we take expedited discovery.

25    We issued 12 subpoenas and we had sought to enforce them.

Fc2dvidh

1        They have borne fruit, and we have learned that

2   Mr. Grattan, while he did not make -- consummate many sales,

3   did try to and some sales were made.  And whether or not they

4   were made under the Vidivixi name is not in dispute.  Where

5   there is an email address and a signature block containing the

6   website and right directly under, Mark -- you know, "Mark

7   Grattan."  The invoices alone, your Honor, I would respectfully

8   submit, on their face, now being in evidence, provide grounds

9   for a preliminary injunction.

10        There is no assurance that we have as to the

11  preservation of the goodwill, quality control or the use of the

12  partnership's trademark.  Yes, it is a partnership.  And I

13  understand that your Honor, as you said yesterday -- as your

14  Honor said yesterday, you encouraged the parties to begin

15  soliciting testimony speaking more directly to the injunction

16  rather than, say, to who contributed what, which would be

17  perhaps more appropriate for a partnership dissolution or a

18  final accounting, and I understand that.  However, as your

19  Honor is no doubt aware, one instance of customer confusion is

20  sufficient to warrant injunctive relief.  And I'm not saying

21  this is a landslide here, but I will respectfully submit that

22  the emails with the invoices and Nick Cope's payment alone make

23  plain that there is almost a certain likelihood of confusion.

24  And I understand that that's grammatically incorrect, but there

25  is no doubt that the risk of irreparable harm and the absence

Fc2dvidh

          1    of quality control -- of access to quality control on behalf of

          2    my client who at a bare minimum, an absolute bare minimum, is a

          3    50 percent owner in this partnership.  There's --

          4             THE COURT:  If there is a partnership that has rights

          5    to the name Vidivixi, isn't there a problem at the outset

          6    establishing trademark infringement or any of the other torts

          7    that spring from that?  Because each of the partners would have

          8    the right to use the name, wouldn't they?  And so if that's

          9    right, then the fact that there could be confusion, as you say,

         10    is one of the elements that you never really get to.

         11             If both people have the right to use the name, you

         12    don't get to the issue of whether there is infringement because

         13    there is a likelihood of confusion or blurring or any of the

         14    other possible elements for the intellectual property torts.

         15             MR. PEK:  Understood, your Honor, but unfair

         16    competition is one of them, and unfair competition under the

         17    Lanham Act is not specific to registered marks or --

         18             THE COURT:  Yes, but --

         19             MR. PEK:  I understand what your Honor is saying, I

         20    do.  And that being said, I would be most curious to know what

         21    going forward this Court would decide with respect to the

         22    pieces of furniture that -- if there is a partnership or, you

         23    know, are in storage and the no sale restriction, how we can

         24    walk out of here without at least one party being extremely

         25    concerned with respect at least to the furniture or the IP or,

Fc2dvidh

1    going forward, the use of the Mark.

2              I am hard-pressed to think of your Honor's order -- an

3    order from your Honor that could preserve or restore the status

4    quo if it has been upset.  Clearly, this is no doubt a

5    partnership dissolution, and I don't wish to take any more of

6    the Court's time.  But I do respectfully submit that we have

7    submitted enough, that the invoices speak for themselves and

8    that the emails speak for themselves, and that under the, you

9    know, the Lanham Act and just the policies underlying unfair

10   competition, I understand why the wrinkle -- a very critical

11   wrinkle is that the partnership had owned the IP as a result of

12   the writing arising under common law, but that is where we

13   stand.

14             That is why I amended the complaint.  I have not

15   sought to drag this out whatsoever.  With all due respect,

16   opposing counsel's application for fees is absolutely absurd,

17   in my estimation, and that is the only reason I wish to reserve

18   posthearing briefing on that issue.

19             And I don't have anything more to say.  I don't want

20   to take your Honor's time.  Your Honor has been very gracious

21   in granting us an audience and --

22             THE COURT:  I don't grant an audience; I have a

23   hearing.  OK.

24             MR. PEK:  Thank you, your Honor.

25             THE COURT:  Mr. Rao.

Fc2dvidh

1            MR. RAO:  Thank you, your Honor.

2            This case has, defendants respectfully submit, always

3     been speculation in search of a theory.  The idea that

4     Mr. Grattan was violating the Lanham Act or the unfair

5     competition laws when he was a business partner of

6     Mr. Bradley's and was so clearly promoting the interests of

7     that partnership is simply unsupported by the evidence.  The

8     fact that he -- the fact of the matter is we have established

9     that all of the supposed sales, except for the Nick Cope

10    invoice, came through other channels, that Mr. Grattan has been

11    a woodworker for a very long time and has been running a

12    business and that those other inquiries were not related to

13    Vidivixi, and, if anything, he was trying to promote Vidivixi

14    amongst his existing client base to generate sales.

15           There is clear documentation of both plaintiff and

16    defendant signing documents as principals of Vidivixi.  There

17    is clear documentation showing that Mr. Grattan was integrally

18    involved in the design and promotion of the brand of Vidivixi,

19    including the website and all of the intellectual property.  So

20    it's at best unclear and at worst baseless to argue that

21    Mr. Grattan has somehow violated trademark laws.

22           Regarding plaintiffs' other claims, which are many,

23    they simply haven't presented evidence to bear their burden of

24    proof.  You know, we have claims for defamation.  We have

25    claims for deceptive trade practices.  We have a whole host of

Fc2dvidh

1    kitchen-sink claims, but ultimately it comes down to the issue

2    of whether Mr. Grattan made sales of Vidivixi furniture, and

3    the evidence hasn't shown that there was any breach of

4    fiduciary duty or breach of partnership obligation.

5         The only thing the evidence has shown is that

6    Mr. Bradley attempted to use a trademark filing and an LLC

7    filing to issue demand letters and create threats from an

8    entity that didn't exist even four months ago.  So I'm not sure

9    how that establishes in any way a breach of a partnership duty,

10   but I leave that to plaintiffs to bear the burden of proof.

11        As far as the injunction factors, we respectfully

12   submit that plaintiffs have not borne their burden on

13   likelihood of success on the merits.  We respectfully submit

14   that there is no irreparable harm possible from pure money

15   damages that may have arisen from sales of furniture.  Those

16   issues could be dealt with in a partnership accounting.

17        We respectfully submit that the balance of equities do

18   not favor plaintiff, and, in fact, Mark Grattan was an integral

19   part of Vidivixi.  He designed the furniture.  He was always

20   entitled to some portion of the profits of the sales.  That the

21   current state of affairs is where plaintiffs have taken

22   furniture out of the showroom, put it into a much more

23   expensive storage space out of sight of any market or client

24   base is not a preservation of the status quo but a huge upset

25   of the status quo and it is actually unreasonable from a

Fc2dvidh

1    business perspective.  It just doesn't make sense.

2           And, finally, there is no public interest in issuing

3    this injunction.  And we, defendants, respectfully submit that

4    the Court should deny the injunction.

5           Thank you, your Honor.

6           THE COURT:  Now, you also said that you were looking

7    for some form of costs from the preliminary injunction.  I

8    would certainly not award costs without a motion that sought

9    costs and explained what the basis for the motion is because it

10   makes a big difference.  There are various sources of costs and

11   they require different showings.  Some require bad faith and

12   they are very precise, and so a simple statement that we seek

13   costs is not sufficient to get costs.

14          So if the spirit moved you and you thought you wanted

15   to make a motion for costs, you could make a motion for costs.

16   I am not going to give legal advice on the subject of whether

17   to make a motion, but I can tell you that it is extremely

18   difficult to get costs because the showing is extremely high

19   and that oftentimes more cost and expense is spent making such

20   a motion which ultimately is unsuccessful so that the costs are

21   sunk costs and wasted.

22          MR. RAO:  Understood, your Honor.

23          THE COURT:  I'm sorry.

24          MR. RAO:  We understand, your Honor, and if we make

25   such a motion we hope to support it with evidence that the

Fc2dvidh

1    Court would find compelling as a reason to grant such motion.

2             THE COURT:  All I can do is tell you that I have grave

3    doubts as to the success of that motion.

4             MR. RAO:  I understand.

5             THE COURT:  I don't decide anything until it is

6    briefed on the facts and the law.

7             Now, I'll take the preliminary injunction motion under

8    advisement and I'll decide it, hopefully, soon.  So, thank you.

9             Now, the principals have had an opportunity to listen

10   to each other and hear all of the evidence; so have the

11   lawyers.  There appears to be common ground between the parties

12   that there was a working relationship which the parties have

13   described as a partnership for some period of time, and the

14   plaintiff has even said it comes down to a question of

15   dissolution of the partnership and the division of partnership

16   assets.  It is truly unfortunate that you all have not yet

17   settled this case.  I urged you to do that.  I sent you to the

18   Magistrate Judge but so far that's been unsuccessful.

19            What do the parties have to look forward to?  Putting

20   aside the preliminary injunction, whatever happens on the

21   preliminary injunction, the next stage is to complete

22   discovery.  I tried to have an expedited trial on everything

23   but the defendant said no.  The defendant wanted to complete

24   discovery and then make a dispositive motion, which would be a

25   motion for summary judgment at the conclusion of all of the

Fc2dvidh

discovery.  Then if that motion were not granted, you all would

go to trial.

         Now, I can tell you that what will happen is that both

sides will expend a considerable amount of attorneys' fees,

which is a matter of concern to me simply in the interest of

justice.  I'm here to resolve disputes.  If a case should be

tried, it should be tried.  If it should be settled, it should

be settled.  But the issue of attorneys' fees should not be

something that clients have to deal with.  Unfortunately,

clients need lawyers and lawyers end up getting paid.

         But it's up to the clients ultimately to make the

decisions as to what they're going to do, and those factors

include what's in the best interest of the clients at the end

of the day.  It's clear there was a working relationship here

which the parties have no desire to put back together, and

there's got to be some resolution among all of you.  Whether

that comes after a lot more attorneys' fees on motions for

summary judgment or at trial, there still has to be a

resolution among all of you.  And the lawyers should attempt to

resolve it, but it's the clients who should be the driving

force behind a reasonable resolution.

         You all got along for a considerable period of time.

The testimony indicates that you have mutual friends and

acquaintances in the industry.  I am limited by what I can say

because I'm the trial judge.  I also have a motion that's

Fc2dvidh

1    pending before me.  I will decide the motion.  I will then

2    preside over the subsequent proceedings.  But in the interest

3    of justice, I can tell you that you should talk about

4    settlement, because it's only by settling that both sides can

5    walk away without either side concluding that they have lost.

6    It is the only way that both sides can come away with a

7    situation that they can go on about their professional lives.

8    Neither side has an interest in being consumed by the

9    litigation and by being eaten up by attorneys' fees.

10          So, in the interest of justice, I can tell you that

11   you should talk about settlement, because what that does is it

12   takes out of the equation either side's fear that by talking

13   about settlement they appear to be signaling weakness or

14   something like that, which is really not a reasonable position

15   in any event.  But when talk about settlement because the Judge

16   tells you to talk about settlement, it's not a sign of

17   litigation weakness by either side.

18          So I told you to talk about settlement.  I will take

19   the motion under advisement.  I will decide the motion in the

20   near future.  It will still take a little time for me to decide

21   the motion, but if you reach any resolution, you should send me

22   a letter indicating that.  OK.  Good afternoon, all.

23          MR. PEK:  Thank you, your Honor.

24          MR. RAO:  Thank you, your Honor.

25                              -  -  -

INDEX OF EXAMINATION

Examination of:                                    Page

MARK ANTHONY GRATTAN

Direct By Mr. Pek  . . . . . . . . . . . . . 186

Cross By Mr. Rao . . . . . . . . . . . . . . 261

Redirect By Mr. Pek  . . . . . . . . . . . . 277

PLAINTIFF EXHIBITS

Exhibit No.                                    Received

 2   . . . . . . . . . . . . . . . . . . . 229

 3   . . . . . . . . . . . . . . . . . . . 233

 4   . . . . . . . . . . . . . . . . . . . 240

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 AC  . . . . . . . . . . . . . . . . . . . 273